UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

2026 JUL -9 P 12: 41

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY, MEREDITH BENDIAN, in her individual capacity and official capacity as Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE, OFFICER BERNHARD, Badge No. 61, first name presently unknown, SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20, Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

NOTICE OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Motion Day: August 3, 2026
Oral Argument: Not requested unless the Court determines that oral argument would assist the Court

PLEASE TAKE NOTICE that Plaintiff Christopher Peterson, appearing pro se,

will move before the Honorable André M. Espinosa, U.S.M.J., or such other Judge

as the Court may designate, on August 3, 2026, or as soon thereafter as the Court

may consider the matter, for an Order granting Plaintiff leave to file the Proposed Second Amended Complaint and Jury Demand.

PLEASE TAKE FURTHER NOTICE that Plaintiff brings this motion pursuant to Federal Rule of Civil Procedure 15(a)(2), to the extent necessary Federal Rule of Civil Procedure 15(d), Local Civil Rule 15.1, and the Court's prior Order permitting Plaintiff to file a motion for leave to amend.

PLEASE TAKE FURTHER NOTICE that Plaintiff states that this motion should be treated as opposed because Defendants previously moved to dismiss Plaintiff's pleading and Plaintiff has not obtained Defendants' consent to the filing of the Proposed Second Amended Complaint.

PLEASE TAKE FURTHER NOTICE that in support of this motion, Plaintiff relies upon the following papers and materials:

1. Plaintiff's Certification in Support of Motion for Leave to File Second Amended Complaint;
2. Plaintiff's Memorandum of Law in Support of Motion for Leave to File Second Amended Complaint;
3. Exhibit A — Clean Proposed Second Amended Complaint and Jury Demand;
4. Exhibit B — Marked/Redline Version of Proposed Second Amended Complaint Showing Changes from Prior Amended Complaint;
5. Exhibit C — Comparison Chart Summarizing Major Amendments;
6. Exhibit D — Certification of Process Server Jyll Jakes;
7. The proposed form of Order submitted with this motion; and
8. The pleadings, filings, orders, and record in this matter.

PLEASE TAKE FURTHER NOTICE that Plaintiff respectfully requests that the

Court enter an Order granting Plaintiff leave to file the Proposed Second Amended

Complaint and Jury Demand attached as Exhibit A, deeming it the operative

pleading upon filing, and granting such other and further relief as the Court deems

just and proper.

Respectfully submitted,

/s/ Christopher Peterson
Christopher Peterson
Plaintiff Pro Se
Address on file with the Court
christopherpeterson847@gmail.com

Dated: July 9, 2026

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH
OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY,
MEREDITH BENDIAN, in her individual capacity and official capacity as
Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD
HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE,
OFFICER BERNHARD, Badge No. 61, first name presently unknown,
SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE
BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief
of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20,
Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

**PLAINTIFF'S CERTIFICATION IN SUPPORT OF MOTION FOR LEAVE TO
FILE SECOND AMENDED COMPLAINT**

I, Christopher Peterson, certify as follows:

1. I am the Plaintiff in this matter. I am appearing pro se.

2. I submit this Certification in support of my motion for leave to file the

   Proposed Second Amended Complaint and Jury Demand.

3. I make this Certification based upon my personal knowledge, review of

   records, review of court filings and orders, recordings, transcripts, police

reports, OPRA records, municipal records, emails, and other materials in my possession, except where stated upon information and belief.

4. This motion is brought pursuant to Federal Rule of Civil Procedure 15(a)(2), to the extent necessary Federal Rule of Civil Procedure 15(d), Local Civil Rule 15.1, and the Court's prior Order permitting Plaintiff to seek leave to amend.

5. I respectfully request leave to file the Proposed Second Amended Complaint because it narrows, reorganizes, clarifies, and supplements the prior pleading.

6. The Proposed Second Amended Complaint does not seek review, reversal, modification, enforcement, or supervision of any state-court custody order, restraining order, parenting-time order, criminal-court order, evidentiary ruling, venue ruling, or family-court ruling.

7. The Proposed Second Amended Complaint instead seeks damages and appropriate prospective relief for Defendants' alleged independent conduct, including alleged misuse of law-enforcement authority, improper disclosure and use of sensitive records, materially false or misleading allegations, unlawful detention, interference with protected recording activity, interference with lawful federal service of process, and ongoing judicial-

security classifications allegedly imposed without notice or an opportunity to be heard.

8. The Proposed Second Amended Complaint removes or narrows claims and defendants that Plaintiff does not seek to pursue in the same manner as the prior pleading.

9. The Proposed Second Amended Complaint adds factual detail and clarifying allegations concerning the specific conduct of the defendants Plaintiff seeks to proceed against.

10. The Proposed Second Amended Complaint adds and clarifies allegations concerning Groezinger's September 16, 2022 recorded interview with the Bergen County Prosecutor's Office, the recorded custody exchanges, and the superseding indictment.

11. The Proposed Second Amended Complaint adds and clarifies allegations concerning the June 5, 2025 Oakland police encounter, including the alleged shift from an unverified car-seat allegation to a recording/FRO enforcement theory.

12. The Proposed Second Amended Complaint adds and clarifies allegations concerning the alleged release, use, possession, and transmission of Waldwick, Ramsey, Hawthorne, juvenile or juvenile-related, sealed, expunged, confidential, or non-public law-enforcement records.

13. The Proposed Second Amended Complaint adds and clarifies allegations concerning the alleged Ramsey juvenile-records disclosure, including the alleged involvement of municipal records channels, the Borough Clerk/records custodian, and police-chief approval.

14. The Proposed Second Amended Complaint adds and clarifies allegations concerning materials submitted to Dr. Marc Tarle, including Plaintiff's allegation that Groezinger submitted a "book" of information to Dr. Tarle that contained Plaintiff's confidential juvenile or juvenile-related records and other sensitive records.

15. The Proposed Second Amended Complaint adds and clarifies allegations concerning The Behaved Brain, LLC, including alleged extra-judicial police reports, police-security requests, threatened affidavits, and disputed safety accusations.

16. The Proposed Second Amended Complaint adds and clarifies allegations concerning alleged judicial-security classifications, JSMART-related threat-risk information, court-security alerts, courthouse-security treatment, and lack of notice or opportunity to contest any ongoing classification.

17. The Proposed Second Amended Complaint also adds allegations concerning interference with lawful federal service of process after this federal action was filed.

18. Specifically, the Proposed Second Amended Complaint adds Officer Bernhard, Badge No. 61, first name presently unknown, and Sergeant Christopher Sanchez as defendants based on alleged interference with lawful service of federal litigation papers.

19. Plaintiff alleges that the service-of-process allegations arose after this federal action was filed and after Plaintiff attempted to serve federal litigation papers on defendants.

20. Plaintiff is submitting the signed Certification of Process Server Jyll Jakes in support of those allegations.

21. Attached as Exhibit A is a clean copy of Plaintiff's Proposed Second Amended Complaint and Jury Demand.

22. Attached as Exhibit B is a marked/redline version of the Proposed Second Amended Complaint showing changes from the prior Amended Complaint.

23. Attached as Exhibit C is a comparison chart summarizing the major amendments, newly added allegations, narrowed claims, added defendants, and changes intended to address deficiencies identified in prior motion-to-dismiss briefing and the Court's dismissal order.

24. Attached as Exhibit D is the signed Certification of Process Server Jyll Jakes.

25. I understand that Local Civil Rule 15.1 requires a party seeking leave to amend to attach the proposed amended pleading and to show how it differs from the prior pleading.

26. Because the Proposed Second Amended Complaint substantially reorganizes, narrows, clarifies, and rewrites the prior Amended Complaint, the marked/redline version necessarily shows substantial deletions and additions.

27. The marked/redline version is submitted to comply with Local Civil Rule 15.1 and to allow the Court and parties to see the changes between the prior Amended Complaint and the Proposed Second Amended Complaint.

28. The comparison chart is submitted to assist the Court because the Proposed Second Amended Complaint is substantially reorganized and because a traditional redline may be difficult to follow.

29. I am not seeking leave to amend for purposes of delay, harassment, or bad faith.

30. I am seeking leave to amend so that the operative pleading accurately reflects the defendants, claims, factual allegations, later-discovered information, and post-filing events that Plaintiff seeks to pursue.

31. I respectfully submit that the Proposed Second Amended Complaint will assist the Court by presenting the claims in a clearer and more organized manner than the prior Amended Complaint.

32. I further respectfully submit that the Proposed Second Amended Complaint will not unduly prejudice Defendants because the case remains at the pleading stage and the Proposed Second Amended Complaint is being submitted before discovery has proceeded on the merits of the newly clarified claims.

33. I also respectfully submit that amendment is not futile because the Proposed Second Amended Complaint pleads specific factual allegations supporting claims under 42 U.S.C. § 1983, the New Jersey Civil Rights Act, and related theories, including malicious prosecution, due process, First Amendment retaliation, unlawful detention, Monell liability, abuse of process, service-of-process interference, and prospective relief concerning court-security classifications.

34. I respectfully request that the Court grant Plaintiff leave to file the Proposed

Second Amended Complaint and Jury Demand attached as Exhibit A.

35. I further request that, upon granting leave, the Court deem the Proposed

Second Amended Complaint filed as the operative pleading or permit

Plaintiff to file it promptly in accordance with the Court's instructions.

I certify under penalty of perjury that the foregoing is true and correct.


Respectfully submitted,

/s/ Christopher Peterson
Christopher Peterson
Plaintiff Pro Se
Address on file with the Court
christopherpeterson847@gmail.com

Dated: July 9, 2026

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY, MEREDITH BENDIAN, in her individual capacity and official capacity as Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE, OFFICER BERNHARD, Badge No. 61, first name presently unknown, SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20, Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................. 3

PROCEDURAL AND FACTUAL BACKGROUND RELEVANT TO AMENDMENT ......................................................... 5

LEGAL STANDARD ....................................................... 8

ARGUMENT ..........................................................10

I. LEAVE TO AMEND SHOULD BE FREELY GRANTED UNDER RULE 15 ............................................................10

substantially reorganized and rewritten. Current D.N.J. Local Rule 15.1 requires the proposed amended pleading and a version showing differences by striking/bracketing deletions and underlining additions.   Rule 15(a)(2) and Rule 15(d) supply the federal amendment and supplemental-pleading standards.

## ARGUMENT

## I. LEAVE TO AMEND SHOULD BE FREELY GRANTED UNDER RULE 15.

The Rule 15 standard favors amendment. The Proposed Second Amended Complaint is not an attempt to delay the case or burden Defendants. It is intended to clarify the pleading, narrow the claims, remove or limit theories, add specific factual allegations, and address issues raised by prior motion practice and the Court's dismissal order.

Plaintiff is pro se and has prepared a proposed amended pleading that more clearly separates the claims, identifies the defendants against whom each claim is asserted, and expressly limits the relief sought so that the pleading does not seek review or reversal of state-court decisions.

The Proposed Second Amended Complaint also adds factual detail concerning the specific conduct of each defendant or group of defendants. It separates factual allegations into sections and separates the claims into nine counts. This organization will assist the Court and the parties in evaluating the claims.

Because Rule 15 requires that leave be freely given when justice so requires, and because the amendment is intended to cure pleading issues and clarify the operative allegations, leave should be granted.

## II. THE PROPOSED AMENDMENT IS NOT SOUGHT IN BAD FAITH AND WILL NOT CAUSE UNDUE PREJUDICE.

There is no bad faith or improper purpose. Plaintiff seeks leave to amend because the Proposed Second Amended Complaint reflects later-discovered facts, post-filing events, and a narrower, clearer statement of the claims Plaintiff seeks to pursue.

The amendment does not unfairly surprise Defendants. Many of the factual categories were already part of the dispute, including the alleged criminal prosecution, custody-exchange allegations, records requests and disclosures, Oakland police encounter, Behaved Brain allegations, and courthouse-security

issues. The proposed amendment clarifies and narrows those allegations, rather than expanding the case in a way that would create unfair prejudice.

The proposed amendment also adds allegations concerning service-of-process interference, which occurred after the federal action was filed. Those allegations are tied to the prosecution of this case and are supported by the signed Certification of Process Server Jyll Jakes.

This matter remains at a procedural stage where amendment will not cause undue prejudice. Defendants will have a full opportunity to respond to the Proposed Second Amended Complaint if leave is granted.

## III. SUPPLEMENTAL ALLEGATIONS ARE APPROPRIATE UNDER RULE 15(d).

To the extent the Proposed Second Amended Complaint includes events occurring after the prior pleading, supplementation is proper under Rule 15(d).

The post-filing allegations include alleged interference with lawful federal service of process by Officer Bernhard, Sergeant Sanchez, and John Does. Those allegations are directly connected to this federal action because they concern attempts to serve federal litigation papers on defendants.

violence issues, or the correctness of any state-court ruling. Instead, Plaintiff seeks damages and prospective relief for independent conduct allegedly committed by defendants.

The Proposed Second Amended Complaint also narrows the private-defendant allegations. It does not assert liability merely because a private person complained, retained counsel, appeared in court, or made legal arguments. It alleges knowing use of materially false factual allegations, non-public police information, municipal records channels, and state enforcement mechanisms to cause prosecution, detention, records misuse, evaluations, restrictions, or other constitutional injury.

The proposed claims are therefore not facially futile.

**A**. The malicious-prosecution allegations are plausibly pleaded.

The Proposed Second Amended Complaint alleges that Groezinger supplied materially false or misleading factual allegations to prosecutor's investigators concerning recorded custody exchanges, that she knew the exchanges were recorded, and that those allegations became factual predicates for the superseding indictment and the State's continued reliance on those allegations.

The Proposed Second Amended Complaint further alleges that Ritondale initiated or supported criminal charges through materially false or misleading charging

narratives, including misstatements or omissions concerning Plaintiff's recorded statements and the surrounding context.

The pleading alleges favorable termination, lack of probable cause, deprivation of liberty, and damages. Those allegations are sufficient to proceed past the leave-to-amend stage.

**B**. The records-disclosure and due-process allegations are plausibly pleaded.

The Proposed Second Amended Complaint alleges that Gurney, Messner, Bendian, Waldwick, Ramsey, Groezinger, Kleiner, and John Does participated in the acquisition, approval, release, possession, transmission, dissemination, or use of sensitive law-enforcement records, including juvenile or juvenile-related records and other confidential or non-public materials.

Plaintiff alleges that those records were not obtained or used through ordinary neutral public access, but through law-enforcement status, police-chief approval, municipal records channels, records-custodian action, or informal law-enforcement relationships.

The pleading also alleges later discovery of those records in materials obtained from Dr. Tarle's office and later use of those records in proceedings or evaluations

affecting Plaintiff's parental rights, liberty interests, privacy interests, and reputation.

These allegations are sufficient to warrant amendment and are not facially futile.

**C**. The Oakland First and Fourth Amendment allegations are plausibly pleaded.

The Proposed Second Amended Complaint alleges that Oakland officers detained or prolonged Plaintiff's detention based on an unverified car-seat allegation and then shifted the basis of the encounter to a recording/FRO theory after the car-seat issue could not be verified.

The pleading further alleges that Oakland had prior documented notice that materially similar custody-exchange recording did not constitute probable cause for a restraining-order violation, yet officers nevertheless threatened enforcement based on recording activity during a public police encounter.

Plaintiff alleges both unreasonable seizure and chilling of protected recording or documentation activity. Those allegations are sufficient to permit amendment.

**D**. The Monell allegations are plausibly pleaded for purposes of amendment.

The Proposed Second Amended Complaint alleges municipal policies, customs, practices, or failures involving Waldwick, Oakland, and Ramsey.

**G.** The service-of-process allegations are proper supplemental allegations.

The Proposed Second Amended Complaint adds Officer Bernhard and Sergeant Sanchez based on alleged interference with lawful federal service of process after this case was filed.

The allegations are supported by the signed Certification of Process Server Jyll Jakes and concern litigation activity in this case. Plaintiff alleges that the process server was performing lawful service of federal litigation papers, that Waldwick officers treated the service attempt as trespassing or suspicious conduct, and that law-enforcement or motor-vehicle information was used or threatened to be used in a manner that burdened or chilled Plaintiff's access to court.

Those allegations are sufficiently related to the case and are properly included under Rule 15(d).

V. PLAINTIFF HAS COMPLIED WITH LOCAL CIVIL RULE 15.1.

Plaintiff has attached the required materials.

**Exhibit A** is the clean Proposed Second Amended Complaint and Jury Demand.

**Exhibit B** is the marked/redline version showing changes from the prior Amended Complaint.

**Exhibit C** is a comparison chart summarizing the major amendments.

**Exhibit D** is the signed Certification of Process Server Jyll Jakes.

Because the Proposed Second Amended Complaint substantially rewrites, reorganizes, and narrows the prior pleading, the redline necessarily shows substantial deletions and additions. Plaintiff has also included Exhibit C to assist the Court in understanding the major changes.

## VI. LEAVE TO AMEND WILL PROMOTE CLARITY AND JUDICIAL EFFICIENCY.

Granting leave will allow the case to proceed on a clearer, narrower, and better organized pleading.

The Proposed Second Amended Complaint identifies the defendants, claims, factual categories, and relief sought with more precision. It removes confusion about whether Plaintiff seeks review of state-court decisions and makes clear that Plaintiff seeks relief for alleged independent constitutional violations.

Allowing amendment will assist the Court and the parties by making the operative pleading clearer before further proceedings.

## CONCLUSION

For the foregoing reasons, Plaintiff Christopher Peterson respectfully requests that the Court grant Plaintiff leave to file the Proposed Second Amended Complaint and Jury Demand attached as **Exhibit A**, deem the Proposed Second Amended Complaint the operative pleading upon filing, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Christopher Peterson
Christopher Peterson
Plaintiff Pro Se
Address on file with the Court
christopherpeterson847@gmail.com

Dated: July 9, 2026

## EXHIBIT A

## CLEAN PROPOSED SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff submits this clean copy of the Proposed Second Amended Complaint and Jury Demand in support of Plaintiff's Motion for Leave to File Second Amended Complaint.

This is the pleading Plaintiff respectfully requests leave to file as the operative complaint in this action.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY, MEREDITH BENDIAN, in her individual capacity and official capacity as Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE, OFFICER BERNHARD, Badge No. 61, first name presently unknown, SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20, Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

PROPOSED SECOND AMENDED COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. This civil-rights action does not seek review, reversal, modification, or supervision of any state-court judgment, custody order, restraining order, parenting-time order, or criminal-court order.

2. Plaintiff seeks damages and appropriate prospective relief for independent conduct by defendants that occurred before, outside, or apart from any state-court adjudication.

3. The claims arise from defendants' alleged misuse of law-enforcement authority, non-public police records, materially false or misleading allegations, judicial-

security classifications, and state enforcement mechanisms to cause restrictions, prosecution, detention, intimidation, and deprivation of Plaintiff's constitutional rights.

4. Plaintiff alleges that private defendants did not merely complain in good faith or advocate in court. Plaintiff alleges that certain private defendants knowingly supplied materially false, misleading, or objectively unreliable information; used or helped obtain sensitive law-enforcement records; and participated in conduct that foreseeably caused state action against Plaintiff.

5. Plaintiff alleges that certain municipal and law-enforcement defendants relied on accusations without reasonable verification, released or disseminated sensitive records without lawful basis, threatened Plaintiff with arrest for protected recording activity, and participated in conduct that violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments.

6. Plaintiff further alleges that Ramsey and Bendian released or caused the release of confidential juvenile or juvenile-related law-enforcement records through municipal and police records channels despite legal duties to withhold, redact, deny, or seek legal review before disclosure.

7. Plaintiff alleges that Defendant Robin Morante, in her official capacity as Chief of Court and Judicial Security for the State of New Jersey, oversees or participates in the administration, dissemination, maintenance, or

implementation of court-security threat designations, JSMART-related threat-risk information, courthouse-security alerts, or similar judicial-security classifications affecting Plaintiff and other pro se litigants.

8. Plaintiff does not ask this Court to determine custody, parenting time, best interests, domestic violence issues, or the correctness of any state-court ruling. Plaintiff seeks redress for defendants' own conduct and the independent injuries caused by that conduct.

## SCOPE OF CLAIMS AND WHAT PLAINTIFF IS NOT ASKING THIS COURT TO DO

9. Plaintiff does not seek review, reversal, modification, enforcement, or invalidation of any state-court custody order, restraining order, parenting-time order, criminal-court order, evidentiary ruling, venue ruling, or family-court ruling.

10. Plaintiff does not ask this Court to decide custody, parenting time, best interests of the children, domestic violence issues, or the correctness of any state-court ruling.

11. Plaintiff seeks damages and appropriate prospective relief for defendants' own independent conduct, including conduct that occurred before state-court rulings, outside state-court proceedings, through law-enforcement channels, through allegedly false or misleading reports to law enforcement, through alleged misuse of confidential records, through alleged threats or coercive

conduct, and through ongoing judicial-security classifications allegedly imposed without notice or opportunity to be heard.

12. Plaintiff alleges that the injuries were caused by defendants' conduct, not by the mere existence of state-court orders.

13. As to Defendant Robin Morante, Plaintiff seeks prospective declaratory and injunctive relief only, directed to any ongoing court-security designation, JSMART-related designation, courthouse-security alert, threat-risk classification, or dissemination of threat-risk information concerning Plaintiff. Plaintiff does not seek damages from Morante for judicial rulings or for any judge's adjudicative acts.

## PARTIES

14. Plaintiff Christopher Peterson is an individual residing in New Jersey.

15. Defendant Kaitlyn Groezinger is an individual residing in New Jersey and is sued in her individual capacity.

16. Defendant Bryan Gurney is a former Ramsey Police Chief and current or former public-safety official. He is sued in his individual capacity.

17. Defendant Bryan Gurney is sued because Plaintiff alleges that Gurney did not act merely as a private grandfather or private citizen. Plaintiff alleges that Gurney used his law-enforcement status, law-enforcement relationships, access, influence, and/or authority as a police chief or public-safety official to

obtain, approve, facilitate, or cause the release of sensitive police records, domestic-violence-related records, and juvenile or juvenile-related records concerning Plaintiff.

18. Defendant Mark Messner was, at relevant times, Chief of Police for the Borough of Waldwick. He is sued in his individual capacity.

19. Defendant Mark Messner is sued because Plaintiff alleges that he personally approved, authorized, facilitated, or permitted the release of sensitive Waldwick police records concerning Plaintiff after direct or indirect communication with Gurney.

20. Defendant Borough of Waldwick is a municipal entity in New Jersey.

21. Defendant Borough of Oakland is a municipal entity in New Jersey.

22. Defendant Borough of Ramsey is a municipal entity in New Jersey. Plaintiff sues Ramsey only for claims arising from the alleged release, disclosure, dissemination, or failure to protect Plaintiff's confidential juvenile or juvenile-related law-enforcement records through Ramsey municipal and police records channels.

23. Defendant Meredith Bendian was, at relevant times, the Borough Clerk and/or records custodian for the Borough of Ramsey. She is sued in her individual capacity for her personal participation in receiving, processing, routing, transmitting, approving, releasing, or failing to prevent the release of

Plaintiff's confidential juvenile or juvenile-related law-enforcement records, and in her official capacity to the extent prospective or municipal records-related relief is appropriate.

24. Plaintiff alleges that Bendian had served as Ramsey Borough Clerk since approximately 2010 and was a trained and experienced municipal records official.

25. Plaintiff alleges that Bendian was a Registered Municipal Clerk and, by virtue of her position, training, experience, and records-custodian responsibilities, knew or reasonably should have known that juvenile or juvenile-related law-enforcement records are confidential, exempt from ordinary public disclosure, and may not be released to a private party without lawful authorization, court authorization, or legally sufficient justification. Plaintiff further alleges that Bendian's knowledge is confirmed by a later OPRA response in which Bendian denied a request for juvenile records on the ground that juvenile records are exempt from disclosure under OPRA.

26. Defendant Donald Harvey was, at relevant times, a law-enforcement officer or supervisor for the Borough of Oakland. He is sued in his individual capacity.

27. Defendant Matthew Lopez was, at relevant times, a law-enforcement officer for the Borough of Oakland. He is sued in his individual capacity.

28. Defendant Hank Anderson was, at relevant times, a law-enforcement officer for the Borough of Oakland. He is sued in his individual capacity.

29. Defendant Dylan Ritondale was, at relevant times, a law-enforcement officer for the Borough of Waldwick. He is sued in his individual capacity.

30. Defendant Officer Bernhard, Badge No. 61, first name presently unknown, was, at relevant times, a law-enforcement officer for the Borough of Waldwick. He is sued in his individual capacity. Plaintiff alleges that Bernhard contacted a retained process server during service of Plaintiff's federal complaint, instructed the process server not to return to Groezinger's residence because she was considered to be trespassing, and thereby interfered with or burdened lawful service of federal litigation papers.

31. Defendant Sergeant Christopher Sanchez was, at relevant times, a supervisory law-enforcement officer for the Borough of Waldwick. He is sued in his individual capacity. Plaintiff alleges that Sanchez was one of the Waldwick officers present during the April 17, 2020 incident that resulted in Plaintiff's removal from the home and later criminal charges. Plaintiff further alleges that Sanchez later spoke with the retained process server after Officer Bernhard's August 19, 2025 call, advised that Waldwick police had obtained the process server's cellular telephone number by contacting the registered owner of the vehicle she was driving, advised the process server not to return

to Groezinger's residence, and thereby ratified, continued, or participated in the interference with lawful service of federal litigation papers. Plaintiff alleges Sanchez's April 17, 2020 involvement is relevant to knowledge, pattern, motive, relationship to the underlying dispute, and the non-neutral nature of the later service-of-process interference.

32. Defendant Lawrence Kleiner is an attorney who represented Groezinger in state proceedings. Plaintiff does not sue Kleiner for ordinary legal advocacy, legal argument, filing papers, courtroom statements, or representing his client in court. Plaintiff sues Kleiner only for alleged extra-judicial or non-privileged factual conduct, including the alleged knowing use, possession, transmission, dissemination, or reinforcement of materially false factual assertions and non-public law-enforcement records to trigger, reinforce, or perpetuate state action against Plaintiff. Plaintiff alleges that Kleiner's actionable conduct includes, without limitation, extra-judicial threats or communications concerning custody-exchange enforcement, the alleged use or reinforcement of non-public police materials, Hawthorne body-worn-camera footage, Ramsey juvenile or juvenile-related records, and factual theories that were later repeated to law enforcement, prosecutors, or evaluators despite recordings or documents contradicting them.

33. Defendant The Behaved Brain, LLC is a New Jersey limited liability company. Plaintiff does not sue Behaved Brain for merely complying with a subpoena, obeying a court order, asserting ordinary confidentiality objections, directing Plaintiff to counsel, or refusing to release records pursuant to a court order. Plaintiff sues Behaved Brain only for alleged extra-judicial conduct before or outside neutral evidentiary process, including materially false or misleading factual reports to law enforcement, requests for extra patrols or police-security measures, threatened staff affidavits, and coordinated safety accusations portraying Plaintiff as intimidating, threatening, harassing, unsafe, dangerous, or stalking, despite Plaintiff's recordings and later police review contradicting that danger narrative.

34. Defendant Robin Morante is the Chief of Court and Judicial Security for the State of New Jersey, or otherwise an official responsible for court and judicial security policies, practices, communications, alerts, threat-risk classifications, courthouse-security designations, JSMART-related threat information, or similar systems affecting litigants' access to courts.

35. Defendant Morante is sued in her official capacity only for prospective declaratory and injunctive relief concerning ongoing security classifications, threat-risk designations, JSMART-related entries, court-security alerts, communications, or dissemination of information concerning Plaintiff.

36. Plaintiff alleges that Morante is an appropriate official-capacity defendant because she has responsibility for overseeing, administering, maintaining, communicating, correcting, reviewing, or implementing court-security threat designations, judicial-security alerts, JSMART-related information, courthouse-security procedures, or similar systems that continue to affect Plaintiff.

37. John Does 1-20 are individuals whose identities are presently unknown and who participated in the acts described below, including unknown law-enforcement personnel, municipal personnel, records personnel, security personnel, or private actors who participated in the alleged records misuse, prosecution-related conduct, service-of-process interference, court-security classification, or other constitutional violations described in this Complaint.

## JURISDICTION AND VENUE

38. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims under 42 U.S.C. § 1983 and the United States Constitution.

39. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims, including claims under the New Jersey Civil Rights Act.

40. Venue is proper in this District because the events giving rise to the claims occurred in New Jersey and the defendants reside or acted in New Jersey.

## FACTUAL ALLEGATIONS

A. April 17, 2020 allegations and resulting state action

41. On or about April 17, 2020, Defendant Groezinger contacted or spoke with law enforcement concerning Plaintiff.

42. Groezinger alleged that Plaintiff threatened her and/or made statements that she later characterized as a basis for domestic-violence and criminal action.

43. The conversation between Plaintiff and Groezinger was recorded.

44. Plaintiff alleges that the recording did not support the materially more severe version of events later supplied by Groezinger.

45. Plaintiff alleges that the recording reflected an argument, but did not show that Plaintiff made an actual, imminent, unconditional threat to kill Groezinger or harm the children.

46. Plaintiff alleges that the children were asleep and unaware of the conversation.

47. DCP&P later investigated and closed the matter with a "Not Established" finding.

48. When officers responded, Groezinger did not initially demand that Plaintiff be arrested or permanently removed. Instead, Groezinger asked whether Plaintiff could simply leave for the night and return in the morning.

49. When officers explained that they could not simply make Plaintiff leave for the night without a restraining order, Groezinger asked whether obtaining a restraining order would affect custody.

50. Plaintiff further alleges that Groezinger later provided inconsistent accounts concerning the same alleged choking incident, at times describing the event as occurring against a wall and at other times describing it as occurring on a bed. Plaintiff alleges that these inconsistencies were material because they concerned the core factual allegations used to portray Plaintiff as violent and dangerous.

51. Those statements were recorded by police body microphone or body camera.

52. Plaintiff alleges that those statements are material because they contradict Groezinger's later portrayal that she was acting only out of immediate fear for her life and support the inference that custody consequences were part of the purpose for invoking state power.

53. Despite the recording, the lack of corroboration, and the children being asleep and unaware, Groezinger's allegations became the factual basis for police intervention, removal from the home, criminal charges, and later restrictions.

54. Plaintiff was charged with terroristic threats and endangering the welfare of a child.

55. Plaintiff alleges that the charges lacked probable cause because they were based on materially false, misleading, or exaggerated allegations supplied by Groezinger and not on independently verified facts.

56. Plaintiff alleges that Groezinger's conduct was not limited to seeking protection in good faith, but included using materially false or exaggerated allegations to trigger state action and gain advantage in custody-related disputes.

57. Plaintiff alleges that Groezinger's April 17, 2020 allegations were later repeated or reinforced through third-party statements, testimony, reports, or narratives that were based substantially on information supplied by Groezinger rather than direct observation of the alleged threats or misconduct.

58. Plaintiff does not ask this Court to review, reverse, or second-guess the Final Restraining Order hearing, any credibility finding, or any state-court ruling.

59. Plaintiff alleges these facts only as background showing the source, repetition, and later use of factual narratives that were supplied to law enforcement, prosecutors, evaluators, or other state actors.

60. Plaintiff alleges that the third-party witnesses did not personally observe Plaintiff make an imminent threat, threaten the children, threaten to burn down the residence, or commit an act of domestic violence during the April 17, 2020 police incident.

61. Plaintiff alleges that some prior factual narratives concerning Plaintiff were contradicted by contemporaneous records, communications, or recordings.

62. Plaintiff does not seek an adjudication of prior state-court witness credibility disputes.

63. Plaintiff alleges that the relevance of these facts is limited to motive, knowledge, pattern, causation, and the later use of allegedly false or misleading factual narratives in law-enforcement or state-action processes.

64. Plaintiff's actionable claims do not depend on overturning the FRO or any finding made at the FRO hearing, but on independent conduct by defendants that allegedly caused prosecution, records misuse, detention, security restrictions, or other constitutional injury.

B. Later allegations concerning custody exchanges

65. After the April 17, 2020 incident, Plaintiff began documenting custody exchanges to protect himself from further false allegations, including through recordings or video documentation he believed were lawful, permitted, or necessary to preserve objective evidence.

66. The custody exchanges occurred at or near police-station or municipal locations.

67. Plaintiff documented or preserved objective evidence of custody exchanges because prior allegations had already resulted in severe state action, including removal from the home, criminal charges, and restrictions on contact.

68. Plaintiff alleges that video recordings of later custody exchanges contradicted allegations that he stalked, harassed, threatened, intimidated, or improperly approached Groezinger during exchanges.

69. Plaintiff alleges that despite the existence of recordings, Groezinger continued to advance allegations concerning the exchanges that were materially inconsistent with the objective recordings.

70. Plaintiff alleges that those allegations became part of the factual basis for additional criminal charges, restrictions, and threats of enforcement.

71. Plaintiff alleges that Groezinger and Kleiner had access to, knew about, or were aware of recordings that contradicted the factual allegations being advanced.

72. Plaintiff alleges that those allegations were not merely litigation positions but factual accusations used to trigger or reinforce state action.

73. Plaintiff alleges that the injury from these allegations is independent of any request to overturn a state-court order because the injury arose from the creation and use of false factual predicates for state enforcement.

C. Groezinger's September 16, 2022 BCPO interview, recorded custody exchanges, and the superseding indictment

74. On September 16, 2022, Defendant Groezinger participated in a recorded interview with investigators from the Bergen County Prosecutor's Office concerning Plaintiff's conduct during child-custody exchanges.

75. The custody exchanges discussed during that interview were recorded by Plaintiff.

76. During the September 16, 2022 interview, as reflected in the BCPO interview recording and/or transcript, Groezinger told prosecutor's investigators that Plaintiff moved within two to three feet of her during custody exchanges, recorded her, forced her to take things from his hands in order to get the child back, refused to release the child to Groezinger's mother, required Groezinger to personally appear for exchanges, followed or approached her when she attempted to create distance, accused her of using an impostor, and used the custody-exchange process as a means of control.

77. Plaintiff alleges that those statements were materially false, misleading, exaggerated, or contradicted by the custody-exchange recordings.

78. Plaintiff alleges that the recordings show that he did not run up to Groezinger, did not place or shove a camera in her face, did not threaten or intimidate her, did not force her to take objects from his hand in order to receive the child, did not use the child as bait, did not follow or approach her in the manner alleged, did not improperly refuse to release the child in violation of the

restraining order, and did not engage in conduct that would objectively

constitute stalking or a restraining-order violation.

79. Groezinger knew the exchanges were being recorded when she made those

allegations because one of her allegations was that Plaintiff was recording her

and placing the camera in her face.

80. During the grand-jury presentation, as reflected in the grand-jury transcript, the

State presented Groezinger's allegations through Detective Jeffrey Madonna,

who testified that he had reviewed the file and repeated Groezinger's

allegations concerning Plaintiff's alleged proximity, recording, refusal to

release the child to Groezinger's mother, alleged demand for face-to-face

interaction, alleged refusal to release the child until Groezinger exited the

vehicle, alleged "impostor" accusation, and alleged conduct during custody

exchanges.

81. The grand jury was told that Plaintiff recorded custody exchanges and heard

Groezinger's accusations through Detective Madonna, but Plaintiff alleges

that the grand jury was not shown or played the custody-exchange recordings

that would have allowed it to compare Groezinger's allegations against the

objective video evidence.

82. Plaintiff alleges that the State presented Groezinger's allegations as factual

predicates for the superseding indictment without presenting the objective

recordings that would have allowed the grand jury to assess whether Plaintiff actually moved toward Groezinger, forced hand-to-hand exchanges, withheld the child, followed or approached her, recorded her in the manner alleged, accused her of using an impostor in the manner alleged, or engaged in conduct that objectively constituted stalking or a restraining-order violation.

83. The superseding indictment added charges of stalking and violating a final restraining order based substantially on alleged misconduct during custody exchanges.

84. The superseding indictment did not identify each exchange by specific date with sufficient particularity. When Plaintiff sought a bill of particulars, he was provided only a general time period of June, July, and August 2022.

85. Plaintiff has recordings of every custody exchange before, during, and after the June, July, and August 2022 time period relied upon for the superseding indictment.

86. After the superseding indictment, Plaintiff provided the custody-exchange recordings to the prosecutor and to the criminal court in support of his motion to dismiss the indictment. In opposition to that motion, the prosecutor acknowledged Plaintiff's reliance on the videos but asserted that the videos corroborated Groezinger's statement to Detective Madonna.

87. Despite receiving those recordings after the superseding indictment, the prosecutor opposed Plaintiff's motion to dismiss by continuing to rely on the same custody-exchange allegations and by asserting that the videos corroborated Groezinger's statement. Plaintiff alleges that the recordings did not corroborate Groezinger's allegations and instead contradicted the factual premise of the stalking and restraining-order-violation charges.

88. Plaintiff alleges that Groezinger did not merely make a private complaint. She knowingly supplied materially false or misleading factual allegations to prosecutor's investigators about events she knew were recorded. Those allegations were then repeated, adopted, or relied upon by state actors as operative facts in a criminal prosecution.

89. Plaintiff alleges that without Groezinger's materially false or misleading allegations concerning the recorded custody exchanges, the stalking and restraining-order-violation charges would not have been pursued or continued. Plaintiff further alleges that the later prosecutorial opposition to dismissal confirms that the prosecution continued to rely on Groezinger's custody-exchange narrative even after Plaintiff supplied the objective recordings.

90. Plaintiff's injuries from this conduct include additional criminal charges, increased criminal exposure, restrictions, reputational harm, legal expense, emotional distress, and deprivation of liberty.

91. Plaintiff does not seek review or reversal of any state-court judgment. Plaintiff

seeks damages for the independent use of materially false factual allegations

to cause or contribute to state action against him.

D. Groezinger's June 5, 2025 Oakland report and the shift from car-seat suspicion to recording/FRO enforcement

92. On June 5, 2025, before a custody exchange at or near the Oakland Municipal

Court parking lot, Groezinger communicated with the Oakland Police

Department.

93. Groezinger reported that Plaintiff or the vehicle transporting the child did not

have a proper car seat or booster seat.

94. Groezinger also reported or asserted that being recorded during the exchange

constituted a violation of the final restraining order.

95. After the child entered the vehicle, Groezinger left the location, and Oakland

officers then approached Plaintiff and/or the vehicle.

96. Plaintiff alleges that the officers could not verify whether there was or was not

a booster seat in the vehicle.

97. Plaintiff alleges that Groezinger could not reasonably have verified the absence

of a booster seat from her vantage point. Plaintiff possesses photographs from

the same or substantially similar vantage point showing that the booster seat

area could not be seen clearly.

98. Plaintiff alleges that after officers could not verify the car-seat allegation, the justification for the detention shifted to a possible final-restraining-order violation based on recording by a third party.

99. The Oakland Police Department had previously addressed a substantially similar recording allegation under the same or materially similar restraining-order language. In a May 23, 2023 Oakland police report, Oakland documented that Assistant Prosecutor Silletti was consulted regarding a possible violation based on filming during custody exchanges and found that there was not probable cause to constitute a violation.

100. Plaintiff alleges that Oakland therefore had prior notice that the same or materially similar custody-exchange recording issue did not constitute probable cause for a restraining-order violation.

101. Plaintiff alleges that Groezinger's June 5, 2025 report was not a neutral or objectively reliable report of a clearly observed violation, but an unverified allegation that caused police detention and then shifted into a recording/FRO enforcement theory Oakland had already been told lacked probable cause under similar circumstances.

102. Plaintiff's injury from this conduct includes detention, intimidation, interference with protected recording activity, fear of arrest, and deprivation of constitutional rights.

E. Gurney, Waldwick, and irregular release of domestic-violence-related records

103. On or about December 19, 2019, while serving as a law-enforcement official and/or police chief, Defendant Bryan Gurney personally submitted, sought, or caused to be sought records from the Waldwick Police Department concerning Plaintiff and Groezinger.

104. The request was not processed as an ordinary neutral public-records request. Plaintiff later obtained phone records showing that Gurney had two telephone communications with Waldwick Police Chief Mark Messner shortly before the OPRA request was submitted.

105. The OPRA request was submitted by or through Patti Gurney on Bryan Gurney's behalf, and the communications reflected familiarity between Gurney and Messner.

106. Gurney used the email address chiefgurney@gmail.com in connection with the request or related communications, and Messner's response included that address.

107. Messner responded "as requested" and transmitted records directly with files attached.

108. Plaintiff alleges that the initial version of the request produced to Plaintiff was not signed or authorized by the Borough Clerk. Plaintiff later received a version of the same request bearing a clerk signature, which Plaintiff alleges

supports the inference that the records release was later made to appear as though it had proceeded through ordinary OPRA channels.

109. Plaintiff alleges that the records requested and released included Plaintiff's own domestic-violence-related report concerning Groezinger, and that Gurney's OPRA request sought not merely a public incident log but police reports from Groezinger, police reports from Plaintiff, and any other police report emanating from either party at the same address.

110. Plaintiff alleges that those records were not ordinary records available for informal, unredacted, direct, or relationship-based release without proper OPRA review, confidentiality review, redaction, denial where required, or legal approval.

111. Plaintiff alleges that Gurney used his law-enforcement status, relationships, access, influence, or authority to obtain records that an ordinary requester would not have received.

112. Plaintiff alleges that the released Waldwick records were later used in Gurney's daughter's custody case against Plaintiff in an effort to restrict or interfere with Plaintiff's parenting time with his daughter.

113. Plaintiff alleges that this later use of the Waldwick records confirmed that the disclosure caused continuing injury beyond the mere release of the records.

F. Ramsey juvenile records, Groezinger's OPRA request, Gurney's police-chief approval, and later disclosure to Dr. Tarle

114. On or about September 29, 2020, Groezinger submitted an OPRA request to the Borough of Ramsey seeking records concerning Plaintiff.

115. On or about October 5, 2020, records were released in response to Groezinger's request.

116. Plaintiff alleges that the released records included confidential juvenile or juvenile-related law-enforcement records concerning Plaintiff.

117. At the time of the request and release, Defendant Bryan Gurney was the Ramsey Police Chief.

118. Defendant Meredith Bendian was, at relevant times, the Ramsey Borough Clerk and/or municipal records custodian.

119. Plaintiff alleges that he was unaware that his confidential juvenile or juvenile-related records had been released to Groezinger until July 25, 2024, when Plaintiff and his family-law attorney retrieved materials from Dr. Marc Tarle's office and discovered records that Groezinger had provided to Dr. Tarle.

120. Plaintiff alleges that the materials retrieved from Dr. Tarle's office included Plaintiff's juvenile or juvenile-related law-enforcement records and Waldwick records previously released through the Gurney/Messner records chain.

121. Plaintiff has emails and court-record confirmation showing that Groezinger submitted Plaintiff's juvenile or juvenile-related records and other records to Dr. Tarle.

122. Kleiner, Groezinger's attorney, confirmed both in emails and on the record that Groezinger submitted those documents to Dr. Tarle. In a March 11, 2025 certification, Groezinger herself stated in substance that the issue with Dr. Tarle stemmed from documentation she claimed was lawfully provided to her through an OPRA request to the Borough of Ramsey, that she did not show the records to Kleiner, and that she "simply forwarded them to Dr. Tarle." Groezinger further stated in substance that the records from when Plaintiff was much younger could probably be disregarded because Plaintiff's alleged more recent "offenses" were sufficient to "paint a true picture" of Plaintiff. At the March 14, 2025 OTSC hearing, Kleiner further stated in substance that Dr. Tarle accidentally received documentation that Groezinger apparently accidentally received from Ramsey regarding an arrest Plaintiff may have had when he was a minor. Plaintiff further alleges that Dr. Tarle emailed Plaintiff requesting that Plaintiff appear for one final appointment so that Dr. Tarle could complete the evaluation. Plaintiff further alleges that, during a later recorded call, Dr. Tarle told Plaintiff in substance that he no longer needed to speak with Groezinger because Groezinger had supplied a "book" of

information about Plaintiff. Shortly afterward, Plaintiff and his counsel obtained that "book" of information from Dr. Tarle's office, and it contained Plaintiff's confidential juvenile or juvenile-related records and other sensitive records. Plaintiff alleges that these facts caused continuing injury and reinforced the need to determine who released, transmitted, received, maintained, and used those records.

123. On or about August 21, 2024, Plaintiff spoke on a recorded call with Marlene Dougherty, the Ramsey Police Department's designated records clerk.

124. During that recorded call, Dougherty confirmed that when an OPRA request is submitted through the Borough or Borough website, the request is routed to the Borough Clerk, then to the Police Chief for approval, and then back to the Borough Clerk for release.

125. Dougherty further confirmed that if a records request is submitted directly to the Police Department, the request goes directly to the Police Chief for approval and release.

126. Plaintiff alleges that under either route described by Ramsey's designated police records clerk, the Ramsey Police Chief was required to approve or authorize release of police records before disclosure.

127. Plaintiff alleges that the juvenile or juvenile-related records would not have been released without Gurney's approval, authorization, sign-off, or failure to prevent disclosure in his official role as Ramsey Police Chief.

128. Plaintiff alleges that Groezinger's later transmission of those records to Dr. Tarle caused continuing injury because the records were used in a custody-related forensic evaluation and related family-court proceedings.

129. Plaintiff alleges that he did not know, and could not reasonably have known, the existence, scope, route, participants, or later use of the Ramsey juvenile-records disclosure until July 25, 2024 and related 2024 proceedings and disclosures.

G. Hawthorne body-camera footage, Newport SID information, later discovery, and delayed accrual

130. On or about December 14, 2022, Groezinger submitted an OPRA request to the Hawthorne Police Department seeking records and body-worn-camera footage concerning a disorderly-persons incident involving Plaintiff.

131. The Hawthorne incident did not occur during Plaintiff's parenting time and did not involve Plaintiff's children.

132. Hawthorne's disclosure log reflects that Groezinger was provided four pages of documents on or about December 14, 2022, but the disclosure did not include body-worn-camera footage.

133. On or about December 19, 2022, Gurney submitted a separate request seeking only the body-worn-camera footage that Groezinger had not received.

134. On or about December 19, 2022, Gurney was provided the body-worn-camera footage.

135. At the January 27, 2023 hearing before Judge Janeczko, Kleiner stated on the record that he had submitted or relied upon the Hawthorne documentation and body-worn-camera footage.

136. Plaintiff alleges that the sequence of events supports the inference that Groezinger could not obtain the body-worn-camera footage herself, that Gurney used his law-enforcement status, access, or influence to obtain the precise footage she did not receive, and that the footage was then provided to or used by Kleiner on Groezinger's behalf.

137. Plaintiff alleges that this was not ordinary litigation advocacy or neutral records access, but the use of law-enforcement records channels to obtain and use police materials against Plaintiff in custody-related proceedings.

138. Groezinger also used or relied upon information concerning Plaintiff's Newport, Rhode Island arrest, which was later dismissed, sealed, or expunged.

139. Groezinger claimed in court that she became aware of the Newport arrest through a public police blotter or public online source.

140. Plaintiff alleges, however, that Groezinger searched for or obtained information concerning the Newport matter using Plaintiff's Rhode Island SID number or another law-enforcement identifier not publicly available on the ordinary court docket or public online records.

141. Plaintiff confirmed with the Newport court clerk that the SID number was not visible on the public docket or ordinary online records and was information available only through law-enforcement-accessible sources or non-public channels.

142. Plaintiff alleges that Groezinger's possession or use of that non-public identifier supports the inference that she received law-enforcement-only information from Gurney or another law-enforcement source.

143. Plaintiff later obtained OPRA-related emails, phone records, request forms, disclosure logs, municipal records, recorded-call evidence, and court materials involving records requests concerning Plaintiff.

144. Those records and communications identified or referenced Gurney, Groezinger, Messner, Bendian, Waldwick, Ramsey, Hawthorne, or other actors in connection with records concerning Plaintiff.

145. Plaintiff alleges that these records and communications showed that records concerning Plaintiff were not obtained solely through ordinary neutral public access but through coordinated requests, law-enforcement channels, municipal

records channels, police-chief approval, records-custodian action, or law-enforcement relationships. Plaintiff further alleges that Kleiner's March 14, 2025 on-record statements support this inference because Kleiner acknowledged that Groezinger searched online or checked for Plaintiff's arrests and also stated in substance that a person is not entitled to obtain records from a court while a matter is pending, which supports Plaintiff's allegation that Hawthorne disorderly-persons materials, police records, body-worn-camera footage, or discovery-type materials were released to Groezinger and Gurney through improper or non-public channels before Plaintiff himself had access to discovery in that matter.

146. Plaintiff alleges that on July 25, 2024, when Plaintiff and his family-law attorney retrieved materials from Dr. Tarle's office, Plaintiff first discovered that Groezinger had provided Dr. Tarle with Plaintiff's juvenile or juvenile-related records and Waldwick records.

147. Plaintiff alleges that on or about August 21, 2024, he learned through a recorded call with Ramsey Police Department's designated records clerk that Ramsey police-record requests submitted through the Borough's OPRA portal were routed to the Borough Clerk, then to the Police Chief for approval, and then back to the Borough Clerk for release.

148. Plaintiff alleges that the August 21, 2024 recorded call further confirmed that if a police-record request was submitted directly to the Ramsey Police Department, it would go directly to the Police Chief for approval and release.

149. Plaintiff alleges that the December 2022 Hawthorne disclosure logs later revealed that Groezinger requested records and body-worn-camera footage, received only documents, and that Gurney then requested and received the body-worn-camera footage that Groezinger did not receive.

150. Plaintiff alleges that these later-discovered communications and later-discovered uses support delayed accrual, equitable tolling, or factual development as to timeliness because Plaintiff could not reasonably know the full scope of the records-access scheme, approval chain, dissemination, and later constitutional injury until he obtained the communications and learned how the records were approved, released, disseminated, and used.

151. Plaintiff alleges that his claims are not based solely on a single historical records release, but on the acquisition, approval, disclosure, dissemination, later use, and continuing reliance on sensitive records in proceedings and evaluations affecting Plaintiff's parental rights, privacy rights, and liberty interests, including later discovery through transcripts, emails, disclosure logs, police reports, recorded calls, and materials obtained from Dr. Tarle's office.

H. Kleiner's extra-judicial exchange threat and later use of the same theory in the superseding indictment

152. Before the superseding indictment, the operative state-court exchange order provided in substance that Groezinger, the plaintiff in the FRO matter, was to transport E.P. to and from the Mahwah Police Department both ways.

153. Plaintiff alleges that the order did not authorize Groezinger to unilaterally substitute her mother or another third party in place of herself for the custody exchange.

154. Kleiner sent an email to Plaintiff's then-counsel stating that Groezinger would no longer personally conduct custody exchanges.

155. Plaintiff's counsel responded that Groezinger could not unilaterally change the court-ordered exchange procedure and that if the parties intended to permit third-party transportation or third-party exchanges, the order would need to be amended.

156. Kleiner nevertheless asserted, threatened, or communicated in substance that Plaintiff would be violating the order if he refused to release the child to Groezinger's mother and that Kleiner would pursue legal action or action in all legal forms if Plaintiff did not release the child to Groezinger's mother.

157. Plaintiff alleges that the order was later amended to allow third-party transportation, which supports Plaintiff's allegation that the original order did

not authorize Groezinger's unilateral substitution of her mother at the time Kleiner threatened enforcement.

158. Plaintiff alleges that Groezinger and Kleiner knew or reasonably should have known that the court-ordered exchange procedure did not authorize Groezinger's unilateral substitution of her mother, yet Plaintiff's refusal to accept that substitution was later framed as criminal conduct. Plaintiff further alleges that this same mother-substitution and refusal-to-release theory appeared in Groezinger's BCPO interview, the grand-jury presentation, and the State's later opposition to Plaintiff's motion to dismiss the superseding indictment. Plaintiff alleges that this mother-substitution theory was not merely a private legal disagreement. After Plaintiff's counsel advised Kleiner that the operative order required Groezinger herself to conduct exchanges and did not authorize unilateral substitution of Groezinger's mother, the same disputed theory was later supplied to BCPO investigators, repeated in the grand-jury presentation, and relied upon as a factual predicate for the restraining-order-violation and stalking charges. Plaintiff alleges that Kleiner's pre-indictment threat is relevant because it shows notice that the theory was disputed and unsupported, yet the theory was later used as though Plaintiff's refusal to release the child to Groezinger's mother was criminal conduct.

I. Specific state-action allegations concerning private defendants

159. Plaintiff alleges that Groezinger, Gurney, and Kleiner were not acting merely as private complainants, family members, or ordinary litigation participants.

160. Groezinger supplied specific factual allegations to prosecutor's investigators concerning recorded custody exchanges, knew the exchanges were recorded, and those allegations were then repeated, adopted, or relied upon by state actors in pursuing the superseding indictment. Plaintiff further alleges that the same custody-exchange narrative was later repeated in the State's opposition to Plaintiff's motion to dismiss the indictment after Plaintiff supplied the custody-exchange recordings.

161. Groezinger also made the June 5, 2025 Oakland report that caused police officers to approach and detain Plaintiff based on an unverified car-seat allegation and a recording/FRO theory Oakland had previously documented as lacking probable cause under similar circumstances.

162. Gurney used or exploited law-enforcement status, police-chief authority, public-safety relationships, police-records approval channels, or law-enforcement-accessible information to obtain records that were not available to an ordinary requester and that were later used against Plaintiff in custody-related proceedings and evaluations. Plaintiff further alleges that he recently discovered that Bryan Gurney's sister, Kathlyn Gurney, is or was employed by the Borough of Oakland as confidential secretary to the Borough

Administrator. Plaintiff alleges that this relationship is relevant to discovery concerning Gurney's municipal relationships, possible informal access, possible communications, or possible influence involving Oakland-related actors, records, or law-enforcement channels. Plaintiff does not presently allege that Kathlyn Gurney personally violated Plaintiff's rights.

163. Kleiner allegedly used or reinforced factual allegations and non-public police materials obtained through law-enforcement or municipal records channels outside ordinary neutral public access. Before the superseding indictment, Kleiner threatened legal consequences based on Groezinger's unilateral mother-substitution theory after Plaintiff's counsel disputed that the exchange order allowed such substitution. Plaintiff alleges that the same theory later appeared in Groezinger's BCPO interview, the grand-jury presentation, and the State's opposition to Plaintiff's motion to dismiss the superseding indictment. Plaintiff further alleges that Kleiner possessed, referenced, transmitted, or used non-public police materials, including Hawthorne body-worn-camera footage and Ramsey juvenile or juvenile-related records, in a manner that reinforced state action against Plaintiff.

164. Plaintiff alleges that the timing, sequence, repeated use of the same factual narratives, attorney communications, records requests, police reports, prosecutor filings, and later use of those narratives support a plausible

inference that Kleiner participated in the creation, transmission, or reinforcement of factual predicates later used by state actors. Plaintiff alleges that the specific communications among Kleiner, Groezinger, Behaved Brain, law-enforcement actors, prosecutors, or John Does are presently within defendants' possession, but the known emails, recordings, police reports, court transcripts, records-disclosure evidence, and repeated factual narratives support a reasonable inference of coordinated extra-judicial conduct.

165. Plaintiff alleges that the private defendants' conduct became state action because it involved knowing participation in, substantial causation of, or joint use of state enforcement mechanisms, police-records channels, prosecutorial action, police detention, and custody-related state processes.

166. Plaintiff does not seek to impose liability merely because a private person complained, requested protection, retained counsel, or advocated in court. Plaintiff seeks relief for the knowing use of materially false factual allegations, non-public law-enforcement information, police-records channels, and state enforcement mechanisms to cause prosecution, detention, restrictions, evaluations, and constitutional injury.

## J. Behaved Brain allegations

167. Plaintiff learned that his minor child had been receiving therapy or services through The Behaved Brain, LLC.

168. Plaintiff alleges that he was not informed of or included in the child's therapy despite joint legal custody and his parental rights.

169. Plaintiff sought access to information and records concerning his child's therapy and care.

170. On or about February 6, 2024 and February 7, 2024, Plaintiff went to Behaved Brain locations, including the Wyckoff and Ho-Ho-Kus locations, to seek information concerning his child's therapy and records.

171. Plaintiff recorded his interactions with Behaved Brain personnel.

172. Plaintiff alleges that the recordings show he was calm, polite, conversational, cooperative, and non-threatening during his interactions with Behaved Brain personnel. Plaintiff acknowledges that he discussed background concerning the custody dispute, criminal charges, and his concern that he had been excluded from his son's therapy, but alleges that he did so in a calm and non-threatening manner while attempting to obtain information concerning his son's care.

173. Despite those recordings, Behaved Brain personnel, agents, or representatives falsely or misleadingly characterized Plaintiff as intimidating, threatening,

harassing, unsafe, or dangerous, even though the recordings do not show

Plaintiff threatening anyone, threatening to sue anyone, yelling, refusing to

leave, physically intimidating staff, or acting aggressively, and even though

the Wyckoff police report later documented that "at no time did Mr. Peterson

make specific threats toward them."

174. Plaintiff alleges that Katie Gateley, owner of Behaved Brain and wife of

attorney Matthew Gateley, or another Behaved Brain representative, contacted

and/or personally appeared at the Ho-Ho-Kus Police Department and the

Wyckoff Police Department concerning Plaintiff's visits to Behaved Brain.

Plaintiff alleges that Gateley reported or caused to be reported that Plaintiff

had been harassing employees telephonically and in person, appeared at both

the Wyckoff and Ho-Ho-Kus locations, had an intimidating nature, caused

staff to feel unsafe, and caused Behaved Brain to consider or request extra

police patrols or outside security.

175. Plaintiff alleges that the police reports and body-camera footage confirm that

Behaved Brain escalated the matter to law enforcement. Plaintiff further

alleges that the police reports also contain exculpatory or contradictory facts,

including that Gateley declined to sign complaints, that the Wyckoff report

stated Plaintiff made no specific threats toward staff, that Sgt. Gil later

listened to Plaintiff's recordings and wrote that Plaintiff did not seem

aggressive or argumentative, and that Sgt. Gil documented there were no pending charges from the Wellness Center.

176. Plaintiff alleges that Behaved Brain's conduct was not limited to passive compliance with subpoenas or ordinary confidentiality objections. Before any neutral evidentiary testing occurred, Behaved Brain allegedly escalated Plaintiff's recorded, non-threatening visits to law enforcement, supplied or caused to be supplied a disputed danger narrative to police, and sought police involvement, police documentation, extra patrols, security-detail assistance, or other government-security measures based on factual assertions contradicted by Plaintiff's recordings and later police review.

177. Plaintiff alleges that Behaved Brain did not merely await a court ruling or respond neutrally to subpoenas. Instead, Behaved Brain, through Katie Gateley, Matthew Gateley, counsel, employees, or agents, allegedly created, transmitted, or reinforced a safety narrative that Plaintiff was intimidating, threatening, harassing, unsafe, or dangerous; caused that narrative to be documented in police reports or police-security requests; and then used or reinforced the same narrative in connection with Plaintiff's attempt to obtain information concerning his son's care.

178. Plaintiff alleges that on or about February 7, 2024, hours after subpoenas were served, Katie Gateley went to or communicated with the Ho-Ho-Kus Police

Department and/or Wyckoff Police Department concerning Plaintiff's visits to Behaved Brain. Plaintiff possesses police body-camera footage and police records showing that Gateley supplied a safety narrative to law enforcement after Plaintiff attempted to obtain information concerning his son's therapy and after subpoenas were served.

179. Plaintiff alleges that Gateley's statements to law enforcement were materially false or misleading and were contradicted by Plaintiff's recordings. Gateley stated or suggested that Plaintiff sat and waited at the Wyckoff office for approximately ninety minutes, but Plaintiff's recording reflects that he waited patiently for approximately thirty-five minutes for a therapy session to end before speaking with the therapist. Gateley further stated or suggested that Plaintiff did not have identification or refused to show identification, but Plaintiff's recordings reflect that Plaintiff offered to show identification and a court order reflecting shared legal custody.

180. Plaintiff further alleges that Gateley or Behaved Brain personnel characterized Plaintiff as demanding records, refusing to identify himself, intimidating therapists, or creating a safety concern, but Plaintiff's recordings reflect that Plaintiff identified himself, offered identification, referenced the court order concerning legal custody, spoke calmly, did not threaten staff, did not refuse to leave, did not act aggressively, and accepted being directed to counsel.

181. Plaintiff alleges that during the February 7, 2024 police interaction, Gateley stated in substance that Plaintiff technically had not done anything illegal yet. Plaintiff alleges that this statement is material because it shows Behaved Brain knew that Plaintiff's recorded conduct had not crossed into criminal conduct, yet Behaved Brain nevertheless escalated the matter to law enforcement, requested security measures, and supplied or reinforced a danger narrative later repeated in court.

182. Plaintiff alleges that Behaved Brain affirmatively sought police involvement and police security based on the same disputed safety narrative. Plaintiff possesses body-camera footage and/or police records showing that Gateley filled out or submitted police-security-detail, extra-patrol, or police-security request forms in both Wyckoff and Ho-Ho-Kus because of Plaintiff, even though Plaintiff's recordings did not show threats, aggression, refusal to leave, or unlawful conduct. Plaintiff alleges that Behaved Brain requested government action, police documentation, extra patrols, police-security measures, or law-enforcement involvement based on factual assertions that were materially contradicted by Plaintiff's recordings. Plaintiff further alleges that these police-security requests were made for the purpose of creating or reinforcing an official danger narrative concerning Plaintiff after he sought information about his son's therapy and after subpoenas were served.

183. On or about February 7, 2024, Plaintiff was on a recorded telephone call with his attorney and Matthew Gateley, counsel for Behaved Brain.

184. During that recorded call, Matthew Gateley stated, threatened, or communicated in substance that if Plaintiff continued to press for records concerning his child, Behaved Brain would have staff members sign affidavits accusing Plaintiff of intimidating or harassing staff.

185. Plaintiff alleges that this was not a neutral confidentiality objection, ordinary subpoena response, or ordinary legal position, but a threat to create or obtain sworn accusations in response to Plaintiff's continued assertion of parental and records-access rights.

186. Plaintiff alleges that, regardless of whether staff affidavits were ultimately filed or formally used, the threatened affidavit narrative and staff-safety accusations were relayed, supplied, or reinforced through Behaved Brain's counsel, police reports, police-security requests, and the February 9, 2024 OTSC hearing.

187. Plaintiff alleges that the affidavits, police reports, and intimidation narrative were materially contradicted by Plaintiff's recordings, by the Wyckoff report's statement that Plaintiff made no specific threats, and by Sgt. Gil's later report stating that Plaintiff did not seem aggressive or argumentative after Sgt. Gil of the Ho-Ho-Kus Police Department listened to the recordings.

188. Plaintiff alleges that Behaved Brain knew or had reason to know that the characterizations of Plaintiff as intimidating, threatening, harassing, unsafe, or dangerous were false or materially misleading because its own personnel participated in the interactions, because the interactions were recorded, because Gateley declined to sign complaints, and because the Wyckoff report documented no specific threats. Plaintiff further alleges that Sgt. Gil's later review of the recordings independently confirmed that the aggressive or argumentative narrative was not supported by the recordings.

189. Plaintiff alleges that Behaved Brain, through Katie Gateley, Matthew Gateley, counsel, employees, or agents, communicated with Groezinger, Kleiner, law enforcement, or John Does concerning Plaintiff's attempt to obtain his son's therapy information and concerning the factual narrative that Plaintiff was intimidating, harassing, unsafe, dangerous, or stalking Groezinger.

190. Plaintiff alleges that this coordination is supported by the timing and sequence of events: Plaintiff's recorded non-threatening visits occurred on February 6 and February 7, 2024; subpoenas were served on February 7, 2024; Katie Gateley then went to or contacted police and supplied a safety narrative; Matthew Gateley then stated on a recorded call that Behaved Brain would have staff sign affidavits accusing Plaintiff of intimidation or harassment if Plaintiff continued pressing for records; and the same safety/stalking narrative

was then repeated by Behaved Brain's counsel and Kleiner. Plaintiff alleges that the precise communications among Behaved Brain, Groezinger, Kleiner, law enforcement, and John Does are within defendants' possession, but the known timing, repeated factual narrative, police reports, body-camera footage, recorded call, and transcript evidence support a plausible inference of coordinated extra-judicial conduct.

191. Plaintiff alleges that the February 9, 2024 hearing is not the basis for liability by itself. Plaintiff references the hearing only because it shows that the same disputed danger narrative allegedly created or reinforced outside court through police reports, police-security requests, threatened affidavits, and communications with private and state actors was repeated and used after those extra-judicial actions occurred. Plaintiff does not seek liability against Behaved Brain for ordinary subpoena compliance, ordinary confidentiality objections, or merely appearing through counsel.

192. Plaintiff alleges that Kleiner's February 9, 2024 statements are not asserted as ordinary courtroom advocacy giving rise to liability by themselves. Plaintiff references those statements because they repeated the same factual narrative allegedly created or reinforced outside court: that Plaintiff acted aggressively, intimidated Behaved Brain staff, threatened people, threatened to sue, and was stalking Groezinger by seeking information concerning his son's therapist.

Plaintiff alleges that this narrative was contradicted by Plaintiff's recordings, the therapist-interaction transcripts, police reports documenting no specific threats, and later police review stating that Plaintiff did not seem aggressive or argumentative. Plaintiff further alleges that the transcripts of Plaintiff's actual interactions with the therapists do not show Plaintiff threatening to sue the therapists, threatening staff, refusing to leave, or acting aggressively.

193. Plaintiff alleges that the stalking narrative concerning Behaved Brain was materially false or misleading because Plaintiff's recordings show that he stated he was seeking information concerning his son and his son's treatment, not attempting to contact, monitor, approach, or communicate with Groezinger. Plaintiff alleges that the same false stalking narrative was used across extra-judicial police reports, security requests, threatened affidavits, and later litigation references, supporting the inference that the narrative was coordinated and not merely a good-faith legal position.

194. Plaintiff alleges that Behaved Brain's counsel and Kleiner repeated factual characterizations concerning Plaintiff before any sworn testimony, cross-examination, or neutral evidentiary testing of those accusations occurred. Plaintiff alleges that the relevant actionable conduct occurred before or outside that hearing, including the police reports, police-security requests,

threatened affidavits, and communications that allegedly created or reinforced the disputed safety narrative.

195. Plaintiff does not seek relief based on the family court's ruling, the family court's weighing of evidence, or the correctness of any state-court decision. Plaintiff alleges that the injury arose from defendants' extra-judicial creation, transmission, and reinforcement of materially false factual accusations through police reports, police-security requests, threatened affidavits, non-public records, and repeated danger/stalking narratives before those accusations were subjected to fair evidentiary testing.

196. Plaintiff alleges that Behaved Brain is not sued for complying with a subpoena, obeying a court order, asserting ordinary confidentiality objections, directing Plaintiff to counsel, or making a good-faith request for neutral records review. Behaved Brain is sued for extra-judicial conduct before or outside neutral court process, including materially false or misleading factual reports to police, police-security requests, extra-patrol requests, threatened staff affidavits, and coordinated safety accusations portraying Plaintiff as threatening, intimidating, harassing, unsafe, or dangerous, despite Plaintiff's recordings, the Wyckoff report, Gateley's body-camera statement that Plaintiff technically had not done anything illegal yet, and Sgt. Gil's later review contradicting that danger narrative.

197. Plaintiff alleges that Behaved Brain's conduct was undertaken in coordination with Groezinger, Kleiner, law-enforcement actors, or John Does for the purpose of restricting Plaintiff's access to information concerning his child's care, portraying Plaintiff as dangerous or stalking, and causing state-action consequences before fair evidentiary testing occurred. Plaintiff alleges that the injury is independent of the correctness of any family-court ruling because the injury arose from the false extra-judicial accusations, police escalation, police-security requests, threatened affidavits, and coordinated danger narrative itself.

K. Oakland June 5, 2025 custody exchange

198. Plaintiff appeared at the Oakland Police Department, Oakland Municipal Court, or related municipal parking lot for a custody exchange on June 5, 2025.

199. Defendant Harvey was the supervising officer on scene and directed, approved, or failed to stop the continued detention after the alleged car-seat violation could not be verified. Defendant Lopez participated in the encounter, questioning, investigation, continued detention, or threat of enforcement. Defendant Anderson participated in the encounter, questioning, investigation, continued detention, or threat of enforcement. Each officer remained present during the encounter, knew the initial car-seat allegation had not been

verified, knew the justification had shifted to recording/FRO enforcement, and failed to intervene to stop the continued detention or threat of arrest.

200. Before the exchange, Groezinger communicated with Oakland police and reported both an alleged car-seat issue and an alleged restraining-order violation based on recording.

201. The police response was based on Groezinger's allegation that Plaintiff's child had previously been transported without a proper child safety restraint.

202. The alleged car-seat incident did not occur in the officers' presence.

203. Plaintiff alleges that no Oakland officer personally observed the alleged car-seat violation.

204. Plaintiff alleges that the accusation was based entirely on Groezinger's after-the-fact complaint.

205. After the child entered the vehicle, Groezinger left the location, and Oakland officers then approached Plaintiff and/or the vehicle.

206. Plaintiff alleges that Groezinger could not reasonably have verified the absence of a booster seat from her vantage point.

207. Plaintiff possesses photographs from the same or substantially similar vantage point showing that the booster-seat area could not be seen clearly.

208. Plaintiff alleges that the vehicle's rear seating area could not be verified from outside the vehicle in the manner claimed.

209. Plaintiff alleges that officers were unable to confirm whether a child restraint was or was not present.

210. Plaintiff alleges that the vehicle at issue was not Plaintiff's vehicle but belonged to or was being driven by a family friend or another person.

211. Plaintiff alleges that Plaintiff was not operating the vehicle at the time of the alleged violation.

212. Plaintiff alleges that officers sought consent to inspect or search the vehicle.

213. Plaintiff alleges that consent to search or inspect the vehicle was not given.

214. Plaintiff alleges that after consent was not given and officers could not independently verify the alleged car-seat violation, officers continued the encounter, prolonged Plaintiff's detention, or shifted the basis for enforcement.

215. Plaintiff alleges that after the officers were unable to confirm the alleged child-restraint violation, they shifted the basis of the encounter to the recording issue and the restraining order.

216. The Oakland Police Department had previously addressed a substantially similar recording allegation under the same or materially similar restraining-order language. In a May 23, 2023 Oakland police report, Oakland documented: "It should be noted that due to the verbiage in the amended FRO regarding filming during custody exchange, AP Silletti was consulted for legal

advice regarding a possible violation to which she found there was not probable cause to constitute a violation."

217. Plaintiff alleges that Oakland therefore had prior notice that the same or materially similar custody-exchange recording issue did not constitute probable cause for a restraining-order violation.

218. Plaintiff alleges that after officers could not verify the car-seat allegation, the justification for the detention shifted to a possible final-restraining-order violation based on recording by a third party.

219. Plaintiff alleges that Groezinger's June 5, 2025 report was not a neutral or objectively reliable report of a clearly observed violation, but an unverified allegation that caused police detention and then shifted into a recording/FRO enforcement theory Oakland had already been told lacked probable cause under similar circumstances.

220. Plaintiff alleges that he was told he was not free to leave.

221. Plaintiff alleges that the encounter was prolonged beyond the time necessary to address any lawful purpose.

222. Plaintiff alleges that the detention lasted approximately twenty-five minutes, despite the officers' inability to verify the alleged car-seat violation and despite Oakland's prior documented notice that similar custody-exchange recording did not constitute probable cause for a restraining-order violation.

223. Plaintiff alleges that the officers lacked reasonable suspicion or probable cause to detain him or prolong his detention.

224. Plaintiff alleges that the officers relied on an unverified accusation from an adverse party in a contentious custody dispute without independent corroboration.

225. Plaintiff alleges that he had a First Amendment interest in documenting police activity occurring in a public police-station, municipal, or courthouse parking-lot area, subject to lawful restrictions.

226. Plaintiff alleges that the amended restraining-order language permitted Plaintiff to use a dash-mounted dash camera for exchange-related recording.

227. Plaintiff alleges that he was not personally using a handheld camera to record Groezinger or communicate with Groezinger.

228. To the extent a person accompanying Plaintiff recorded any portion of the encounter, Plaintiff alleges that the recording captured police activity or the public custody-exchange setting and was not directed communication, contact, harassment, intimidation, or approach toward Groezinger.

229. Plaintiff alleges that Defendant Harvey, Lopez, Anderson, or one or more of them threatened Plaintiff with arrest or enforcement action based on recording activity occurring during the public police encounter.

230. Plaintiff alleges that Oakland officers identified or referenced the amended-FRO recording language during the June 5, 2025 encounter. Plaintiff alleges, however, that the language identified was the same or materially identical language Oakland had already addressed in the May 23, 2023 police report, where Oakland documented that Assistant Prosecutor Silletti found no probable cause for a restraining-order violation under the same or materially similar circumstances involving recording during a custody exchange by someone other than Plaintiff.

231. Plaintiff alleges that the threat of arrest or enforcement chilled Plaintiff's own ability to document police conduct by lawful means, including through the dash-mounted dash camera permitted by the amended restraining order.

232. Plaintiff alleges that the officers' threat waś not justified by the amended-FRO language because Oakland had prior documented notice that the same or materially similar custody-exchange recording issue did not constitute probable cause for a violation. Plaintiff alleges that the officers nevertheless treated public recording during a custody exchange as potential restraining-order misconduct despite Oakland's prior documented notice to the contrary.

233. Plaintiff alleges that the threat of arrest or enforcement interfered with and chilled protected recording or documentation activity.

234. Plaintiff alleges that the Oakland officers' conduct violated his First Amendment right to record police activity in public and his Fourth Amendment right to be free from unreasonable seizure.

235. Plaintiff alleges that the injury from this incident is independent of any challenge to a family-court order because the injury arises from the officers' conduct during a police encounter on June 5, 2025.

L. Ritondale and criminal complaint allegations

236. Defendant Ritondale responded to or participated in the April 17, 2020 Waldwick police response.

237. Plaintiff further alleges that Defendant Sergeant Christopher Sanchez was also present during the April 17, 2020 Waldwick police response that resulted in Plaintiff's removal from the home.

238. Plaintiff alleges that Sanchez's presence during the April 17, 2020 incident is relevant because Sanchez had prior personal knowledge of the original police response, the circumstances surrounding Plaintiff's removal from the home, the parties involved, and the factual background that later became part of the criminal, restraining-order, custody, and law-enforcement narratives concerning Plaintiff.

239. Plaintiff does not assert a standalone damages claim against Sanchez merely for being present at the April 17, 2020 incident unless discovery shows that

Sanchez personally prepared, approved, signed, swore out, transmitted, or materially contributed to a false or misleading report, affidavit, criminal complaint, charging narrative, records action, or other state-action process. Plaintiff pleads Sanchez's April 17, 2020 presence at this stage as relevant to knowledge, context, pattern, motive, and the plausibility of Plaintiff's allegations concerning later Waldwick conduct, including the August 19, 2025 service-of-process interference.

240. Plaintiff alleges that Ritondale personally initiated criminal proceedings by swearing out, signing, approving, or submitting the probable-cause affidavit, criminal complaint, report, or charging narrative that led to criminal charges against Plaintiff.

241. Plaintiff alleges that those charges included terroristic threats and endangering the welfare of a child.

242. Plaintiff alleges that Ritondale later acknowledged in sworn testimony or court proceedings that Waldwick officers initiated the charges and stated, in substance, "we did the charges."

243. Plaintiff alleges that Ritondale attributed statements, threats, or conduct to Plaintiff that were not supported by the available recording.

244. Plaintiff alleges that Ritondale's affidavit, complaint, report, or charging narrative attributed statements to Plaintiff that do not appear in the recording,

including statements that Plaintiff would "burn the residence down" or cause harm.

245. Plaintiff alleges that the actual recording reflected conditional, non-imminent, expressive, or emotionally charged speech materially different from the statements attributed to him.

246. Plaintiff alleges that the distinction between what Plaintiff actually said and what Ritondale attributed to Plaintiff was material to probable cause.

247. Plaintiff alleges that the recording did not show an actual, imminent, unconditional threat to kill Groezinger, harm the children, burn the residence down, or cause immediate physical harm.

248. Plaintiff alleges that Ritondale had access to, reviewed, relied upon, or reasonably should have reviewed the available recording before initiating or supporting criminal charges.

249. Plaintiff alleges that if Ritondale reviewed the recording, he knowingly or recklessly omitted context and materially altered the substance of Plaintiff's recorded statements.

250. Plaintiff alleges that if Ritondale did not review the recording, the failure to review readily available objective evidence was reckless under the circumstances because the recording was central to the allegation and probable-cause determination.

251. Plaintiff alleges that the misstatements and omissions were material because, had the charging authority been presented with the complete context reflected by the recording—including the conditional nature of the statements, the fact that the children were asleep and unaware, Groezinger's request that Plaintiff merely leave for the night, and her inquiry regarding the custody consequences of a restraining order—probable cause would not have existed.

252. Plaintiff alleges that Ritondale's charging narrative omitted material exculpatory facts, including that the children were asleep and unaware of the conversation, that Groezinger asked whether Plaintiff could leave for the night and return in the morning, and that Groezinger asked whether a restraining order would affect custody.

253. Plaintiff alleges that those omitted facts were material to probable cause because they undermined the claim that Groezinger was acting solely from immediate fear and undermined the claim that Plaintiff's statements constituted an actual imminent threat.

254. Plaintiff alleges that the criminal prosecution terminated in Plaintiff's favor when the charges were dismissed.

255. Plaintiff alleges that the prosecution lacked probable cause and caused a deprivation of liberty.

256. Plaintiff alleges that his malicious-prosecution claim accrued upon favorable termination of the criminal proceedings.

257. Plaintiff alleges that his claim is based on the initiation and support of charges through materially false or misleading factual assertions, not on a request to overturn any restraining order or family-court judgment.

M. Municipal policies, customs, or failures

258. Plaintiff alleges that Waldwick failed to maintain adequate policies, training, and supervision regarding the release of sensitive domestic-violence, victim-related, juvenile, or law-enforcement records.

259. Plaintiff alleges that Waldwick permitted sensitive records to be released through law-enforcement relationships or informal channels rather than neutral lawful records procedures.

260. Plaintiff alleges that Waldwick's records practices allowed police leadership to approve, facilitate, or permit the release of sensitive records to other law-enforcement-connected individuals without adequate review.

261. Plaintiff alleges that Ramsey failed to maintain adequate policies, training, supervision, and safeguards regarding OPRA processing, police-chief approval, juvenile-record confidentiality, redaction, legal review, and release of juvenile or juvenile-related law-enforcement records.

262. Plaintiff alleges that Ramsey's records practices allowed confidential juvenile or juvenile-related records to be released through municipal or police records channels without adequate safeguards, legal review, redaction, withholding, or denial.

263. Plaintiff alleges that Waldwick failed to train or supervise officers and records personnel regarding OPRA exemptions, domestic-violence confidentiality, juvenile-record confidentiality, victim-record confidentiality, and limits on disclosure.

264. Plaintiff alleges that Waldwick failed to maintain adequate safeguards to prevent police leadership or law-enforcement relationships from influencing records-release decisions.

265. Plaintiff alleges that Oakland failed to train or supervise officers regarding verification of custody-dispute accusations before detention.

266. Plaintiff alleges that Oakland failed to train or supervise officers regarding the limits of police authority during civil custody exchanges.

267. Plaintiff alleges that Oakland failed to train or supervise officers regarding the First Amendment right to record police activity in public places.

268. Plaintiff alleges that Oakland's practices permitted officers to rely on unverified allegations from one parent in a custody dispute to detain, threaten, or restrict the other parent.

269. Plaintiff alleges that Oakland's practices permitted officers to use the threat of arrest or enforcement to compel compliance where officers lacked probable cause, reasonable suspicion, or an objectively verified violation.

270. Plaintiff alleges that Oakland officers acted in concert during the June 5, 2025 encounter, including by participating in the detention, continuing the encounter despite lack of confirmation, shifting the justification for the encounter, and threatening enforcement based on public recording activity.

271. Plaintiff alleges that these municipal policies, customs, practices, or failures were moving forces behind the constitutional violations alleged above.

272. Plaintiff alleges that the municipal conduct was not limited to isolated negligence but reflected practices, customs, or failures to train that foreseeably caused constitutional injury.

N. Retaliation and interference with federal litigation/service of process

273.    After Plaintiff filed this federal action, Plaintiff attempted to serve or caused service of federal litigation papers on certain defendants.

274.    On or about August 7, 2025, a process server retained or used for service of federal litigation papers attempted to serve Defendant Groezinger at Groezinger's residence at approximately 5:38 p.m. The process server observed a black SUV in the driveway and was advised by occupants

residing in the apartment below Groezinger's residence that Groezinger resided at that address, but no one answered the door.

275.    Later that same evening, at approximately 6:03 p.m., the same process server attempted to serve Defendant Bryan Gurney at his residence. A male identifying himself as Bryan Gurney spoke to the process server through the Ring doorbell or intercom, asked what the documents concerned, and was advised that they were legal papers for him. Gurney stated that he was "out of the country" and declined to state when he would return or make himself available to accept service.

276.    Plaintiff alleges that on August 19, 2025, at approximately 7:32 p.m., the same process server returned to Groezinger's residence. The process server again observed the same black SUV parked in the driveway. After the process server rang the Ring doorbell, an unidentified male whom Plaintiff believes resided with or was associated with Groezinger yelled or stated in substance that Groezinger did not live there and told the process server to leave or he would call the police. Plaintiff alleges that Groezinger did live at that residence. Later that same evening, at approximately 7:55 p.m., the same process server served Gurney, and Plaintiff alleges that during or immediately after that service, Gurney demanded the process server's driver's license, yelled at her to get off his property, and the process server

heard what she described as Mr. Gurney spitting in her direction as she walked toward her vehicle.

277.    Plaintiff alleges that later on August 19, 2025, at approximately 9:27 p.m., the process server received a telephone call from Defendant Officer Bernhard, Badge No. 61, of the Waldwick Police Department. Bernhard instructed the process server not to return to Groezinger's residence because she was considered to be trespassing. Plaintiff further alleges that at approximately 10:51 p.m., the process server spoke with Defendant Sergeant Christopher Sanchez, who had also been present during the April 17, 2020 Waldwick police response involving Plaintiff. Sanchez advised that the Waldwick Police Department had contacted the registered owner of the vehicle the process server was driving to determine whether she had permission to operate that vehicle. Plaintiff alleges that Sanchez described the matter as a "misunderstanding" and not an investigation, but nevertheless advised the process server that she should not return to Groezinger's residence. Plaintiff alleges that this conduct was not a neutral traffic, safety, or criminal investigation, but had the effect of questioning, discouraging, or interfering with lawful service of federal litigation papers by treating lawful service attempts as trespassing or suspicious conduct. Plaintiff alleges that lawful service of federal litigation papers is litigation activity and was not

contact, communication, harassment, intimidation, or approach toward Groezinger. Plaintiff further alleges that this conduct chilled or burdened Plaintiff's access to court and prosecution of this federal civil-rights action, and supports Plaintiff's allegation that law-enforcement mechanisms and motor-vehicle or police-information systems were used or threatened to be used against lawful litigation activity.

O. Judicial-security classification, JSMART-related threat designation, and lack of notice

278. Plaintiff alleges, upon information and belief, that he has been treated as a court-security concern, judicial-security concern, threat, threat-risk subject, or "problem litigant" in court-related systems, courthouse-security communications, JSMART-related records, judicial-security alerts, or similar databases or communications.

279. Plaintiff alleges, upon information and belief, that New Jersey court-security officials use or rely upon systems, databases, lists, alerts, JSMART-related information, or internal communications to identify litigants who are considered judicial-security risks, courthouse-security risks, or threats.

280. Plaintiff alleges, upon information and belief, that these classifications may be disseminated to judges, chambers staff, court administration, sheriff's officers,

courthouse security personnel, law-enforcement personnel, or other court-related officials.

281. Plaintiff alleges that Defendant Robin Morante, as Chief of Court and Judicial Security for the State of New Jersey, oversees, administers, supervises, maintains, disseminates, implements, reviews, or has authority to correct such court-security classifications, JSMART-related entries, threat-risk designations, courthouse-security alerts, or judicial-security communications.

282. Plaintiff alleges that Morante's responsibilities include warning judges or courthouse-security personnel about perceived threats, problem litigants, or persons classified as security risks.

283. Plaintiff alleges that he has been subjected to heightened courthouse-security treatment that was not ordinary courthouse screening. During Plaintiff's criminal proceedings before Judge Wilcox, the criminal prosecutor was accompanied by a plain-clothes security detail at Plaintiff's hearings for more than one year. Plaintiff alleges that the existence of that plain-clothes security detail was confirmed on the record during the January 25, 2024 transcript before Judge Wilcox. Plaintiff further alleges that approximately two days before he was barred from appearing physically in Judge Antoniewicz's courtroom, approximately four sheriff's officers escorted Groezinger into and out of the courtroom. After that hearing, one sheriff's officer approached

Plaintiff and stated in substance that when officers were called in, the situation had been described as though Plaintiff was a "monster," but that Plaintiff appeared to be a good father fighting for his children and should keep going. Plaintiff was not provided notice of any threat designation, security classification, factual basis, report, or procedure to contest the security treatment.

284. Plaintiff further alleges that, beginning on or about October 10, 2025, he was barred from appearing physically in Judge Antoniewicz's courtroom and forced to appear by Zoom, despite having submitted an ADA accommodation request seeking in-person access. Plaintiff alleges that there was no conduct by Plaintiff warranting exclusion from the courtroom, and that Plaintiff had appeared in person approximately two days earlier without incident.

285. Plaintiff alleges that the heightened treatment included being monitored, escorted, subjected to special courthouse-security procedures, barred from physical courtroom access, or otherwise treated differently from ordinary litigants without notice of the basis for that treatment, without disclosure of the information being used, and without any opportunity to contest or correct the alleged security classification.

286. Plaintiff alleges that the designation or classification was imposed without notice to Plaintiff.

287. Plaintiff alleges that he was not told that he had been classified as a judicial-security threat, courthouse-security risk, JSMART-related threat-risk subject, or problem litigant.

288. Plaintiff alleges that he was not told the factual basis for any such classification.

289. Plaintiff alleges that he was not provided the records, allegations, reports, communications, or criteria relied upon to classify him.

290. Plaintiff alleges that he was not given an opportunity to contest, correct, appeal, or seek review of any such classification.

291. Plaintiff alleges that persons designated in this manner are treated similarly to individuals placed on other government watchlists: they are burdened by a government classification, but are not told that they are on the list, why they are on the list, or how to get off the list.

292. Plaintiff alleges that such designation harms access to court because a litigant who has been secretly labeled as a threat enters court proceedings under a cloud of suspicion without any meaningful opportunity to challenge the information being disseminated about him.

293. Plaintiff alleges that secret court-security classifications are especially harmful to pro se litigants because they may cause judges, court staff, sheriff's officers, or courthouse personnel to view ordinary litigation activity, service

of papers, objections, appeals, motions, or requests for relief as suspicious, threatening, or dangerous.

294. Plaintiff alleges that he has engaged in protected activity, including filing lawsuits, filing motions, seeking records, serving legal papers, appealing state-court orders, criticizing government conduct, and seeking legal recourse against government officials.

295. Plaintiff alleges that labeling pro se litigants as judicial-security threats merely because they seek legal recourse, challenge government officials, file complaints, file motions, or object to perceived misconduct violates the First Amendment and Fourteenth Amendment.

296. Plaintiff alleges that any ongoing designation continues to cause injury because it affects his access to court, the manner in which court personnel and security personnel perceive him, and the fairness or appearance of neutrality in proceedings involving him.

297. Plaintiff alleges that any ongoing designation also chills his willingness to file motions, serve legal papers, attend court, seek relief, record or document public official conduct where lawful, or assert his rights.

298. Plaintiff alleges that the injury is independent of the correctness of any state-court ruling because the injury arises from the secret classification, dissemination, and lack of procedural safeguards.

299. Plaintiff does not seek damages against judges or court officials for judicial rulings.

300. Plaintiff seeks prospective relief requiring notice of any ongoing designation, disclosure of the factual basis sufficient to permit meaningful review, an opportunity to contest or correct inaccurate information, and procedures sufficient to prevent secret, unsupported, retaliatory, or mistaken classification of Plaintiff as a court-security threat.

301. Plaintiff also seeks prospective relief prohibiting defendants from maintaining or disseminating false, unsupported, retaliatory, or materially misleading security classifications concerning Plaintiff without constitutionally adequate notice and opportunity to be heard.

302. Plaintiff alleges that the constitutional injuries described above arise from separate factual events, separate actors, and separate categories of conduct, including malicious prosecution, disclosure and use of confidential records, detention, interference with recording activity, false extra-judicial accusations, and ongoing judicial-security classifications.

## CLAIMS FOR RELIEF

### COUNT I

42 U.S.C. § 1983 / NJCRA — Due Process and Joint Action Based on Misuse and Disclosure of Sensitive Law-Enforcement, Juvenile, and Confidential Records Against Gurney, Messner, Bendian, Waldwick, Ramsey, and John Does; and against Groezinger and Kleiner to the extent they knowingly requested, used, possessed, disseminated, transmitted, or relied upon unlawfully disclosed, confidential, juvenile, sealed, expunged, or non-public law-enforcement records.

303. Plaintiff repeats and realleges the above paragraphs.

304. Plaintiff had constitutionally protected interests in due process, family integrity, privacy, and freedom from state action based on unlawfully obtained or improperly disseminated sensitive records.

305. Defendants Gurney, Messner, and Bendian, acting under color of law or jointly with state actors, obtained, released, facilitated, approved, processed, transmitted, or disseminated sensitive law-enforcement records concerning Plaintiff.

306. The records included domestic-violence-related records, police reports, juvenile or juvenile-related records, sealed or confidential materials, or other sensitive law-enforcement records.

307. Plaintiff alleges that the release and dissemination were not ordinary lawful OPRA processing but were facilitated through law-enforcement status, law-enforcement communications, police-chief authority, municipal records channels, records-custodian action, or informal channels.

308. Plaintiff alleges that Ramsey and Waldwick permitted or caused sensitive records to be released through municipal and police records systems without adequate safeguards, redaction, legal review, or compliance with confidentiality requirements.

309. Defendants Groezinger and Kleiner used, possessed, referenced, transmitted, disseminated, or relied upon records and non-public law-enforcement information to reinforce adverse factual narratives against Plaintiff and to trigger, support, or perpetuate state action. Plaintiff alleges that Groezinger admitted in a March 11, 2025 certification that she received records through an OPRA request to Ramsey and forwarded them to Dr. Tarle, and that Kleiner confirmed in emails and on the record that Groezinger submitted Plaintiff's juvenile or juvenile-related records and other records to Dr. Tarle. Plaintiff further alleges that Kleiner knew or reasonably should have known that juvenile or juvenile-related records, sealed records, expunged records, or non-public police materials were not ordinary public litigation materials because Kleiner acknowledged that the records involved an alleged arrest from when Plaintiff was a minor and acknowledged that records from pending matters are not ordinarily obtainable from court while the matter is pending. Plaintiff further alleges that Bendian later issued an OPRA response

denying a request for juvenile records on the ground that juvenile records are exempt from disclosure, supporting Plaintiff's allegation that Bendian knew or should have known that such records were confidential.

310. Plaintiff alleges that Groezinger requested and obtained Ramsey juvenile or juvenile-related records, possessed those records, transmitted those records to Dr. Tarle, and used those records in custody-related proceedings or evaluations. Plaintiff further alleges that Groezinger admitted in her March 11, 2025 certification that she received records through an OPRA request to Ramsey and "simply forwarded them to Dr. Tarle," and that this admission supports Plaintiff's allegation that the injury arose from acquisition, possession, disclosure, and transmission of confidential records, not merely from protected courtroom advocacy.

311. Plaintiff alleges that Groezinger requested Hawthorne body-worn-camera footage but did not receive it, that Gurney then requested and received the same footage, and that Kleiner later referenced or submitted that footage in court on Groezinger's behalf.

312. Plaintiff alleges that the sequence of requests, releases, and later use supports the inference that private defendants knowingly used law-enforcement records channels and non-public information to cause or reinforce state action against Plaintiff.

313. The records were later used in proceedings, evaluations, custody disputes, or

restrictions affecting Plaintiff's parental rights, liberty interests, privacy

interests, and reputation.

314. Plaintiff did not discover the full scope of the acquisition, approval,

dissemination, and later use of the records until later proceedings and

disclosures.

315. Defendants' conduct caused Plaintiff constitutional injury.

316. Defendants are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil

Rights Act.

## COUNT II
42 U.S.C. § 1983 / NJCRA — Malicious Prosecution / Initiation of State Action
Without Probable Cause
Against Groezinger, Ritondale, and John Does; and against Kleiner to the extent
his extra-judicial conduct knowingly caused or reinforced the restraining-order-
violation theory.

317. Plaintiff repeats and realleges the above paragraphs.

318. Defendants initiated, caused, or substantially contributed to criminal

proceedings or state enforcement action against Plaintiff.

319. The proceedings were based on materially false, misleading, exaggerated, or

objectively unreliable allegations.

320. Groezinger supplied specific allegations to BCPO investigators during the

September 16, 2022 recorded interview, as reflected in the BCPO interview

recording and/or transcript, including allegations that Plaintiff moved within

two to three feet of her, recorded her, forced her to take things from his hands in order to get the child back, refused to release the child to Groezinger's mother, required Groezinger to personally appear for exchanges, followed or approached her when she attempted to create distance, accused her of using an impostor, and used the custody-exchange process as a means of control.

321. Plaintiff alleges that those allegations were contradicted by the custody-exchange recordings and that Groezinger knew the exchanges were being recorded when she made the allegations. Plaintiff further alleges that after the recordings were supplied to the prosecutor and court, the State continued to rely on the same allegations and asserted that the recordings corroborated Groezinger's statement, even though Plaintiff alleges the recordings objectively contradicted her version.

322. The grand-jury transcript reflects that the State presented Groezinger's allegations to the grand jury through Detective Madonna, including allegations concerning Plaintiff's alleged physical proximity, recording, refusal to release the child to Groezinger's mother, alleged demand for face-to-face interaction, alleged refusal to release the child until Groezinger exited the vehicle, alleged "impostor" accusation, and alleged conduct during custody exchanges.

323. The grand jury was told that Plaintiff recorded the exchanges, but the recordings were not shown or played to the grand jury.

324. Plaintiff alleges that Groezinger's allegations became the factual predicate for state action when law enforcement or prosecutors repeated, adopted, or relied upon them before the grand jury and then continued to rely upon them in opposition to Plaintiff's motion to dismiss the superseding indictment after Plaintiff supplied the custody-exchange recordings.

325. Plaintiff alleges that Kleiner's pre-indictment threat regarding Groezinger's unilateral refusal to personally conduct exchanges contributed to the later theory that Plaintiff violated the restraining order by refusing to release the child to Groezinger's mother. Plaintiff further alleges that Kleiner knew or reasonably should have known that Groezinger could not unilaterally change the exchange procedure, because Plaintiff's counsel advised Kleiner that the order required Groezinger to conduct the exchange and did not authorize her mother to replace her. Plaintiff further alleges that this same mother-substitution and refusal-to-release theory appeared in Groezinger's BCPO interview, the grand-jury presentation, and the State's later opposition to Plaintiff's motion to dismiss the superseding indictment. Plaintiff alleges that Kleiner's extra-judicial threat and the later use of the same theory in criminal proceedings support a plausible inference that Kleiner knowingly caused or

reinforced a factual predicate for state action, rather than merely making a protected legal argument in court.

326. Ritondale initiated, supported, or contributed to criminal complaints, reports, affidavits, or charging documents without probable cause and despite the availability of objective evidence.

327. Ritondale personally swore out, signed, approved, or submitted a probable-cause affidavit, criminal complaint, report, or charging narrative that materially mischaracterized Plaintiff's recorded statements.

328. Plaintiff further alleges that the charging documents materially altered the language attributed to Plaintiff by converting statements expressing emotion or frustration into direct future threats, omitted exculpatory context reflected in the recording and body-microphone evidence, and relied upon factual assertions that were contradicted by available objective evidence.

329. The proceedings lacked probable cause.

330. The proceedings terminated in Plaintiff's favor.

331. Plaintiff's criminal proceedings terminated favorably when the charges were dismissed in their entirety after review by a new prosecutor. The dismissal was not based on compromise, plea, diversion, or technical avoidance of guilt, but reflected termination of the prosecution against Plaintiff.

332. Plaintiff suffered deprivation of liberty, reputational injury, emotional distress, legal expense, and restrictions arising from the prosecution.

333. Defendants acted knowingly, recklessly, maliciously, or with improper purpose.

334. Defendants are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act.

## COUNT III
### First Amendment Retaliation / Interference With Right to Record Police Activity Against Harvey, Lopez, Anderson, and John Does

335. Plaintiff repeats and realleges the above paragraphs.

336. Plaintiff engaged in or sought to engage in protected documentation of police activity occurring in a public police-station, municipal, or courthouse parking-lot area, including through recording methods permitted by the amended restraining-order language.

337. The documentation concerned police activity and a custody exchange involving law enforcement.

338. Plaintiff alleges that he was not personally using a handheld camera to record Groezinger or communicate with Groezinger.

339. Plaintiff alleges that the recording or documentation did not constitute unlawful contact, communication, harassment, intimidation, or approach toward Groezinger.

340. Defendants threatened Plaintiff with arrest or enforcement action based on recording or documentation activity.

341. The threat would chill a person of ordinary firmness from continuing lawful documentation of police activity.

342. Plaintiff's protected documentation activity, or perceived documentation activity, was a substantial or motivating factor for the threat.

343. Defendants lacked a lawful basis to prohibit, threaten arrest over, or chill lawful documentation of police activity in a public place, including documentation by means permitted under the amended restraining-order language.

344. Defendants violated Plaintiff's First Amendment rights.

## COUNT IV
Fourth Amendment — Unlawful Detention
Against Harvey, Lopez, Anderson, and John Does

345. Plaintiff repeats and realleges the above paragraphs.

346. Defendants detained Plaintiff or prolonged his detention during the June 5, 2025 Oakland incident.

347. Defendants lacked reasonable suspicion or probable cause.

348. Defendants relied on an unverified accusation from an adverse party in a custody dispute without independent corroboration.

349. No officer personally observed the alleged car-seat violation.

350. Defendants could not confirm whether a child restraint was or was not present.

351. Defendants prolonged the detention after failing to confirm the alleged violation.

352. Defendants sought to inspect or search a vehicle without adequate legal basis and continued the encounter after consent was denied.

353. Defendants shifted the basis of the encounter from the unverified car-seat allegation to the recording/FRO issue after the original allegation could not be verified.

354. Defendants violated Plaintiff's Fourth Amendment rights.

## COUNT V
### Monell Municipal Liability
Against Waldwick, Oakland, and Ramsey, including Waldwick municipal liability for alleged service-of-process interference by Waldwick officers

355. Plaintiff repeats and realleges the above paragraphs.

356. Waldwick maintained or permitted policies, customs, practices, or failures to train regarding the release of sensitive law-enforcement records.

357. Waldwick's policies, customs, practices, or failures allowed sensitive domestic-violence-related, juvenile, victim-related, or law-enforcement records to be released through law-enforcement relationships or informal channels.

358. Waldwick failed to maintain adequate procedures, training, supervision, and safeguards to prevent direct police-official communications, law-enforcement relationships, motor-vehicle or registration-information access, police-information systems, trespass warnings, or police directives from being used for improper, informal, retaliatory, or relationship-based purposes, including sensitive records-release decisions and interference with lawful service of federal litigation papers.

359. Ramsey maintained or permitted policies, customs, practices, or failures to train regarding OPRA processing, police-chief approval, juvenile-record confidentiality, redaction, legal review, and release of juvenile or juvenile-related law-enforcement records.

360. Ramsey's policies, customs, practices, or failures allowed Plaintiff's confidential juvenile or juvenile-related records to be released through municipal or police records channels without adequate safeguards.

361. Ramsey failed to maintain adequate procedures to ensure that juvenile or juvenile-related records were withheld, redacted, reviewed by counsel, or denied before disclosure to a private requester.

362. Ramsey's records-release practices, including the routing of OPRA requests between the Borough Clerk and Police Chief, were moving forces behind the disclosure of Plaintiff's confidential juvenile or juvenile-related records.

363. Ramsey's records system placed final release authority in municipal records channels while relying on police-chief approval for police records, but failed to include adequate safeguards to prevent juvenile or juvenile-related records from being released to private parties.

364. Oakland maintained or permitted policies, customs, practices, or failures to train regarding police involvement in custody exchanges, verification of accusations before detention, and the public's right to record police activity.

365. Oakland permitted officers to threaten arrest or enforcement over protected public recording activity without identifying a lawful basis. Oakland had actual notice before June 5, 2025 that the same or materially similar custody-exchange recording issue did not create probable cause for a restraining-order violation because the May 23, 2023 Oakland police report documented that an assistant prosecutor found no probable cause under the amended FRO language. Despite that prior notice, Oakland officers again used the recording/FRO theory to prolong Plaintiff's detention and threaten enforcement.

366. These policies, customs, practices, or failures were moving forces behind the constitutional violations alleged above, including the alleged release or use of sensitive records, the June 5, 2025 Oakland detention and recording-related threats, the Ramsey juvenile-record disclosure, and Waldwick's alleged use of

law-enforcement or motor-vehicle information to interfere with lawful federal

service of process.

367. The municipalities are liable under 42 U.S.C. § 1983.

## COUNT VI
### Abuse of Process / Retaliatory Misuse of Legal Process
### Against Groezinger, Kleiner, and John Does

368. Plaintiff repeats and realleges the above paragraphs.

369. Defendants used or threatened to use legal process and state enforcement

mechanisms for purposes other than those for which such processes were

designed.

370. The processes allegedly misused included criminal accusations, restraining-

order enforcement mechanisms, criminal-process threats, and law-

enforcement referrals allegedly used to accomplish collateral purposes,

including retaliation, intimidation, restriction of protected conduct, and

reinforcement of false factual narratives.

371. As to Kleiner, Plaintiff alleges that the process misused included extra-

judicial threats of restraining-order enforcement or criminal consequences

based on Groezinger's unilateral mother-substitution theory, after Plaintiff's

counsel had already disputed that the operative exchange order allowed

Groezinger to substitute her mother for exchanges. Plaintiff alleges that the

same theory was later repeated in Groezinger's BCPO interview, the grand-

jury presentation, and the State's opposition to Plaintiff's motion to dismiss the superseding indictment.

372. Defendants allegedly used those mechanisms to retaliate against Plaintiff, restrict his access to records, suppress his participation in his child's care, chill protected recording activity, and portray him falsely as dangerous, intimidating, unstable, or lawless.

373. Groezinger allegedly used materially false or misleading allegations to trigger or reinforce law-enforcement and criminal processes.

374. Kleiner is not sued in this count for courtroom argument, legal filings, or ordinary advocacy. Kleiner is sued only to the extent he allegedly used extra-judicial threats of restraining-order enforcement or criminal consequences to support a factual theory he knew or reasonably should have known was disputed, contradicted by the operative exchange order, contradicted by Plaintiff's counsel's written objection, or later used as a factual predicate for criminal enforcement.

375. Plaintiff alleges that the misuse of process was intended to accomplish collateral objectives, including portraying Plaintiff as violating the restraining order, portraying Plaintiff as stalking or dangerous, chilling Plaintiff's protected conduct, and causing or reinforcing criminal or enforcement consequences not justified by the actual facts.

376. Plaintiff suffered damages as a result.

377. Defendants are liable for abuse of process and/or constitutional misuse of

process.

## COUNT VII
42 U.S.C. § 1983 / NJCRA — Joint Action and Due Process Deprivation Based on
False Extra-Judicial Accusations, Police Escalation, and Security Requests
Against Behaved Brain, Groezinger, Kleiner, and John Does

378. Plaintiff repeats and realleges the above paragraphs.

379. Plaintiff had protected interests in parental participation, due process, access

to information concerning his child's care, and freedom from state action

based on materially false or misleading factual accusations.

380. Behaved Brain, through its agents or representatives, allegedly supplied,

threatened to supply, created, or helped create false extra-judicial accusations

that Plaintiff was threatening, intimidating, harassing, unsafe, or dangerous.

381. Plaintiff alleges that those accusations were false or materially misleading

because Plaintiff's recordings show calm, polite, cooperative, and non-

threatening interactions; the Wyckoff police report documented that Plaintiff

made no specific threats toward staff; a Ho-Ho-Kus supervising officer later

listened to Plaintiff's recordings and wrote that Plaintiff did not seem

aggressive or argumentative; and no pending charges were filed by the

Wellness Center.

382. Plaintiff alleges that Behaved Brain affirmatively involved law enforcement, sought police reports, extra patrols, security-detail assistance, or police-security measures, and supplied or reinforced the disputed danger narrative through those law-enforcement channels.

383. Plaintiff alleges that on or about February 7, 2024, Matthew Gateley stated on a recorded call with Plaintiff and Plaintiff's attorney that Behaved Brain would have staff members sign affidavits accusing Plaintiff of intimidating or harassing staff if Plaintiff continued to press for records concerning his child.

384. Plaintiff alleges that Behaved Brain acted jointly or in coordination with Groezinger, Kleiner, law-enforcement actors, or John Does by creating, transmitting, or reinforcing materially false factual accusations through police reports, police-security requests, threatened affidavits, and repeated safety/stalking narratives that foreseeably caused state involvement and restricted Plaintiff's parental participation before neutral evidentiary testing occurred.

385. Plaintiff alleges that the injury arose from false extra-judicial accusations, police escalation, police-security requests, threatened affidavits, and coordinated state-action consequences, not from Behaved Brain's ordinary confidentiality objections or from the correctness of any family-court ruling.

Defendants are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil

Rights Act.

## COUNT VIII
42 U.S.C. § 1983 — Prospective Declaratory and Injunctive Relief Regarding
Judicial-Security Classification, JSMART-Related Threat Designation, Lack of
Notice, and Lack of Opportunity to Be Heard
Against Robin Morante in Her Official Capacity Only

386. Plaintiff repeats and realleges the above paragraphs.

387. Plaintiff alleges that he has been treated as a court-security concern, judicial-

security threat, threat-risk subject, JSMART-related threat-risk subject,

courthouse-security concern, or problem litigant without notice or opportunity

to contest the classification.

388. Plaintiff alleges that Defendant Robin Morante, as Chief of Court and Judicial

Security for the State of New Jersey, has authority over, responsibility for, or

involvement in the administration, dissemination, maintenance,

implementation, review, correction, or supervision of such classifications,

alerts, security communications, or courthouse-security procedures.

389. Plaintiff alleges that any ongoing classification or dissemination of that

classification affects his access to court and the fairness or apparent neutrality

of proceedings.

390. Plaintiff alleges that secret court-security classifications, JSMART-related

designations, threat-risk alerts, or courthouse-security warnings impose a

continuing stigma and practical burden on access to courts when they are maintained or disseminated without notice, factual basis, review, or an opportunity to correct inaccurate information.

391. Plaintiff alleges that designating pro se litigants as judicial-security threats merely for seeking legal recourse, filing lawsuits, filing motions, serving legal papers, appealing orders, criticizing government officials, or challenging official misconduct violates the First Amendment and Fourteenth Amendment.

392. Plaintiff alleges that he has a due-process right to notice and a meaningful opportunity to contest any ongoing governmental classification that labels him a judicial-security threat, courthouse-security risk, problem litigant, or similar threat-risk subject when that classification affects his access to court, courthouse treatment, or official perception of him.

393. Plaintiff seeks prospective relief only, including notice of any ongoing classification, disclosure of the factual basis sufficient to permit meaningful review, an opportunity to contest or correct inaccurate information, and procedures to prevent unsupported, retaliatory, or mistaken threat-risk classifications.

394. Plaintiff also seeks prospective relief prohibiting the ongoing maintenance or dissemination of false, unsupported, retaliatory, or materially misleading

security classifications concerning Plaintiff without constitutionally adequate process.

395. Plaintiff does not seek damages against judges for judicial rulings.

396. Plaintiff does not seek reversal, modification, supervision, or review of any state-court order.

397. Plaintiff seeks prospective relief against Morante only in her official capacity to remedy ongoing or future constitutional violations arising from court-security classifications and lack of procedural safeguards.

## COUNT IX
### 42 U.S.C. § 1983 / NJCRA — First Amendment Retaliation, Access-to-Courts Interference, and Interference With Lawful Federal Service of Process Against Officer Bernhard, Sergeant Christopher Sanchez, and John Does

398. Plaintiff repeats and realleges the above paragraphs.

399. Plaintiff engaged in protected litigation activity by filing this federal civil-rights action and causing lawful service of federal litigation papers on defendants.

400. The retained process server was performing lawful service of process in connection with Plaintiff's federal civil-rights action and was not attempting to threaten, harass, intimidate, contact, or communicate with Groezinger for any purpose other than lawful service of federal litigation papers.

401. Defendant Officer Bernhard, acting under color of state law, contacted the retained process server after an attempted service at Groezinger's residence and instructed her not to return because she was considered to be trespassing.

402. Defendant Sergeant Sanchez, acting under color of state law, later spoke with the retained process server, advised that Waldwick police had obtained her cellular telephone number by contacting the registered owner of the vehicle she was driving, stated that the matter was a "misunderstanding" and not an investigation, but nevertheless advised that she should not return to Groezinger's residence. Plaintiff further alleges that Sanchez was not a neutral stranger to the underlying dispute because he had been present during the April 17, 2020 Waldwick police response involving Plaintiff.

403. Plaintiff alleges that the process server approached Groezinger's residence by the customary path to the front entrance, rang the doorbell, waited briefly, and left. Plaintiff further alleges that there were no signs, gates, barriers, or other restrictions preventing visitors or process servers from approaching the front entrance.

404. Plaintiff alleges that Defendants Bernhard and Sanchez used, ratified, continued, or participated in police authority, trespass warnings, police directives, motor-vehicle or registration-information access, or police-information systems in a manner that would deter a person of ordinary

firmness from continuing lawful service efforts in connection with Plaintiff's federal civil-rights action. Plaintiff further alleges that Sanchez's prior involvement in the April 17, 2020 police response supports the inference that the August 19, 2025 police involvement was not merely a random or neutral misunderstanding, but occurred against the backdrop of Waldwick's prior involvement with Plaintiff, Groezinger, and the same underlying dispute.

405. Plaintiff alleges that the adverse action was caused by, motivated by, or substantially connected to the protected litigation activity, namely the attempt to serve federal litigation papers on Groezinger in this civil-rights action.

406. Plaintiff alleges that Defendants' conduct burdened, chilled, delayed, or interfered with Plaintiff's access to court, prosecution of this federal civil-rights action, ability to complete lawful service, and ability to use ordinary federal litigation procedures without improper police interference.

407. Plaintiff alleges that Defendants lacked a lawful basis to treat the process server's ordinary service attempts as trespassing, suspicious conduct, or restraining-order-related misconduct.

408. Defendants Bernhard, Sanchez, and John Does are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act.

## DAMAGES

409. Plaintiff suffered loss of liberty, reputational harm, emotional distress, humiliation, anxiety, legal expenses, restrictions on parental rights, interference with protected speech, loss of privacy, damage to family relationships, and other damages.

410. Plaintiff suffered damages arising from the alleged unlawful acquisition, approval, release, disclosure, dissemination, and later use of sensitive law-enforcement records, domestic-violence-related records, juvenile or juvenile-related records, sealed records, confidential records, and other non-public information concerning Plaintiff.

411. Plaintiff suffered damages arising from the alleged release and dissemination of confidential juvenile or juvenile-related records through Ramsey municipal and police records channels, including alleged conduct by Gurney, Bendian, Ramsey, Groezinger, Kleiner, and John Does.

412. Plaintiff suffered damages arising from the alleged release and dissemination of sensitive Waldwick records through Waldwick municipal and police records channels, including alleged conduct by Gurney, Messner, Waldwick, Groezinger, Kleiner, and John Does.

413. Plaintiff suffered damages arising from the alleged use of false, misleading, unlawfully obtained, sealed, expunged, juvenile, confidential, or non-public

records to portray Plaintiff as dangerous, unstable, lawless, intoxicated,
threatening, stalking, or unfit in proceedings, evaluations, custody disputes,
and related restrictions.

414. Plaintiff suffered damages arising from the alleged initiation, continuation, or
reinforcement of criminal proceedings and state enforcement action without
probable cause, including additional restrictions, reputational injury, legal
expense, emotional distress, and deprivation of liberty.

415. Plaintiff suffered damages arising from the June 5, 2025 Oakland incident,
including unlawful detention, interference with protected recording activity,
chilling of First Amendment rights, emotional distress, humiliation, and loss
of liberty.

416. Plaintiff suffered damages arising from the alleged false extra-judicial
accusations, police reports, and threatened affidavits by Behaved Brain,
Groezinger, Kleiner, and/or John Does, including interference with parental
participation, records-access rights, due-process rights, and Plaintiff's ability
to participate in his child's care, and from the use of contradicted factual
narratives portraying Plaintiff as intimidating, threatening, unsafe, dangerous,
or stalking Groezinger when recordings and police review showed otherwise.

417. Plaintiff suffered damages arising from the alleged abuse of legal process,
retaliatory misuse of process, interference with lawful federal service of

process, police interference with a retained process server, and use of false or misleading factual predicates to trigger, reinforce, or perpetuate state action.

418. Plaintiff suffered damages arising from Defendants Bernhard, Sanchez, and/or John Does allegedly treating lawful service of federal litigation papers as trespassing or suspicious conduct, contacting the retained process server, directing or advising the retained process server not to return to Groezinger's residence, using or relying on motor-vehicle or registration-information access to obtain the process server's telephone number, and interfering with Plaintiff's ability to complete lawful service and prosecute this federal civil-rights action.

419. Plaintiff alleges that Defendants' conduct was willful, knowing, reckless, malicious, retaliatory, or undertaken with deliberate indifference to Plaintiff's rights, entitling Plaintiff to punitive damages against individual defendants where legally available.

420. Plaintiff seeks compensatory damages, punitive damages where legally available, declaratory relief where appropriate, prospective injunctive relief where appropriate, costs, and any other relief the Court deems just and proper.

421. Plaintiff seeks compensatory damages and all other legally available relief against Ramsey and Bendian for the alleged unlawful release, disclosure,

dissemination, and later use of confidential juvenile or juvenile-related records concerning Plaintiff.

422. Plaintiff seeks prospective declaratory and injunctive relief against Defendant Morante only in her official capacity and does not seek damages from Morante.

423. Plaintiff does not seek damages against judges for judicial rulings or adjudicative acts.

## JURY DEMAND

424. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Christopher Peterson
Christopher Peterson
Plaintiff Pro Se
Address on file with the Court
christopherpeterson847@gmail.com
Dated: July 9, 2026

## EXHIBIT B

## MARKED/REDLINE VERSION OF PROPOSED SECOND AMENDED COMPLAINT SHOWING CHANGES FROM PRIOR AMENDED COMPLAINT

Plaintiff submits this marked/redline version of the Proposed Second Amended Complaint in support of Plaintiff's Motion for Leave to File Second Amended Complaint.

This exhibit is submitted pursuant to Local Civil Rule 15.1 to show the differences between the prior Amended Complaint and the Proposed Second Amended Complaint.

Because the Proposed Second Amended Complaint substantially reorganizes, narrows, clarifies, and rewrites the prior Amended Complaint, the marked/redline version necessarily shows substantial deletions and additions.

## EXHIBIT B
## MARKED VERSION OF PROPOSED SECOND AMENDED COMPLAINT SHOWING CHANGES FROM PRIOR AMENDED COMPLAINT

Plaintiff submits this marked version pursuant to Local Civil Rule 15.1.

The clean Proposed Second Amended Complaint is submitted separately as Exhibit A.

Deleted material from the prior Amended Complaint is shown in red strikethrough. Added material in the Proposed Second Amended Complaint is shown in blue underline.

The Proposed Second Amended Complaint is substantially reorganized and rewritten. Accordingly, this marked version presents the prior Amended Complaint text in full as deleted and the Proposed Second Amended Complaint text in full as added.

Exhibit C separately summarizes the major amendments for ease of review.

PRIOR AMENDED COMPLAINT TEXT SHOWN AS DELETED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CHRISTOPHER PETERSON,
Plaintiff,
CIVIL ACTION
V. Case No.:
KAITLYN GROEZINGER, BRYAN GURNEY, MICHAEL BLEE, Acting Administrative Director of the Courts of the State of New Jersey, DAVID TANG, Chief of the Family Practice Division within the Administrative Director of the Courts of the State of New Jersey, GARY WILCOX, MICHAEL ANTONIEWICZ, MARK MESSNER, Waldwick Police Chief, LEE SCHAER, LAWRENCE KLEINER, FRANCES MCGROGAN, and THE BEHAVED BRAIN, LLC, DYLAN RITONDALE, WALDWICK BORO, BOROUGH OF OAKLAND, DONALD HARVEY, MATTHEW LOPEZ, HAN ANDERSON, ROBIN MORANTE, and JOHN DOES 1-10.
Defendants.
2:25-cv-11801-
MEF-AME
JURY TRIAL
DEMANDED

AMENDED COMPLAINT and JURY DEMAND

Plaintiff Christopher Peterson, pro se, for his causes of action against Defendants, states as follows:

PARTIES AND RELEVANT PERSONS

1. Plaintiff, Christopher Peterson (referred to at times as "Mr. Peterson") is domiciled in the State of Jersey, residing in Bergen County, New Jersey at times relevant to this Complaint and is the father of minor children (B.P. and E.P.) who

are subject to the jurisdiction of the New Jersey Superior Court, Chancery Division, Family Part ("New Jersey Family Court" or "Family Court"), over which the New Jersey Family Court continues to exercise jurisdiction.

2. Defendant Kaitlyn Groezinger (hereinafter referred to at times as "Defendant" or "Groezinger"), is the legal and biological mother of E.P.

3. Defendant Michael Blee, J.A.D. (hereinafter referred to at times as "Defendant" or "Blee"), is the Acting Administrative Director of the Courts of the State of New Jersey, is sued in his individual and official capacity.

4. Blee is a policy-maker for New Jersey respect to a variety of unconstitutional policies at issue in this case. Those unconstitutional policies have denied and continue to deny Plaintiff his constitutional rights.

5. Blee also acted in concert with other defendants, under color of law, to deny Defendant his Constitutional rights.

6. Defendant, David Tang (hereinafter referred to at times as "Defendant" or "Tang"), is the Chief of the Family Practice Division within the Administrative Director of the Courts of the State of New Jersey, and is sued in his official and individual capacity,

7. Tang is a policy-maker for New Jersey respect to a variety of unconstitutional policies at issue in this case. Those unconstitutional policies have denied and continue to deny Plaintiff his constitutional rights.

8. Tang also acted in concert with other defendants, under color of law, to deny Defendant his Constitutional rights.

9. Defendant, Gary Wilcox, (hereinafter referred to at times as "Defendant" or "Wilcox"), is a Judge in the New Jersey Superior Court, Law Division, Criminal Part, Bergen County, and is sued in his official and individual capacity.

10. Wilcox is a policy-maker for New Jersey respect to a variety of

unconstitutional policies at issue in this case. Those unconstitutional policies have denied and continue to deny Plaintiffhis constitutional rights.

11. Wilcox also acted in concert with other defendants, under color of law, to deny Defendant his Constitutional rights.

12. Defendant, Michael Antoniewicz, (hereinafter referred to at times as "Defendant" or "Antoniewicz"), is a Judge in the New Jersey Superior Court, Chancery Division, Family Part, Bergen County, and is sued in his official and individual capacity.

13. Antoniewicz is a policy-maker for New Jersey respect to a variety of unconstitutional policies at issue in this case. Those unconstitutional policies have denied and continue to deny Plaintiffhis constitutional rights.

14. Antoniewicz also acted in concert with other defendants, under color of law, to deny Defendant his Constitutional rights.

15. Defendant Bryan Gurney (hereinafter referred to at times as "Gurney") is the maternal grandfather of Plaintiffs child B.P.., Gurney is a former Chief of Police, Ramsey, New Jersey Police Department, and current Director of Public Safety at the Boonton, New Jersey Police Department; he is sued in his individual and official capacity.

16. Gurney acted in concert with other defendants, under color of law, to deny Defendant his Constitutional rights.

17. Defendant Mark Messner, (hereinafter referred to at times as "Messner") is, at all times relevant to this complaint, the Chief of Police for the Borough of Waldwick, New Jersey; he is sued in his individual and official capacity.

18. Messner is a policy-maker for Borough of Waldwick respect to a variety of unconstitutional policies at issue in this case. Those unconstitutional policies have denied and continue to deny Plaintiff his constitutional rights under color of law.

19. Defendant Lee Schaer, (hereinafter referred to at times as "Schaer") was, at all times relevant to this complaint, an Assistant Prosecutor for the Bergen County, New Jersey, Prosecutor's Office; she is sued in her individual capacity.

20. Schaer acted in concert with other defendants, under color of law, to deny Defendant his Constitutional and statutory rights.

21. Defendant Lawrence Kleiner, (hereinafter referred to at times as "Kleiner") is, at all times relevant to this complaint, an Attorney at Law in the State ofNew Jersey, acting as attorney for the Defendant Groezinger.

22. Kleiner acted in concert with other defendants, under color of law, to

deny Defendant his Constitutional and statutory rights.

23. Defendant, Frances McGrogan, (hereinafter referred to at times as "Defendant" or "McGrogan"), is a Judge in the New Jersey Superior Court, Law Division, Criminal Part, and, Chancery Division, Family Part, Bergen County, and is sued in her official and individual capacity.

24. McGrogan is a policy-maker for New Jersey respect to a variety of unconstitutional policies at issue in this case. Those unconstitutional policies have denied and continue to deny Plaintiff his constitutional rights.

25. McGrogan also acted in concert with other defendants, under color of law, to deny Defendant his Constitutional rights.

26. Robin Morante, is Chief of Court & Judicial Security for New Jersey; she is sued in both her official and individual capacity.

27. All of the above Defendants, insofar as they are officials of the State of New Jersey or any of its political subdivisions, are subject to suit under the doctrine of Exparte Young to halt the ongoing violation of constitutional rights.

28. Defendant, The Behaved Brain, LLC, (hereinafter referred to at times as "Defendant" or "Behave Brain"), is a New Jersey Limited Liability Company in the State of New Jersey, doing business as Behaved Brain Wellness Center in the County of Bergen, State of New Jersey, and is liable for its actions done under color of state law.

29. Behave Brain, by and through its employees and agents, acted in concert with other defendants, under color of law, to deny Defendant his Constitutional and statutory rights.

30. JOHN DOES 1-10 are individuals, identity ,currently unknown who acted in concert with named defendants to deny Peterson constitutional rights under color of law.

JURISDICTION AND VENUE

31. This is a civil action, seeking a judgment to enforce and declare his rights under the First, Fourth, Ninth and Fourteenth Amendments to the Constitution for the United States of America pursuant to 42 U.S.C. §1983 and 28 U.S.C. §§2201-2202 and §204(a) of the federal Civil Rights Act of 1964 (Civil Rights Act) for Prospective Declaratory and Injunctive Relief, seeking a judgment for violation of rights of free speech under Article I, paragraph 6 of Constitution of the State of New Jersey, under Section 10:6-2 of the New Jersey Statutes (the New Jersey Civil Rights Act), Malicious Abuse of Process, and Malicious Prosecution.

32. The Court has jurisdiction over this action, which presents a federal

question under Article III, §2 of the Constitution for the United States of America,

pursuant to 28 U.S.C. §1331 and 2201-2202, with supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiffs state law claims.

33. Venue is proper in this Court under 28 U.S.C. §1391, because the parties reside in this District, and all of the events giving rise to this claim occurred in this District.

FACTUAL BACKGROUND

34. Plaintiff, Christopher Peterson, is the loving parent and legal guardian of the minor child E.P. ("Plaintiffs Child"), born in March of 2018.

35. E.P.'s mother is Defendant, Kaitlyn Groezinger, who is a parent and legal guardian of E.P.

36. At the time of E.P.'s birth, Plaintiff and Groezinger were living together in the same home with E.P.

37. Plaintiffs child from another relationship, B.P., born on March 3, 2016, was also living with them part time.

38. The mother of B.P. is T.G..

39. B.P. was born in Iowa, and T.G. then, without Plaintiff's consent, moved to New Jersey, which asserted jurisdiction.

40. Subsequent to B.P. being born, a proceeding (under a FD docket

designation) in the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County Vicinage, was brought by T.G., and the Magali M. Francois, J.S.C. issued an order of temporary primary custody to T.G., with supervised visitation for Plaintiff, in a proceeding that was held Ex Parte, without notice to Plaintiff.

41. Subsequently, family court judge James X. Sattely, J.S.C. presided over the case as to B.P.

42. Plaintiff asserted that jurisdiction in New Jersey was improper, and was in fact properly in the State of Iowa.

43. Proceedings contesting jurisdiction lasted 6 months approximately, and the New Jersey Family Court found that it had jurisdiction.

44. Plaintiff subsequently contested the Ex Parte Order of Custody, and it took approximately three years before Plaintiff was able to schedule a plenary hearing on the allegedly "temporary" Ex Parte order of custody, which finally resulted in a consent agreement on custody at the hearing.

45. In New Jersey, allegedly "temporary" custody orders routinely last for years, but due process is denied parents under the fiction that these orders are just temporary.

46. The New Jersey Appellate Division decision, J. G. v. J.H., reaffirms the principles set forth by New Jersey Courts that a plenary hearing is necessary, and required, when making determinations concerning parenting time, custody,

and a child's best interests, whether the parents, are married, divorced, or unmarried and custody is contested.

47. The Third Circuit in B.S.v. v. Somerset County 704 F.3d 250 (3rd Cir. 2013) has also firmed the fundamental constitution right of parents to a prompt and full proceeding to challenge any diminution of custody.

48. JG. v. JH. further affirms that consideration of the custody factors (N.J.S.A. 9:2-4(c)) is required, with the parties being afforded the right to have mediation, discovery, lay, and expert testimony and an evaluation of the child's interests.

49. This reaffirms the core principles in contested child custody matters that a fair plenary hearing must be undertaken with consideration of all the factors in N.J.S.A. 9:2-4 before a court may decide a parenting and custody arrangement that serves the child's best interest.

50. This applies to all family part dockets as per JG. v. JH. - 457 N.J. Super. 365.

51. The Defendant Groezinger has a history in this case is of committing perjury and intentionally making up allegations against Plaintiff.

52. False allegations create contested facts which require a plenary hearing to resolve.

53. Pending the plenary hearing, Plaintiff was subject to restrictions of

supervised visitation only with respect to B.P. (supervised by family members supervised every Saturday for an hour).

54. One hour per week of "supervised visitation" does not allow any meaningful bond between parent and child to be maintained, and the supervised situation leads to the inference by the child that the parent is not trustworthy.

55. Convicted felons in prison are afforded more meaningful contact wit their children than Peterson was allowed here.

56. It was approximately three years later that Defendants allowed Plaintiff unsupervised overnight parenting time with B.P.

57. During the proceedings, Plaintiff discovered text messages between T.G.'s mother and T.G., during the time in which T.G. moved to New Jersey with B.P. and asserted that the New Jersey Family Court should have jurisdiction over B.P, in which T.G.'s mother and T.G. discussed planning to talk to Bryan Gurney about T.G. 's legal strategy to the effect of, let's play this out smart.

58. Bryan Gurney admitted that Plaintiff was not a danger to B.P., and that T.G.'s strategy was to assert jurisdiction in New Jersey because she did not want to take the B.P. back to Iowa.

59. When a plenary hearing was finally scheduled after three years,

Plaintiff entered into a Consent Order issued on May 3, 2018, which granted equal joint 50/50 custody, primary residence with T.G., with a parenting time

arrangement of Tuesdays and Thursdays after school, with every other weekend.

60. Had Plaintiff been afforded a timely plenary hearing he would have obtained 50/50 custody years earlier, and so Defendant's refuse to afford due process to Peterson materially denied him his constitutional rights.

61. On April 17, 2020, Groezinger spoke to the local police, falsely alleging while they were at home, that Plaintiff verbally threatened to kill her, even though the conversation was recorded by Groezinger without Plaintiffs consent, the audio actually disproved the allegation.

62. When the police arrived at the home, Groezinger questioned the police as to how her allegations and obtaining a restraining order would affect custody, whether she should file an application for a restraining order, and if the police could make Plaintiff leave for the night and come back in the morning.

63. The Police indicated to Groezinger that they couldn't give legal advice and couldn't enforce Plaintiff not coming home without restraining order.

64. This was recorded on body microphones by the Police.

65. Groezinger subsequently went to the police and filed an application for a restraining order.

66. While Groezinger was filing the police report, Plaintiff was at home with both of the children.

67. A so-called "temporary" restraining order was issued, with an

100

allegation of terroristic threats.

68. Police came to Plaintiffs home, served restraining order, he was required to leave home, E.P. was left with Groezinger.

69. Police indicated to Plaintiff that there was no threat as to Plaintiff remaining in custody with B.P.

70. Plaintiff and B.P. then left to stay at friend's house.

71. Plaintiff was criminally charged with Terroristic Threats, which was reduced from second degree to third degree (the New Jersey Covid State of Emergency had resulted in the charges originally being improperly elevated to a second degree).

72. The criminal statute for terroristic threats in New Jersey is New Jersey Statute Section 2C:12-3, which establishes that a person is guilty of a crime of the third degree if they threaten to commit any crime of violence with the purpose of terrorizing another, causing evacuation, or creating serious public inconvenience,

or ifthey act in reckless disregard ofsuch risks ....

73. Plaintiffwas also charged with endangering the welfare ofa minor.

74. The criminal statute for endangering the welfare of a child in New Jersey is New Jersey Statute Section 2C:24-4, which establishes that a person is guilty ofa crime of the second degree as to any person "having a legal duty for the care ofa child or who has assumed responsibility for the care ofa child who causes

101

the child harm that would make the child an abused or neglected child ...."

75. In fact, the children were not endangered, and were unaware of the conversation between Plaintiffand Groezinger that led to Groezinger filing for the restraining order (in fact during recorded conversation, Groezinger said that the children were sleeping).

76. The New Jersey Division of Child Protection & Permanency ("DCP&P") investigated and confirmed with Kaitlyn Groezinger that the kids were sleeping.

77. DCP&P investigated and closed out the case, with a "Not Established" finding.

78. During this time, Defendant Groezinger and T.G. became friends.

79. Both Groezinger and T.G. grew up in Ramsey, New Jersey.

80. Subsequently, Groezinger and T.G. would conspire with Gurney to unlawfully obtain confidential records to which they had no legal right to access, in order to attempt to gain an unfair advantage in child custody proceedings.

81. For example, then Ramsey Police Chief Gurney requested the domestic violence report from the Waldwick Police Department through the New Jersey Open Public Records Act ("OPRA"), which could not lawfully be released pursuant to OPRA, but was released under the direct approval of the Waldwick Police Chief, Mark Messner, with whom Gurney had had direct communications

102

through emails regarding the request (copies ofwhich Plaintifflater obtained).

82. Plaintiff grew up in Ramsey, New Jersey, and was the subject of juvenile court proceedings when he was a minor, which included police records that were maintained by the Borough of Ramsey.

83. Gurney, T.G. and Groezinger also conspired to unlawfully obtain Plaintiffs juvenile records from the Ramsey Police Department unlawfully utilizing OPRA, which would never have been released but for Gurney's unlawful signing offon the release ofthe records as Police Chief.

84. Plaintiff was later indicted by a grand jury for child endangerment on

the aforementioned allegations of child endangerment, in the second degree, and Plaintiff obtained a copy ofthe transcripts to the grand jury proceedings.

85. Defendant, Judge Wilcox presided over the criminal proceedings with respect to the indictment.

86. During those proceedings the Bergen County Prosecutor moved to sever the counts in the indictment, over Plaintiffs objections, and Judge Wilcox improperly granted the motion.

87. There was exculpatory evidence that would have impeached Groezinger's expected testimony from Counts II and III of the superseding indictment, which the Prosecutor deliberately concealed from the jury.

88. On appeal, the New Jersey Appellate Division granted Plaintiffs

103

interlocutory appeal, agreemg with us that the counts cannot be severed over Plaintiffs objections.

89. During the course of these proceedings, Groezinger had in-person meetings with the Bergen County Prosecutor's Office, with Assistant Prosecutor, Lee Schaer.

90. Plaintiff filed a motion for a change of venue outside of Bergen County based upon the fact that Gurney was a Police Chief in Bergen County, which was denied.

91. Plaintiff subsequently learned that T.G.'s brother is a member of the Bergen County Prosecutor's swat team and filed a new motion to transfer venue.

92. This time, Groezinger and the Bergen County Prosecutor's office conspired to have the motion heard by the Honorable Frances A. McGrogan, J.S.C., the Family Court judge who had presided over the restraining order case (who had issued the current child custody/visitation order), with both the Prosecutor and the attorney for Groezinger appearing to oppose the motion.

93. In the restraining order case, Judge McGrogan speculated wildly and based on no evidence that if police had not intervened that Peterson would have stabbing her in the head or choked her unconscious. This assertion was based on nothing more than the fact that there was an argument.

94. Judge McGrogan denied the motion ruling that it was the same motion

104

that was previously denied in the Family Court, but there was no previous change of venue motion in the Family Court, completely ignoring the new documented basis for changing venue ofthe criminal case.

95. The indictment was amended before a new grand jury (superseding

indictment) to add charges of stalking and violating a restraining order.

96. The Bergen County Prosecutor then began appearing at Court with private security, despite armed SheriffOfficers being present in the Court room.

97. At one hearing, Plaintiff asked on the record why the Prosecutor had private security, and the Assistant Prosecutor, Lee Schaer, falsely alleged that Plaintiff had shown up at her office looking for her, and threatening her to two Prosecutor's officers, and she was afraid ofhim.

98. This allegation was a false, and Schaer deliberately lied about it

99. Plaintiffasked for proofofthe allegations, it was denied.

100. Given the expression of personal animosity and "fear" expressed by Assistant Prosecutor, Lee Schaer Plaintiff filed a motion to for Schaer to recuse herself, and she never filled opposition.

101. Six to eight months prior filing the motion for recusal, Shaer indicated to Judge Wilcox that, despite the case being reassigned by the Bergen County Prosecutor's Office to another Assistant Prosecutor, she was not withdrawing from the case.

105

102. Shaer's continued involvement, despite the case being reassigned, was motivated by malice and Shaer was no longer acting within the parameters of her office and thus is not entitled to immunity.

103. On the return date a new prosecutor appeared, and said that Lee Schaer was re-assigned.

104. After two appearances, the new prosecutor dismissed the case in its entirety against Plaintiff, because one reviewed by a neutral person it was clear that there was no case.

105. In fact, Schaer had been usmg her position to pursue a private vendetta against Plaintiff.

106. The indictment was dismissed by Judge Wilcox on oral motion by the reassigned prosecutor at the Bergen County Prosecutor's Office.

107. In order to protect himself from further false allegations and document pick-up and drop-offs for his child E.P for the transfers to Groezinger at the police station, Plaintiff would record the transfers, which Judge Wilcox was made aware of during the criminal proceedings.

108. The alleged violation of the restraining order and stalking charges were due to allegations of improper conduct at the transfers at the police station, of which there was no evidentiary basis, and the video recording proved Plaintiffs mnocence.

106

109. Inexplicably, Judge Wilcox opined that simply recording the transfers at the police station could be probable cause for a criminal charge against the Plaintiff, even though the local police had refused to make any such charge.

110. Subsequently, the Family Court issued an order restricting the Plaintiff from audio recording the transfers at the police station, restricting any recording to the dashcam from his vehicle (which due to the angle and distance from the transfer, does not provide a mechanism to accurately document the transfer).

111. This order was a violation of Plaintiffs First and Fourteenth Amendment rights.

112. It is settled law that the First Amendment protects filming or recording events that occur in a public place. Garcia v. Cnty. ofAlameda, — F.4th —, 2025 WL 2536693, at *4 (9th Cir. Sept. 4, 2025)

113. By threatening Peterson if he continued recording, Defendant Judge Wilcox violated Peterson's First and Fourteenth Amendment rights under color of law.

114. Moreover, Defendant Judge Wilcox's threats were not judicial in character as they were not part of an judicial ruling, or a normal judicial function.

115. When a "judge" is not ruling on an issue before the court but threatening to take action based on future hypothetical that person is no longer

107

functioning as a judicial officer.

116. Inexplicably, after Judge Wilcox dismissed the case, Defendant (no longer acting in the capacity of a judge, but acting as administrator) expunged all records concerning the criminal proceedings, in a deliberate attempt to conceal the malicious prosecution and a malicious abuse of process by other Defendants (including Groezinger and Schaer) and an attempt to gain an unfair advantage in child custody proceedings with the Plaintiff under threat of incarceration and a violation ofhis Fourth Amendment rights.

117. During these proceedings, Plaintiff discovered that his minor son was attending "Behaved Brain" for phycological therapy for over a year.

118. Peterson was not informed of, nor did he consent to this "therapy."

119. Peterson found out because his son, one day, while driving during parenting time, pointed at a building and said that he "goes there".

120. Plaintiff then filed an Order to Show Cause seeking enforcement of the already existing order that Plaintiff is supposed to alternate medical appointment attendance.

121. Plaintiff was illegally denied access to the medical records of his

mmor son.

122. Furthermore, (as documented by Plaintiff's recordings of every interaction he had at Behaved Brain) staff at the Behaved Brain center repeatedly

108

concocted stories about Plaintiff, claiming that he was being intimidating and harassing, and that the workers were afraid of him.

123. These false allegation against Peterson were a deliberate attempt to try to get him to stop asserting his constitutional and statutory right to be informed of any sort of "therapy" received by his minor son.

124. When Plaintiffs attorney requested for Behaved Brain's records concerning his child, the attorney for Behaved Brain threatened that if Plaintiff continues to press for records, Behaved Brain will have every staffmember sign an affidavit saying Plaintiff was intimidating and harassing its staff.

125. Plaintiff taped all interactions and was professional and polite throughout.

126. Nevertheless, Judge Antoniewicz opined on the record that Peterson may sound nice but that Plaintiff "may have been making intimidating faces" and he "appears physically threatening".

127. The attorney for Behaved Brain (husband of the owner) colluded with family law attorney for Groezinger, and interjected himself into the hearing, even though Behaved Brain was not a party to the case, over Plaintiffs objections.

128. Behaved Brain was not court appointed, but nevertheless Behaved Brain through its agents and employees systematically worked to get the family court to restrict or deny Peterson's parental rights

109

129. Plaintiff subsequently applied to the Family Court to expand his parenting time.

130. In opposing this application, Groezinger used information regarding a pending disorderly persons/littering charge in Hawthorne, New Jersey against Plaintiff in New Jersey (which is currently on appeal), unrelated to his family.

131. This information about alleged littering was obtained again unlawfully through her contacts with other defendants.

132. Groezinger had made an OPRA request to the Hawthorne Police Department which was partially denied as exempt from OPRA, and then subsequently approved in its entirety when Gurney intervened and wrongly used his influence to get the information released.

133. Gumey's actions constitute criminal official misconduct, as defined

by New Jersey Statute 2C:30-20, which states in pertinent part, "A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit: a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner ...."

134. Groezinger has also improperly used records of a dismissed disorderly persons offense against the Plaintiff regarding an incident which occurred at a bar

in Rhode Island.

135. The incident involved the allegation that Plaintiff using bad language to police in Newport Rhode Island but all charges were dismissed.

136. The charges were not only dismissed but it is well settled that citizens have a First Amendment right to express their disdain to police even in forceful or "offensive" language. Snyder v. Phelps, 562 U.S. 443 (2011).

137. Defendants Groezinger, Kleiner, and Antoniewicz were aware that the charges against Plaintiff were dismissed, expunged, and sealed, but continue to use the records of the unlawful arrest against Plaintiff- despite the fact that the speech was constitutionally protected and had no relation to the custody dispute.

138. Groezinger used contacts with other co-defendants to illegally obtain police bodycam footage of the Rhode Island incident and presented it as evidence in the Family Court proceedings, despite the fact that the charges in Rhode Island were subsequently expunged, and the record in the Rhode Island case sealed.

139. Despite the fact that the bodycam footage does not indicate in any way that the Plaintiff was intoxicated, Groezinger has used the incident to obtain a court order requiring Plaintiff to undergo evaluations for alcohol (which Plaintiff tested negative for) and a substance abuse evaluation.

140. In fact, Judge Antoniewicz, now presiding over the Family Court proceedings, after stating on the record that there were no visible signs of

intoxication on the bodycam footage, stating, "I have to be honest with you, Mr. Kleiner [Groezinger's attorney], I see no visible signs of intoxication. He speaks clearly, I understand what he's saying, and he is walking fine on his own. This is up for interpretation at best."

141. Subsequently, weeks later, Judge Antoniewicz used the bodycam footage as a basis to order that Plaintiff undergo a psychological examination, asserting that Plaintiff may have a disregard for "the law", which could endanger

Plaintiffs children, and finding that Plaintiffappeared to be visibly intoxicated.

142. Judge Antoniewicz specifically stated the purpose of the evaluation was so that he could "determine whether or not [Plaintiffs] OPINION about "the law" would seep into his kids ...."

143. Plaintiffs attorney immediately protested the clear contradiction of what the Order said and what took place in Court, to no avail.

144. Judge Antoniewicz refused to change the Order or admit his mistake.

145. Instead, Judge Antoniewicz appointed Dr. Marc Tarle of New City, New York to do the psychiatric evaluation (after indicating he would appoint a neutral psychiatrist if the parties could not agree to one), a psychiatrist which was the only one suggested by Lawrence Kleiner, Esq., Groezinger's attorney, and objected to by Plaintiffs counsel, and not a neutral unbiased court-appointed psychiatrist.

112

146. In issuing the order, nothing indicated why an out-of-state psychiatrist was being utilized, or if Dr. Marc Tade had agreed to submit to the jurisdiction of the court for any subsequent court proceedings which would require his testimony so as to be subject to the Plaintiffs right ofcross-examination, for example.

147. The order indicated that Plaintiffs parenting time would be suspended ifhe did not schedule the evaluation with Dr. Tarle.

148. Requiring a person to undergo psychiatric evaluation is a violation of Peterson's First and Fourteenth Amendment rights.

149. Requiring a person to undergo psychiatric evaluation 1s a form of compelled speech that is subject to strict scrutiny.

150. Defendants improperly sought to coerce Peterson into acquiescing to violation of his right of the state to intrude into his personal thoughts and feelings by threatening him with loss of other constitutional rights-namely the right to the care custody and companionship ofhis child. Peirce v. Society ofSisters.

151. It also required the Plaintiff to advance $6,500 as a retainer to Dr. Tade, and which currently has been billed for $6,000.

152. Upon information and belief this sort ofpsychiatric evaluation is often no more than a scheme for court officers to enrich their friends.

153. For example, in the infamous "kids for cash" scandal in Pennsylvania Judge Conahan assigned his brother-in-law, Dr. Frank Vita, to conduct

113

psychological evaluations ofvaluated hundreds ofjuveniles.

154. Despite Plaintiffs concerns regarding Dr. Tarle, Plaintiff appeared for

several visits for an evaluation, after which Dr. Tarle requested that Plaintiff sign HIPPA release forms so that Dr. Tarle could discuss issues concerning the evaluation with Groezinger.

155. Again this is a violation of the First and Fourteenth Amendments requiring a psychiatric evaluation that would then be publicly revealed.

156. Moreover, the proposed releases also contained language which would provide access to confidential medical records, including Plaintiffs entire medical history, which Plaintiffobjected to.

157. Groezinger ultimately declined to participate in an interview with Dr. Tarle.

158. Instead, and without Plaintiffs prior knowledge, let alone consent, Plaintiff"document dumped" what Dr. Tarle referred to as a "voluminous book" of documents to his office.

159. Dr. Tarle subsequently, and inexplicably, indicated that he no longer needed to interview Groezinger since he had these documents.

160. Upon review ofdocuments which were provided to Dr. Tarle, Plaintiff was shocked to learn that, among the documents that Groezinger provided to Dr. Tade, were illegally obtained confidential juvenile records from when Plaintiffwas 114

a minor child in the Borough ofRamsey.

161. These records were legally protected and thus illegally obtained.

162. OPRA specifically prevents juvenile records from being released and so does state statute.

163. Groezinger's counsel, Lawrence Kleiner, Esq., said she obtained them through OPRA however, when Plaintiff attempted to obtain OPRA records from another juvenile from the same town to test the response, he was denied.

164. Plaintiff discovered they were in fact obtained from the Ramsey Police Department with the unlawful intervention of Gurney, who was the Police Chief at the time with authority to sign offon the disclosure ofthe subject records.

165. Plaintiff has brought this illegal conduct to the attention of Judge Antoniewicz.

166. Pursuant to Sheridan v. Sheridan, 247 NJ. Super. 552, 558-59 (Ch. Div. 1990), when a Court hears illegal activity on the record it has a duty to report such to the proper authorities.

167. A Court or Judge does not have discretion - specifically in a Court of equity - to ignore statutory law.

168. This is specifically spelled out in Sheridan. N.J.S.A. 2C:52-30, makes it a disorderly persons offense to disclose expunged arrests and records or even their existence.

115

169. In January 2025 a Motion was filed by Groezinger to suspend Plaintiffs parenting time until he completed the psychiatric evaluation.

170. Plaintiff in a cross-motion, seeking to correct the findings in the prior order to reflect the actual record, objected to the unlawful use of the juvenile records as part of the evaluation, objected to the continued representation of Kleiner for Groezinger (due to, among other things, his participation in illegally obtaining the juvenile records), objected to the use of Dr. Marc Tarle, objected to the evaluation being conducted as there was no material evidence that Plaintiff may be an unfit parent, asked for recusal of Judge Antoniewicz for having allowed the use of the illegal juvenile records, for a transfer of venue, and for a Plenary Hearing on child custody issues.

171. In March 2025, Judge Antoniewicz ordered that there would be no new restrictions on parenting time.

172. Judge Antoniewicz, however, also ordered for the evaluation to be completed while disregarding the juvenile records, but to be conducted by the same psychiatrist that had already been illegally provided with the juvenile record.

173. Judge Antoniewicz refused to recuse himself, refused to stop the evaluation, refused to sanction Kleiner for his unlawful conduct on behalf of Groezinger, and refused to order a plenary hearing (with the transfer of venue motion to be determined by the appropriate judge according to New Jersey Court

116

Rules), with the motion to transfer venue still going unheard.

174. Finally, despite Plaintiffs Constitutional Rights under the United States Supreme Court Case, Troxel v. Granville, 530 U.S. 57 (2000), to know who his children are associating with, Kaitlyn Groezinger has failed or refused to provide this infonnation to the Plaintiff.

175. Specifically there is an individual by the name of "Pat", who upon information and belief, is Kaitlyn Groezinger's live-in boyfriend, who tells Plaintiffs son that his name is "C Star", a character from the "SpongeBob SquarePants" animated television series, and Kaitlyn Groezinger refuses to provide his last name.

176. Peterson's one-time fiance and mother ofhis son, Kaitlyn Groezinger, asked to have custody exchanges take place at Mahwah Police Station, because she claimed she was afraid ofPeterson.

177. At one point Peterson was charged with making terroristic threats against his one-time fiance but all charges were eventually dismissed ON May 13,

2024.

178. Given the false claims against him Peterson began to record custody exchanges to protect himself from false allegations.

179. Groezinger has admitted that she would video record interactions with Peterson.

117

180. For example, on June 23, 2022 and August 9, 2022 it is known that Groezinger video recorded custody exchanges.

181. Groezinger claimed that she was "uncomfortable" with Peterson recording their interactions even in a public place.

182. At one point the Criminal Court denied Peterson's motion to dismiss explaining (BER-20-424 (09/21/2023): As to the issue of recording the alleged victim, the FRO clearly states that custody exchanges were to take place in an area under surveillance. Upon review of the transcript where the Defendant had made Judge Janezcko aware that the Mahwah Police Station did not have functioning surveillance in their parking lot, Judge Janezcko suggested doing the exchanges in front of the Defendant's vehicle where a dash camera or similar device could record the exchange. The court, however, did not permit Defendant to use his personal cellphone to record the alleged victim at these exchanges. Under N.J.S.A. 2C:12-10(c), using electronic devices to observe a person's movements may constitute stalking ....

183. In other words, the State of New Jersey claimed it was a crime to use a personal cellphone to record events in a public place.

184. This same court further denied the motion to dismiss by asserting that the mens rea is an affirmative defense.

118

185. Specifically the Criminal Court per Judge Wilcox ruled (BER-20-424 (09/21/2023):
Regarding the question of the mental state of the Defendant, the State submits that this question would essentially require the State to provide affirmative defenses. The court agrees with the State's argument that the State has no obligation to present affirmative defenses to the Grand Jury and accordingly rejects Defendant's argument.

186. The stalking statute at issue (2C:12-10) provides: b. A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional

distress. Emphasis added.

187. This unambiguously makes the mens rea "purposefully or knowingly." Statev.Gandhi,201 N.J.161, 182(2010)

188. A first year law student who thought mens rea 1s an "affirmative defense" would likely fail first yeas criminal law exam.

189. Because no Judge could be so incompetent as to think that mens rea is an "affirmative defense" this Judge evidently deliberately violated the due process rights of Peterson. See In re Winship, 397 U.S. 358 (1970) (every element of an offense must be proved beyond a reasonable doubt).

119

190. Judge Gary Wilcox in fact was suspended for misconduct as a judge in 2024. In The Matter of Gary N. Wilcox A judge of the Superior Court, 2024 089766

FIRST COUNT

Declaratory Relief 28 U.S.C. §2201

191. Plaintiff repeats and re-alleges every allegation set forth above as if recounted at length herein.

192. A declaratory judgment construing and determining the constitutionality of the rules promulgated and procedures employed by the Superior Court of the State of New Jersey, Chancery Division, Family Part will serve useful purpose in clarifying and settling legal relations in issue, and will terminate and afford relieffrom uncertainty, insecurity, and controversy giving rise to proceeding.

193. Plaintiff has Article III standing as there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance ofa declaratory judgment.

194. Plaintiff is not challenging state court judgments, but the underlying and on-going policies that govern those judgments.

120

WHEREFORE, Plaintiff, Christopher Peterson respectfully requests that the Court enter judgment in his favor against Defendants, Kaitlyn Groezinger, Lawrence Kleiner, Bryan Gurney, Michael Blee, J.A.D., David Tang, Gary Wilcox, Michael Antoniewicz, and Frances McGrogan, and award the following relief:

A. Declaring as a matter of right and due process under the First, Fourth and Fourteenth Amendments to the Constitution for the United States of America, that the state, including its judicial branch, may not institute arbitrary and

capricious supervised child visitation restrictions upon a parent when there is no credible evidence of imminent or actual abuse and neglect of that child by the parent.

B. Declaring as a matter of right and due process under the First, Fourth, Fourteenth Amendments to the Constitution for the United States of America, that the state, has no interest in investigating and litigating against parents, in state court or otherwise, when there is no credible evidence of imminent or actual abuse and neglect of that child by the parent.

C. Declaring as a matter of right and due process under the First, Fourth, d Fourteenth Amendments to the Constitution for the United States of America, that a parent has a Constitutional Right to a timely hearing with a full and complete

121

record upon the application to a family court to assert their rights of custody and visitation with their children.

D. Declaring as a matter of right and due process under the First, Fourth, d Fourteenth Amendments to the Constitution for the United States of America, that a parent has a Constitutional Right to a hearing with a full and complete record upon the application to a family court to assert their rights of visitation with their children and that the Family Courts in New Jersey.

E. Declaring as a matter of right and due process under the First, Fourth, d Fourteenth Amendments to the Constitution for the United States of America, that a civil litigant may not be compelled to undergo "psychiatric treatment."

SECOND COUNT

Claim Under 42 U.S.C. §1983

195. Plaintiff repeats and re-alleges every allegation set forth above as if recounted at length herein.

196. The Defendants, Michael Blee, David Tang, Michael Antoniewicz are acting under the color of state law and have a Constitutional duty to ensure fair and timely hearings in connection with the removal of children from the custody of fit parents, and to ensure that those hearings regarding custody and visitation rights of parents.

122

197. This responsibility includes promulgation and enforcement of rules and regulations regarding avoidance of threats and abuse of process in the investigation of allegations of child abuse and to ensure that there is no retaliation against Parents who exercise their First Amendment Rights to file complaints against those persons acting under color of state law are free from retaliation.

198. On information and belief, Defendants, failed to promulgate and enforce of rules and regulations regarding avoidance of threats and abuse of process in the investigation of allegations of child abuse and to ensure that there is no retaliation against Parents who exercise their First Amendment Rights to file complaints against those persons acting under color of state law are free from retaliation.

199. Plaintiff has been harmed by this failure and is at risk of further harm from such failure.

200. The Defendants are charged with the responsibility and duty to abide by Constitutional Due Process of Law in family court proceedings involving the rights of parents to visit with their children.

201. This responsibility includes implementing judicial proceedings which are determined based upon the rule of law and competent evidence with a full and fair opportunity to be heard in a court of record, and not which are determined arbitrary and capriciously.

123

202. These Defendants have failed to abide by and implement such proceedings as a matter of due process as to the Plaintiff and those similarly situated to the Plaintiff.

203. Plaintiff is not challenging state court judgments, but the underlying and ongoing polices that govern those judgments.

204. Plaintiff has been harmed by such policy and is at risk of further harm from such policy.

WHEREFORE, Plaintiff, respectfully demands judgment against the Defendants, Kaitlyn Groezinger, Lawrence Kleiner, Bryan Gurney, Mark Messner, Lee Shaer, Michael Blee, David Tang, Michael Blee, Michael Antoniewicz, and Frances McGrogan, and award the following relief:

A) For Injunctive Relief in the form of an order requiring that the explicit instruction and policy be made requiring those acting under color of state law in New Jersey from retaliation against parents who exercise their First Amendment Rights to file complaints against those persons acting under color of state law who fail to provide due process to parents in connection with custody and parenting time court proceedings free from discrimination against parents asserting their Constitutional Rights.

124

B) For Injunctive Relief in the form of an order requiring the Superior

Court of the State to institute ruled of procedure to guarantee that parents receive fair and timely hearings concerning their rights of visitation with their children consistent with the due process requirements of the Fourteenth Amendment free from discrimination or retaliation.

THIRD COUNT

Claim for Malicious Abuse of Process

205. Plaintiff repeats and re-alleges every allegation set forth above as if recounted at length herein.

206. Abuse of Process is a common law tort in the State of New Jersey which is defined as a cause of action from one party misusing the regularly issued court process, not justified by the underlining legal action.

207. Defendant Kaitlyn Groezinger, in conspiracy with Gurney, Messner, Kleiner, Schaer, and Behaved Brain Wellness Center, have acted improperly in Family Court proceedings in an attempt to intimidate Plaintiff into refraining from advocating for his rights of visitation and custody with his child, through fabrication of evidence, false allegations, and motion practice without a basis in law and in a manner not contemplated by law.

WHEREFORE, Plaintiff Christopher Peterson demands judgment against Defendants, Kaitlyn Groeziner, Bryan Gurney, Mark Messner, Lawrence Kleiner, and The Behave Brain, LLC, and award the compensatory damages to be determined at trial, and punitive damages to be determined at trial, plus interest, and attorney, costs of suit, and such other and further relief the court deems equitable and just.

FOURTH COUNT

CLAIM UNDER 42 U.S.C. §1983 MALICIOUS PROSECUTION

208. Plaintiff repeats and re-alleges every allegation set forth above as if recounted at length herein.

209. Defendants violated plaintiffs Fourth Amendment rights by initiating the prosecution of plaintiff for terroristic threats in New Jersey under New Jersey Statute Section 2C:12-3 and Endangering the Welfare of a Child in New Jersey under New Jersey Statute Section 2C:24-4.

210. Defendants, who initiated the prosecution by means of a conspiracy to fabricate evidence to form a basis for probable cause, in fact lacked probable cause to initiate the proceedings.

211. The criminal proceedings ended in plaintiffs favor and all charges were dismissed against plaintiff on the State's own motion.

212. Defendants acted maliciously or for a purpose other than bringing plaintiff to justice.

213. As a consequence of the proceeding, Plaintiff suffered a significant deprivation of his liberty.

WHEREFORE, plaintiff demands judgment, pursuant to 42 U.S.C. 1983, against the defendants, Kaitlyn Groezinger, Bryan Gurney, and Lee Schaer, jointly and severally for compensatory, pain and suffering, and punitive damages in an amount of ten million dollars ($10,000,000) or to be determined at trial, plus interest, attorney fees pursuant to 42 U.S. C. 1988, costs of suit, and such other and further relief the court deems equitable and just.

FIFTH COUNT

DECLARATORY AND INJUNCTIVE RELIEF THAT PETERSON HAS AND HAD A 14TH AMENDMENT RIGHT (FREE SPEECH, FREEDOM OF THE PRESS, DUE PROCESS) TO AUDIO AND OR VIDEO RECORD CUSTODY EXCHANGES IN A PUBLIC POLICE PARKING LOT

214. Plaintiff incorporates prior statements as fully restated here.

215. Peterson has repeatedly been threatened with arrest and other forms of retaliation by police and judicial defendants if he should audio tape or video tape any exchanges of custody that take place at a police station.

127

216. On or about June 5, 2025 Peterson was with his associate Colleen Bishop to make a custody transfer in the parking lot of Oakland Police Department ("OPD".

217. OPD Officers including Sgt. Donald Harvey, Officer Matthew Lopez and Officer Han Anderson prevented Peterson from audio or video taping in the police parking lot by threatening to arrest him if he tried to video tape.

218. OPD Officers including Sgt. Donald Harvey, Officer Matthew Lopez and Officer Han Anderson also threatened to arrest Bishop if she tried to video tape.

219. OPD Officer in fact retaliated against Peterson when he complained about the treatment by telling him that he was being detained.

220. OPD Officer in fact retaliated against Peterson by performing an illegal search of Bishop's vehicle  although they were unable to get into the vehicle they physically touched an manipulated the vehicle without Bishop's consent or any valid law enforcement reason.

221. The purported justification for the detention and search was that

police claimed that they needed to check to see ifPeterson had a child safety seat.
222. Police did not even have reasonable suspicion ofa crime.
128

223. Despite Plaintiff being illegally detained and Bishop's car illegally
searched, Peterson was still prevented from recording this interaction with police
as was Bishop.
224. Federal and State courts have widely acknowledged the right to audio
or video record to document information or preserve evidence.
225. In Fields v. City ofPhiladelphia, 862 F.3d 353, 359 (3d Cir. 2017) the
Third Circuit held:
To record what there is the right for the eye to see or the ear to hear
corroborates or lays aside subjective impressions for objective facts. Hence
to record is to see and hear more accurately.... Accordingly, recording
police activity in public falls squarely within the First Amendment right of
access to information.
226. The Third Circuit in Fields noted that attempting to punish a person
for documenting actions was a form of illegal retaliation. Id. at 855 ("Individuals
making recordings have also faced retaliation by officers, such as arrests on false
criminal charges and even violence. This case involves retaliation.")
227. The law permitting recording is well-established in this Circuit, so
police knew or should have known that preventing Peterson from recording was a
violation of his constitutional rights.
228. The Ninth Circuit also affirmed that there is a constitutional right to
record events that may be ofpublic interest:
129

We easily dispose of Idaho's claim that the act of creating an
audiovisual recording is not speech protected by the First
Amendment. ... Audiovisual recordings are protected by the First
Amendment as recognized "organ[s] of public opinion" and as a
"significant medium for the communication of ideas." Joseph
Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S.Ct. 777, 96
L.Ed. 1098 (1952) ... It is no surprise that we have recognized
that there is a "First Amendment right to film matters of public
interest." Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir.
1995).
229. Animal Leg. Def. Fund v. Wasden, 878 F.3d 1184, 2018 WL 280905,
at *13 (9th Cir. Jan. 4, 2018)

230. The Alaska Supreme Court held that litigants have a fundamental right to record interviews to preserve evidence. State v. Murtagh, 169 P.3d 602, 623 (Alaska 2007)

231. Furthermore, New Jersey's Appellate Division has long held that litigants have a right to record their interactions inorder to protect themselves from false allegations:

Plaintiffs right to preserve evidence of the nature of the examination, the accuracy of the examiner's notes or recollections, the tones of voice and the like outweigh the examiner's preference that there be no recording device.

232. B.D. v. Carley, 307 N.J. Super. 259, 262, 704 A.2d 979, 981(N.J. Super. App. Div.

233. 1998). See also Koch v. Koch, 424 N.J. Super. 542, 553, 38 A.3d 703, 709 (Ch. Div. 2011) (same in context ofcustody evaluation)

130

234. Accordingly, Peterson had the well-established constitutional right to record his interaction in a police parking lot.

235. Peterson regularly faces State created obstacles to documenting events to protect himself and his children.

236. The Court has stated on the record that the court disapproves of recording.

237. Peterson faces constant barriers from Defendants when he seeks to document interaction with children or with witnesses.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court will:

A) Issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that declares as a matter of law that Peterson has a First and Fourteenth Amendment Right to record, collect evidence and document his interaction with others at the police station or in any other public place.

B) Enjoining Defendants from interfering with this constitutionally protected right in the future.

C) Insofar as NJ. Stat 2C:12-10(c) prevents recording in public places it is an unconstitutional violation ofthe 14th Amendment.

131

SIXTH COUNT
POLICE DEFENDANTS VIOATED PETERSON'S FEDERALLY

GUARANTEED CONSTITUTIONAL RIGHTS (FREE SPEECH, FREEDOM OF THE PRESS, DUE PROCESS) WHEN THEY STOPPED HIM FROM AUDIO AND OR VIDEO RECORDING CUSTODY EXCHANGES IN A PUBLIC POLICE PARKING LOT

238. Plaintiff incorporates prior statements as fully restated here.

239. Police defendants repeatedly threatened to arrest Peterson if he recorded in a public parking lot.

240. Police defendants threatened to arrest an associate of Peterson if she recorded in a public parking lot.

241. This action preventing Peterson from exerc1smg his fundamental constitutional rights was demeaning and harmed Peterson by preventing him from documenting the violation ofhis rights under color of law.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court will:

A) Award damages in an amount to be determined at trial;

B) Award counsel fees and costs

132

SEVENTH COUNT

POLICE DEFENDANTS VIOATED PETERSON'S FEDERALLY GUARANTEED CONSTITUTIONAL RIGHTS TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE WHEN POLICE DETAINED HIM WITHOUT PROBABLE CAUSE OR REASONABLE SUSPICION, AND CONDUCTED AN ILLEGAL SEARCH OF HIS VEIDCLE

242. Plaintiffincorporates prior statements as fully restated here.

243. Police defendants repeatedly threatened to arrest Peterson if he recorded in a public parking lot.

244. When Peterson complained he was illegally detained without either probable cause or reasonable suspicion or any offence.

245. The reason given for the detention was that police needed to check if there was a child safety seat in the car.

246. Peterson and Bishop were detained for approximately 45 minutes.

247. When Peterson complained to the OPD, the internal affairs investigation admitted that Peterson had been detained specifically the OPD investigation stated that "the officers legally detained you during the investigation."

248. Peterson was eventually released without charge.

249. It is long and well established under federal law, that police may not perform an investigatory stop, unless based on specific and articulable facts which

133

give rise to a reasonable suspicion of criminal activity Florida. v. J.L., 529 U.S.
266 (2000) citing Terry v. Ohio, 392 U.S. 1, 30 (1968).
250. The detention here was retaliatory and lacked reasonable suspicion of
any criminal offence.
251. At best it was a pure "fishing expedition" with even less support than
the "anonymous tip" rejected by the Court in Florida v. J.L.
252. Furthermore, in the instant case, the detention actually went beyond
the parameters of a brief investigatory stop and rose to the level of a full-blown
seizure (and ultimately an illegal search of Bishop's vehicle as well).
253. It is long and well established under federal law, that police may not
perfonn an seizure (beyond a brief investigatory stop), unless police have probable
cause of criminal activity. U.S. v. Sharpe, 470 U.S. 675, 686 (1985) (holding that
for an investigatory stop "police must diligently pursue "a means of investigation
that was likely to confirm or dispel their suspicions quickly.")
254. Accordingly, Police both illegally detained Peterson without
reasonable suspicion and continued to detain him without probable cause in
violation of the 4th
and 14th
Amendments.
255. Finally, suspicion of not having a car seat is not an offence for which
citizens are ordinarily detained.
256. Officers in this case only detained Peterson in retaliation.
134

257. Further, susp1c10n of not having a car seat should be held to be
unconstitutional as a basis for detention.
PRAYER FOR RELIEF
WHEREFORE, Plaintiffs pray that this Court will:
A) Award damages in an amount to be determined at trial;
B) Award counsel fees and costs
EIGHTH COUNT
Malicious Prosecution/Malicious Use of Process
258. Plaintiff restates the above paragraphs as fully contained in this
section.
259. Under New Jersey law a civil action based upon the malicious
prosecution of a criminal complaint required "(l) that the criminal action
was instituted by the defendant against the plaintiff, (2) that it was actuated

by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." Epperson v. Wal-Mart Stores, Inc., 373 NJ. Super. 522, 530, 862 A.2d 1156, 1160 (App. Div. 2004) (citing Myrick v. Resorts Int'l Casino & Hotel, 319 N.J.Super. 556, 563, 726 A.2d 262 (App. Div. 1999).

260. On or about April 17, 2020 Peterson and Groezinger had, what Groezinger later admitted, was a "verbal" argument without any overt threats.

261. Groezinger herself did not call police, rather police were called by a third party.

135

262. When Police from Waldwick Police Department arrived, Groezinger told them that Peterson had merely said that he "FELT LIKE burning our house down."

263. Later at a grand jury proceeding it was also confirmed that Peterson merely said "he feels like burning down the house."

264. Peterson was arrested, and Officer Dylan Ritondale swore out a probable cause state that read:

The defendant stated that he would "bum the residence down" and cause physical harm to the victim ifshe contacted the police for assistance.

265. Ritondale's statement was deliberately and maliciously false.

266. Ritondale knew very well that Peterson had not said "that he would 'bum the residence down.' "

267. Upon information and belief Ritondale deliberately exaggerated the statement to attempt to justify the arrest of Plaintiffin his own residence without probable cause.

268. Ritondale's Affidavit of Probable Cause further swore that "Officers were provided with a recording of the defendant stating the above."

269. The above statement was deliberately and maliciously false as the quote does not appear in the audio.

270. Although Groezinger admitted that Peterson merely said that he "FELT LIKE burning our house down" she deliberately exaggerated much of events ofthe argument as was later proven by the audio recording that she herselfmade.

271. In April 2020, Peterson was charged with "Making Terroristic Threats" in the Second Deree (NJ Stat 2C: 12-3) and also charged with "Endearing the Welfare ofa Child in the Second Degree. BER-20-424.

136

272. In May 2021, Peterson filed a motion to dismiss that was granted in part. Specifically, Count 2 was dismissed and Count 1 was reduced from Second Degree to Third Degree, because this count has been improperly elevated to begin with because a Second Degree offense involves counter-terrorism, which was irrelevant, not alleged, and inapplicable to a domestic situation.

273. Peterson and Groezinger share joint custody of a son.

274. Due to the pending false charges against Peterson, custody exchanges were made in the parking lot of Mahwah Police Department.

275. To protect himself against further false allegations Peterson used his cell phone in 2022 to record the custody exchanges

276. Groezinger complained to police on multiple occas10ns Mr. Peterson would video record her during custody exchanges and that she found this threatening.

277. While it was true that Peterson used his cell phone in 2022 to record the custody exchanges, Groezinger's claim to be threatened by this conduct was deliberately and maliciously false.

278. Groezinger had herself often recorded interactions between herself and Peterson and yet claimed when he did the same thing it was threatening.

279. This obvious double standard shows that the allegations were motived by malice.

280. In August 2022, the State then obtained a superseding indictment charging Peterson with one count of "Making Terroristic Threats" in the Third Deree, one count of Stalking and One count of Contempt.

137

281. The Stalking and Contempt charges were based on Peterson recording the custody disputes.

282. Upon information and belief, this continued false prosecution of Peterson was encouraged by Bryan Gurney, former Chief of Police of Ramsey.

283. Gurney used his connections and authority as law enforcement to conspire with Bergan County Assistant Prosecutor, Lee Schaer, to continue the prosecution even though they knew there was no basis for the charges.

284. Peterson filed a motion to dismiss in April 2023 that was denied

by the Court per Judge Gary Wilcox.

285. Criminal Court denied Peterson's motion to dismiss explaining (BER-20-424 (09/21/2023):

The grand jurors also heard testimony that Defendant would record C.G. [sic] and make her uncomfortable and unsafe during at custody exchanges.

286. Judge Wilcox offered no explanation for the implausible assertion that recording a person in a public place made her "unsafe."

287. All of these allegations about "safety" were false and malicious.

288. The Criminal Court per judge Wilcox further denied Peterson's motion to dismiss explaining (BER-20-424 (09/21/2023):

As to the issue of recording the alleged victim, the FRO clearly states that custody exchanges were to take place in an area under surveillance. Upon review of the transcript where the Defendant had made Judge Janezcko aware that the Mahwah Police Station did not have functioning surveillance in their parking lot, Judge Janezcko suggested doing the exchanges in front of the Defendant's vehicle where a dash camera or similar device could record the exchange. The court, however, did not permit Defendant to

138

use his personal cellphone to record the alleged victim at these exchanges. Under N.J.S.A. 2C:12-10(c), using electronic devices to observe a person's movements may constitute stalking .

289. This same court further denied the motion to dismiss by asserting that the mens rea is an affirmative defense.

290. Specifically the Criminal Court per Judge Wilcox ruled (BER-20-424 (09/21/2023):

Regarding the question of the mental state of the Defendant, the State submits that this question would essentially require the State to provide affirmative defenses. The court agrees with the State's argument that the State has no obligation to present affirmative defenses to the Grand Jury and accordingly rejects Defendant's argument.

291. The stalking statute at issue (2C:12-10) provides:

b. A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a

course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress. Emphasis added.

292. This unambiguously makes the mens rea "purposefully or knowingly." State v. Gandhi, 201 NJ. 161, 182 (2010).

293. Furthermore the, indictment in this case read:

WITHIN THE JURISDICTION OF THIS COURT, THREATEN TO COMMIT SERIOUS BODILY HARM TO THE DEFENDANT AND TO BURN THEIR RESIDENCE DOWN WITH THE PURPOSE TO TERRORIZE KAITLYN GROEZINGER OR IN RECKLESS DISREGARD OF THE RISK OF CAUSING SUCH TERROR[.]

294. The mens rea is obvious even on the face ofthe indictment.

139

295. A first year law student who thought mens rea 1
s an
"affirmative defense" would likely fail first year criminal law exam.

296. Because no Judge could be so incompetent as to think that mens rea is an "affirmative defense" this Judge evidently deliberately violated the due process rights of Peterson. See In re Winship, 397 U.S. 358 (1970) (every element of an offense must be proved beyond a reasonable doubt).

297. The denial of the motion to dismiss also mentions that Peterson submitted numerous videos to the court showing custody exchanges and the Court was unable to find any sort ofthreatening conduct on any of the video.

298. Judge Gary Wilcox in fact was suspended for misconduct as a judge in 2024. In The Matter of Gary N. Wilcox A judge of the Superior Court, 2024 089766.

299. Judge Wilcox has repeatedly displayed poor judgment and total disregard for justice and even social decorum.

300. "His Honor" Judge Wilcox, became known as "The TikTk Judge because he created public TikTok videos, some in his judicial robe in his court chambers or partly undressed in his bed containing profanity, graphic sexual references, misogyny, and racist terms, under the pseudonym "Sal Tortorella."

140

301. In the Spring of 2024, after Peterson pointed out a clear conflict of interest for Schaer, Schaer was replaced as prosecutor on the case by

Heather Suffin.

302. Despite no longer being the Assistant Prosecutor on the case, Schaer continued to try to use her influence to convince Suffin to continue the prosecution.

303. This attempt to influence Suffin was not part of Schaer's job as a prosecutor and thus Schaer is not entitled to immunity for these actions

304. After taking over the case, Suffin quickly determined that there was no basis for the prosecution and Suffi moved to dismiss all charges in May 2024.

305. In an Order dated May 13, 2024, the Court per judge Wilcox dismissed all charges against Peterson.

306. Given that Peterson was prosecuted for a non-crime it appears that the prosecution was based on malice.

307. The actions of as yet unidentified individuals acting in concert with the Boroughs of Waldwick, Ramsey, and Oakland, constitute Malicious Prosecution and/or Malicious Use of Process under New Jersey law, as well as denial (under color of law) of constitutionally protected rights to free speech.

141

308. As a result of the malicious prosecution and violation of federal protected rights, Plaintiff suffered emotional distress, and lost time from work due to the need to appear in court and defend against the frivolous charges.

309. With respect to the Superior Court prosecution, although all the actors are not yet known, it is clear that there was not probable cause to sustain a criminal charge.

310. The history of this case strongly suggests that the individuals who instituted the action were actuated by malice for Peterson.

311. The fact that the prosecution was able to obtain an indictment from a grand jury does not insulate any of the John Doe Defendants; as Judge Posner has written for the Seventh Circuit:

1. [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial-none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.

312. Jones v. City of Chicago, 856 F.2d 985, 994, 1988 WL 95587 (7th Cir. 1988)

313. The tort of malicious abuse ofprocess is also cognizable under

section 1983. Jennings v. Shuman, 567 F.2d 1213, 1217 (3d Cir. 1977).
142

314. John Does 1 - 10, some of whom may be employees of the
Boroughs of Waldwick, Ramsey, and Oakland, conspired to maliciously
prosecute Plaintiff for improper purposes.
315. As a result of the above action Peterson has suffered damages
in a final amount to be determined at trial.
PRAYER FOR RELIEF
WHEREFORE, Plaintiffrespectfully requests that the Court:
A. Award Peterson damages arising from his prosecution, arrest
and incarceration;
B. Award Plaintiffreasonable costs and attorneys' fees pursuant to
42 U.S.C. § 1988; and
C. Award Plaintiff other and further relief as the Court deems just
and proper.
NINTH COUNT
NEW JERSEY'S BROAD BAN ON POSSESSION OF ANY SORT
OF "WEAPON" BY INDIVIDUALS SUBJECT TO A
TEMPORARY OR PERMANENT RESTRAINING ORDER
WHEN THERE ARE NO ALLEGATIONS OF VIOLENT
BEHAVIOR VIOLATES THE PROCEDURAL AND
SUBSTANTIVE DUE PROCESS PROVISIONS OF THE
FOURTEENTH AMENDMENT
316. Plaintiff restates the above paragraphs as fully contained in this
section.
317. Under New Jersey law, a court is permitted to en1om any
person subject to a TRO from possessing any sort of weapon even for non-
143

violent alleged offenses such as an allegation that a person sent an annoying
email from another state.
318. The TRO and by NJ. Stat. § 2C:39-1 would also appear to
prohibit Plaintiff from possessing ordinary kitchen knives or steak knife.
319. Recently a person used what is described as a "butcher's knife"
to attack students at Ohio State University.
320. Virtually any sharp object could be regarded as an illegal
"dangerous" knife. See, e,g, State v. Kelly, 118 NJ. 370, 372 (1990)
(upholding conviction for possession of carpet cutter); Liddicoat v. State,

268 P.3d 355, 360 (Alaska Ct. App. 2011) (holding that an ordinary steak knife was a deadly weapon).

321. In another case from Virginia the Court determined that a knife was an illegal weapon because The Court also went on to say that "Ohin's knife ... has a fixed blade, sharp point, and single-sharpened edge affording it unquestionable utility as a stabbing weapon." Ohin v. Commonwealth, 622 S.E.2d 784, 786 (Va. Ct. App. 2005).

322. Under Bouie v. City of Columbia, 378 U.S. 347, 350 (1964) "a criminal statute must give fair warning of the conduct that it makes a crime."

323. NJ. Stat. § 2C:39-1 and the TRO which allows to prohibit Plaintiff from possessing "anything readily capable of ... of inflicting serious bodily injury" including any "dangerous knives" is thus void for vagueness.

324. Further, although the Third Circuit does not appear to have ruled on the issue, numerous courts have held that knives are weapons which are constitutional protected under the Second and Fourteenth Amendments. See, e.g., State v. DeCiccio, 105 A.3d 165, 173 (Conn. 2014) (holding second amendment protected possession of knives)

144

325. The Second Amendment to the United States Constitution made applicable to the states through the Fourteenth Amendment guarantees a personal right to keep "arms" in the home for personal use. McDonald v. City of Chicago, 561 U.S. 742, 791 (2010).

326. Just this Summer in Caetano v. Massachusetts, 136 S.Ct. 1027 (2016) the Supreme Court affirmed that the Second Amendment protects private possession of a variety of weapons, including those not around in the 18th Century as well as weapons not readily adaptible to military purposes—include stun guns.

327. The Court's Per Curium opinion was short, but summarized the case law as follows:

The Court has held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," District of Columbia v. Heller, 554 U. S. 570, 582 (2008), and that this "Second Amendment right is fully applicable to the States," McDonald v. Chicago, 561 U.S. 742, 750 (2010).

328. In a concurring opmion Justice Alita wrote about the importance of the right to possess weapons other than firearms for self-

defense:

The lower court's ill treatment of Heller cannot stand. The reasoning of the Massachusetts court poses a grave threat to the fundamental right of self-defense. The Supreme Judicial Court suggested that Caetano could have simply gotten a firearm to defend herself. 470 Mass., at 783, 26 N.E.3d, at 695. But the right to bear other weapons is "no answer" to a ban on the possession of protected arms. Heller, 554 U.S., at 629, 128 S.Ct. 2783. Moreover, a weapon is an effective means of self-defense only if one is prepared to use it, and it is presumptuous to tell Caetano she should have been ready to shoot the father of her two young children if she wanted to protect herself. Courts

145

should not be in the business of demanding that citizens use more force for self-defense than they are comfortable wielding. ... I am not prepared to say that a State may force an individual to choose between exercising that right and following her conscience, at least where both can be accommodated by a weapon already in widespread use across the Nation. Id. at I033 (Alito, J. concurring).

329. In State v. DeCiccio, 105 A.3d 165, 173 (Conn. 2014) the Connecticut Supreme Court held that "the second amendment protects the defendant's right to possess the dirk knife and police baton in his home and, second, that the statute's complete ban on transporting those items between residences unduly burdens that right." See also State v. Herrmann, 873 N.W.2d 257, 261 (Wis. App. 2015) (holding that possession of knives is protected by the Second Amendment)

330. Finally, banning possession of any weapon on the basis of mere allegations of non-violent conduct not involving a weapon violates due process.

331. Upon information and belief New Jersey Court pursuant to NJ. Stat. § 2C:25-28(j) routinely and universally order that no one subject to a TRO may possess any weapon whatsoever, and order this without a particularized finding of danger or use of a weapon.

146

332. Given the fundamental constitutional rights involved to possess "arms" stripping individuals of this right in summary proceedings is a denial

of due process.

333. In Voisine v. U.S., 136 S. Ct. 2272 (2016) the Supreme Court held that 18 U.S.C. § 92l(a)(33)(A) was not unconstitutional in that it prohibited possession of a firearm by a person convicted of misdemeanor assault or another "crime of domestic violence involving the use of force: "Recall that under § 921(a)(33)(A), an offense counts as a 'misdemeanor crime of domestic violence" only if it has, as an element, the 'use' of force." Id. at 2278.

334. New Jersey's statute differs in two significant ways from 18 U.S.C. § 921(a)(33)(A): first, the New Jersey Statute applies to non-violent offense which do not involve the use of force (such as sending annoying emails) second, the federal statute involves an actual conviction (after a full trial or a guilty plea). In contrast, the New Jersey statute permits suspension of Second Amendment rights in ex parte and/or summary proceedings. See also Binderup v. Atty. Gen. U.S. of Am., 836 F.3d 336, 349 (3d Cir. 2016) ("persons who have committed serious crimes forfeit the right to possess fireanns").

147

335. Indeed the Third Circuit in Binderup recently ruled that it was "only the seriousness of the purportedly disqualifying offense" which determines whether Second Amendment rights may be terminated. Binderup v. Atty. Gen. U.S. of Am., 836 F.3d 336, 350 (3d Cir. 2016) (noting further that "there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights." But New Jersey routinely suspends and/or terminates second amendment rights without any conviction of a crime, much less a serious crime.

336. Accordingly, New Jersey statutes. 2C:25-19, 2C:25-28, and 2C:39-l taken together are unconstitutional because they 1) purport to permit the suspension of Second Amendment rights based on minor non-violent offense, 2) do so on the basis of ex parte and/or summary proceedings which amount to a finding of probable cause for a minor offense, and 3) fail to provide someone under an TRO adequate definition of what "weapons" will result in further punishment.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare under the Declaratory Judgment Act that 2C:25-19, 2C:25-28, and 2C:39-l taken together are unconstitutional insofar as they prevent Plaintifffrom possession a knife;

148

B. Preliminarily and permanently enJom state defendants from enforcing the weapons provisions of that 2C:25-l9, 2C:25-28, and 2C:39-1 with respect to knives;

C. Award Plaintiffreasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D. Award Plaintiff other and further relief as the Court deems just and proper.

TENTH COUNT

DECLARATORY AND INJUNCTIVE RELIEF THAT DEFENDANTS HAVE DENIED PETERSON EQUAL PROTECTION UNDER COLOR OF LAW AND DENIED PETERSON ACCESS TO AN UNBIASED COURT IN VIOLATION OF THE 14TH AMENDMENT BY NEGATIVE EX PARTE COMMUNICATION WITH JUDGES

337. Plaintiffincorporates prior statements as fully restated here.

338. New Jersey State Police, Central Security Unit, Counter Terrorism Bureau maintains files on individuals suspected ofbeing threats to judges.

339. There is also a Cyber Threat Intelligence Unit in New Jersey that appears to be part ofthe State Police.

340. The Administrative Office of the Courts, Court & Judicial Security Unit maintains files on individuals suspected of being threats to judges.

341. Counter Terrorism Bureau ("CTB") and/or Court & Judicial Security Unit ("C&JSU") often work together to monitor individuals suspected of being threats to judges.

149

342. Among other things CTB and/or C&JSU monitor social media looking for individuals who might be threats to "thejudicial system."

343. Among other things CTB and/or C&JSU monitor other media, including YouTube and podcasts looking for individuals who might be threats to "the judicial system."

344. Among other things CTB and/or C&JSU collect comments or complaints from court officers and staff about individuals who might be threats to "thejudicial system."

345. Among other things CTB and/or C&JSU maintain a "Judiciary Incident Reporting System" that contains a database of potential threats to the Court system and/o judicial employees.

346. During the time-frame at issue in this suit, and continuing as of this filing Robin Morante. Chief of Court & Judicial Security, has been the primary

person responsible warning judgment about alleged threats.

347. As one example, Judge David Katz has testified that Morante repeatedly contacted him or his office or staff about perceived threats.

348. Morante confirmed that she reported suspect threats Katz about litigants that were appearing before Judge Katz.

349. Judge Katz never informed the litigants about these ex parte contacts.

150

350. Morante co-founded and is a committee member of the New Jersey Judiciary Security Management Response Team, an initiative that is claimed "to enhance the security of the entire New Jersey Judiciary" state and federal.

351. According to Morante Judiciary Security Management Response Team "is comprised of the United States Marshal Service, the New Jersey State Police, my office, the 21 county sheriffs offices and our local law enforcement partners. And that group has been convened to address judge threats and security threats throughout the judiciary on both the state and federal level, and we also provide and share intelligence when warranted."

352. Accordingly, Morante and her organization provide warning of problem litigants to both state and federal judges.

353. Morante appears to be disposed to conspiracy theories and paranoia as in June of 2022 she had a lawyer on her behalf write a letter to the New Jersey Attorney General accusing "high level state law enforcement and officials [of] engaging in improper, retaliatory, unethical and illegal misconduct," against her.

354. According to Morante C&JSU is "custodians of the judicial incident reporting system which houses reports pertaining to judicial threats [and] security."

355. According to Morante "troopers will go into the internet, comb the internet for intelligence for a security matter to help risk assess."

151

356. According to Morante, her groups investigate potential threats and "threats are defined broadly because there are threats that are security matters and then there are threats that also can escalate to criminal conduct."

357. According to Morante, her groups also review court documents looking for rhetoric that is "alarming" or "hyperbolic," criticizing the court system.

358. According to Morante, her groups keep track of posts and actions that are not literally threatening but considered alarming for some other reason.

359. Litigants who file complaints against Judges are monitored as potential threats (very broadly construed).

360. Among other things CTB and/or C&JSU, and/or additional state

agencies perform a risk assessment ofspecific individuals.

361. This risk assessment ofspecific individuals assesses specific people as to their level ofthreat to judicial employees.

362. According to Morante, her groups may conclude that there is a "significant security risk" even when there is no actual threat ofharm to anyone.

363. Upon information and belief Peterson is on this "problem litigant" list- this may not literally be a unified list, but we will refer to the database as a whole as "the problem litigant list."

364. Peterson has repeatedly been treated as a potentially violent person by judges before whom he has appeared.

152

365. As one example of such treatment, on October 8, 2025 Judge Michael Antoniewicz threatened to have Peterson arrested for trying to talk to the judge on the record.

366. Such threats of arrest go far beyond the normal treatment of a normal litigant and appear to be a result ofPeterson being on the "problem litigant" list.

367. "His Honor" Judge Gary Wilcox, (a.k.a the TikTok Judge) also treated Peterson in such an irrational way (claiming mens rea is an affirmative defense) to raise the inference that Wilcox too was improperly influence by being designated a "problem litigant."

368. Because Peterson has complained about judicial conduct in this complaint (including criticizing "His Honor" the TikTok Judge, it is virtually certain that ifPeterson was not previously on this list he is on the

369. These actions of ex parte communication with judges warning them that Peterson may be dangerous were a denial of Peterson's right to due process before an unbiased tribunal, and denied him equal protection ofthe law by singling him out for "special treatment.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffrespectfully requests that the Court:

A. Declare under the Declaratory Judgment Act that negative ex parte communication to judges about litigants 1s unconstitutional;

153

B. Preliminarily and permanently enJom state defendants from having negative ex parte communications to judges about litigants.

C. Award Plaintiffreasonable costs and attorneys' fees pursuant to

42 U.S.C. § 1988; and

D. Award Plaintiff other and further relief as the Court deems just and proper.

ELEVENTH COUNT

CLAIM UNDER THE NEW JERSEY CIVIL RIGHTS ACT, N.J.S.A 10:6-1 TO 10:6-2,

370. The Plaintiff repeats and re-alleges every allegation set forth above as if recounted at length herein.

371. The Plaintiff enjoys the right under Article I, Section 1 of the New Jersey State Constitution to have the unalienable right to enjoy life and liberty.

372. In violation of this right, the Defendants, by agreement in conspiracy with each other against the Plaintiff, subjected the Plaintiff to unlawful prosecution and violations of his rights to family integrity under the New Jersey Constitution, which protects the inviolability of the family unit, and the fundamental liberty interest of parents in raising their biological children, which is deeply rooted in constitutional protections, including due process and equal protection principles, and is considered a fundamental constitutional right.

373. The Defendants deprived the Plaintiff of these rights under the color of State law.

374. The Defendants acted in reckless disregard for the Plaintiffs rights.

375. As a result, the Plaintiff suffered serious injury and damage.

WHEREFORE, plaintiff demands judgment, pursuant to N.JS.A. I0:6-1 to 10:6-2, against defendants Kaitlyn Groezinger, Bryan Gurney, Mark Messner, Lee Schaer, Lawrence Kleiner, and The Behaved Brain, LLC, jointly and severally on the sixth count of this complaint for compensatory, pain and suffering, and punitive damages in an amount of ten million dollars ($10,000,000) or to be determined at trial plus interest, attorney fees, costs of suit, and such other and further relief the court deems equitable and just.

ATTORNEY'S FEES

A) Plaintiff incorporates by reference the allegations contained m paragraphs above, as though fully set forth here.

B) As a result of Defendants' actions as alleged m this complaint, Plaintiff has been required to retain the service of attorneys and are entitled to a reasonable amount for attorney's fees pursuant to 42 U.S.C.A. §1988 for those violations covered by the Civil Rights Act.

JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff demands that this matter be tried to a jury of twelve in the United States District Court for the District of New Jersey.

Respectfully submitted,

Dated: October 20, 2025

Christopher Peterson, pro se

156

# END OF PRIOR AMENDED COMPLAINT TEXT
# PROPOSED SECOND AMENDED COMPLAINT TEXT SHOWN AS ADDED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY, MEREDITH BENDIAN, in her individual capacity and official capacity as Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE, OFFICER BERNHARD, Badge No. 61, first name presently unknown, SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20,
Defendants.
Civil Action No. 2:25-cv-11801-MEF-AME
PROPOSED SECOND AMENDED COMPLAINT AND JURY DEMAND

INTRODUCTION
1. This civil-rights action does not seek review, reversal, modification, or supervision of any state-court judgment, custody order, restraining order, parenting-time order, or criminal-court order.
2. Plaintiff seeks damages and appropriate prospective relief for independent conduct by defendants that occurred before, outside, or apart from any state-court adjudication.
3. The claims arise from defendants' alleged misuse of law-enforcement authority, non-public police records, materially false or misleading allegations, judicial-security

classifications, and state enforcement mechanisms to cause restrictions, prosecution, detention, intimidation, and deprivation of Plaintiff's constitutional rights.

4. Plaintiff alleges that private defendants did not merely complain in good faith or advocate in court. Plaintiff alleges that certain private defendants knowingly supplied materially false, misleading, or objectively unreliable information; used or helped obtain sensitive law-enforcement records; and participated in conduct that foreseeably caused state action against Plaintiff.

5. Plaintiff alleges that certain municipal and law-enforcement defendants relied on accusations without reasonable verification, released or disseminated sensitive records without lawful basis, threatened Plaintiff with arrest for protected recording activity, and participated in conduct that violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments.

6. Plaintiff further alleges that Ramsey and Bendian released or caused the release of confidential juvenile or juvenile-related law-enforcement records through municipal and police records channels despite legal duties to withhold, redact, deny, or seek legal review before disclosure.

7. Plaintiff alleges that Defendant Robin Morante, in her official capacity as Chief of Court and Judicial Security for the State of New Jersey, oversees or participates in the administration, dissemination, maintenance, or implementation of court-security threat designations, JSMART-related threat-risk information, courthouse-security alerts, or similar judicial-security classifications affecting Plaintiff and other pro se litigants.

8. Plaintiff does not ask this Court to determine custody, parenting time, best interests, domestic violence issues, or the correctness of any state-court ruling. Plaintiff seeks redress for defendants' own conduct and the independent injuries caused by that conduct.

SCOPE OF CLAIMS AND WHAT PLAINTIFF IS NOT ASKING THIS COURT TO DO

9. Plaintiff does not seek review, reversal, modification, enforcement, or invalidation of any state-court custody order, restraining order, parenting-time order, criminal-court order, evidentiary ruling, venue ruling, or family-court ruling.

10. Plaintiff does not ask this Court to decide custody, parenting time, best interests of the children, domestic violence issues, or the correctness of any state-court ruling.

11. Plaintiff seeks damages and appropriate prospective relief for defendants' own independent conduct, including conduct that occurred before state-court rulings, outside state-court proceedings, through law-enforcement channels, through allegedly false or misleading reports to law enforcement, through alleged misuse of confidential records, through alleged threats or coercive conduct, and through ongoing judicial-security classifications allegedly imposed without notice or opportunity to be heard.

12. Plaintiff alleges that the injuries were caused by defendants' conduct, not by the mere existence of state-court orders.

13. As to Defendant Robin Morante, Plaintiff seeks prospective declaratory and injunctive relief only, directed to any ongoing court-security designation, JSMART-related designation, courthouse-security alert, threat-risk classification, or dissemination of threat-risk information concerning Plaintiff. Plaintiff does not seek damages from Morante for judicial rulings or for any judge's adjudicative acts.

PARTIES

14. Plaintiff Christopher Peterson is an individual residing in New Jersey.

15. Defendant Kaitlyn Groezinger is an individual residing in New Jersey and is sued in her individual capacity.

16. Defendant Bryan Gurney is a former Ramsey Police Chief and current or former public-safety official. He is sued in his individual capacity.

17. Defendant Bryan Gurney is sued because Plaintiff alleges that Gurney did not act merely as a private grandfather or private citizen. Plaintiff alleges that Gurney used his law-enforcement status, law-enforcement relationships, access, influence, and/or authority as a police chief or public-safety official to obtain, approve, facilitate, or cause the release of sensitive police records, domestic-violence-related records, and juvenile or juvenile-related records concerning Plaintiff.

18. Defendant Mark Messner was, at relevant times, Chief of Police for the Borough of Waldwick. He is sued in his individual capacity.

19. Defendant Mark Messner is sued because Plaintiff alleges that he personally approved, authorized, facilitated, or permitted the release of sensitive Waldwick police records concerning Plaintiff after direct or indirect communication with Gurney.

20. Defendant Borough of Waldwick is a municipal entity in New Jersey.

21. Defendant Borough of Oakland is a municipal entity in New Jersey.

22. Defendant Borough of Ramsey is a municipal entity in New Jersey. Plaintiff sues Ramsey only for claims arising from the alleged release, disclosure, dissemination, or failure to protect Plaintiff's confidential juvenile or juvenile-related law-enforcement records through Ramsey municipal and police records channels.

23. Defendant Meredith Bendian was, at relevant times, the Borough Clerk and/or records custodian for the Borough of Ramsey. She is sued in her individual capacity for her personal participation in receiving, processing, routing, transmitting, approving, releasing, or failing to prevent the release of Plaintiff's confidential juvenile or juvenile-related law-enforcement records, and in her official capacity to the extent prospective or municipal records-related relief is appropriate.

24. Plaintiff alleges that Bendian had served as Ramsey Borough Clerk since approximately 2010 and was a trained and experienced municipal records official.

25. Plaintiff alleges that Bendian was a Registered Municipal Clerk and, by virtue of her position, training, experience, and records-custodian responsibilities, knew or reasonably should have known that juvenile or juvenile-related law-enforcement records are confidential, exempt from ordinary public disclosure, and may not be

released to a private party without lawful authorization, court authorization, or legally sufficient justification. Plaintiff further alleges that Bendian's knowledge is confirmed by a later OPRA response in which Bendian denied a request for juvenile records on the ground that juvenile records are exempt from disclosure under OPRA.

26. Defendant Donald Harvey was, at relevant times, a law-enforcement officer or supervisor for the Borough of Oakland. He is sued in his individual capacity.

27. Defendant Matthew Lopez was, at relevant times, a law-enforcement officer for the Borough of Oakland. He is sued in his individual capacity.

28. Defendant Hank Anderson was, at relevant times, a law-enforcement officer for the Borough of Oakland. He is sued in his individual capacity.

29. Defendant Dylan Ritondale was, at relevant times, a law-enforcement officer for the Borough of Waldwick. He is sued in his individual capacity.

30. Defendant Officer Bernhard, Badge No. 61, first name presently unknown, was, at relevant times, a law-enforcement officer for the Borough of Waldwick. He is sued in his individual capacity. Plaintiff alleges that Bernhard contacted a retained process server during service of Plaintiff's federal complaint, instructed the process server not to return to Groezinger's residence because she was considered to be trespassing, and thereby interfered with or burdened lawful service of federal litigation papers.

31. Defendant Sergeant Christopher Sanchez was, at relevant times, a supervisory law-enforcement officer for the Borough of Waldwick. He is sued in his individual capacity. Plaintiff alleges that Sanchez was one of the Waldwick officers present during the April 17, 2020 incident that resulted in Plaintiff's removal from the home and later criminal charges. Plaintiff further alleges that Sanchez later spoke with the retained process server after Officer Bernhard's August 19, 2025 call, advised that Waldwick police had obtained the process server's cellular telephone number by contacting the registered owner of the vehicle she was driving, advised the process server not to return to Groezinger's residence, and thereby ratified, continued, or participated in the interference with lawful service of federal litigation papers. Plaintiff alleges Sanchez's April 17, 2020 involvement is relevant to knowledge, pattern, motive, relationship to the underlying dispute, and the non-neutral nature of the later service-of-process interference.

32. Defendant Lawrence Kleiner is an attorney who represented Groezinger in state proceedings. Plaintiff does not sue Kleiner for ordinary legal advocacy, legal argument, filing papers, courtroom statements, or representing his client in court. Plaintiff sues Kleiner only for alleged extra-judicial or non-privileged factual conduct, including the alleged knowing use, possession, transmission, dissemination, or reinforcement of materially false factual assertions and non-public law-enforcement records to trigger, reinforce, or perpetuate state action against Plaintiff. Plaintiff alleges that Kleiner's actionable conduct includes, without limitation, extra-judicial threats or communications concerning custody-exchange enforcement, the alleged use or reinforcement of non-public police materials, Hawthorne body-worn-camera

footage, Ramsey juvenile or juvenile-related records, and factual theories that were later repeated to law enforcement, prosecutors, or evaluators despite recordings or documents contradicting them.

33. Defendant The Behaved Brain, LLC is a New Jersey limited liability company. Plaintiff does not sue Behaved Brain for merely complying with a subpoena, obeying a court order, asserting ordinary confidentiality objections, directing Plaintiff to counsel, or refusing to release records pursuant to a court order. Plaintiff sues Behaved Brain only for alleged extra-judicial conduct before or outside neutral evidentiary process, including materially false or misleading factual reports to law enforcement, requests for extra patrols or police-security measures, threatened staff affidavits, and coordinated safety accusations portraying Plaintiff as intimidating, threatening, harassing, unsafe, dangerous, or stalking, despite Plaintiff's recordings and later police review contradicting that danger narrative.

34. Defendant Robin Morante is the Chief of Court and Judicial Security for the State of New Jersey, or otherwise an official responsible for court and judicial security policies, practices, communications, alerts, threat-risk classifications, courthouse-security designations, JSMART-related threat information, or similar systems affecting litigants' access to courts.

35. Defendant Morante is sued in her official capacity only for prospective declaratory and injunctive relief concerning ongoing security classifications, threat-risk designations, JSMART-related entries, court-security alerts, communications, or dissemination of information concerning Plaintiff.

36. Plaintiff alleges that Morante is an appropriate official-capacity defendant because she has responsibility for overseeing, administering, maintaining, communicating, correcting, reviewing, or implementing court-security threat designations, judicial-security alerts, JSMART-related information, courthouse-security procedures, or similar systems that continue to affect Plaintiff.

37. John Does 1-20 are individuals whose identities are presently unknown and who participated in the acts described below, including unknown law-enforcement personnel, municipal personnel, records personnel, security personnel, or private actors who participated in the alleged records misuse, prosecution-related conduct, service-of-process interference, court-security classification, or other constitutional violations described in this Complaint.

JURISDICTION AND VENUE

38. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims under 42 U.S.C. § 1983 and the United States Constitution.

39. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims, including claims under the New Jersey Civil Rights Act.

40. Venue is proper in this District because the events giving rise to the claims occurred in New Jersey and the defendants reside or acted in New Jersey.

FACTUAL ALLEGATIONS

A. April 17, 2020 allegations and resulting state action

41. On or about April 17, 2020, Defendant Groezinger contacted or spoke with law enforcement concerning Plaintiff.

42. Groezinger alleged that Plaintiff threatened her and/or made statements that she later characterized as a basis for domestic-violence and criminal action.

43. The conversation between Plaintiff and Groezinger was recorded.

44. Plaintiff alleges that the recording did not support the materially more severe version of events later supplied by Groezinger.

45. Plaintiff alleges that the recording reflected an argument, but did not show that Plaintiff made an actual, imminent, unconditional threat to kill Groezinger or harm the children.

46. Plaintiff alleges that the children were asleep and unaware of the conversation.

47. DCP&P later investigated and closed the matter with a "Not Established" finding.

48. When officers responded, Groezinger did not initially demand that Plaintiff be arrested or permanently removed. Instead, Groezinger asked whether Plaintiff could simply leave for the night and return in the morning.

49. When officers explained that they could not simply make Plaintiff leave for the night without a restraining order, Groezinger asked whether obtaining a restraining order would affect custody.

50. Plaintiff further alleges that Groezinger later provided inconsistent accounts concerning the same alleged choking incident, at times describing the event as occurring against a wall and at other times describing it as occurring on a bed. Plaintiff alleges that these inconsistencies were material because they concerned the core factual allegations used to portray Plaintiff as violent and dangerous.

51. Those statements were recorded by police body microphone or body camera.

52. Plaintiff alleges that those statements are material because they contradict Groezinger's later portrayal that she was acting only out of immediate fear for her life and support the inference that custody consequences were part of the purpose for invoking state power.

53. Despite the recording, the lack of corroboration, and the children being asleep and unaware, Groezinger's allegations became the factual basis for police intervention, removal from the home, criminal charges, and later restrictions.

54. Plaintiff was charged with terroristic threats and endangering the welfare of a child.

55. Plaintiff alleges that the charges lacked probable cause because they were based on materially false, misleading, or exaggerated allegations supplied by Groezinger and not on independently verified facts.

56. Plaintiff alleges that Groezinger's conduct was not limited to seeking protection in good faith, but included using materially false or exaggerated allegations to trigger state action and gain advantage in custody-related disputes.

57. Plaintiff alleges that Groezinger's April 17, 2020 allegations were later repeated or reinforced through third-party statements, testimony, reports, or narratives that were based substantially on information supplied by Groezinger rather than direct observation of the alleged threats or misconduct.

58. Plaintiff does not ask this Court to review, reverse, or second-guess the Final Restraining Order hearing, any credibility finding, or any state-court ruling.

59. Plaintiff alleges these facts only as background showing the source, repetition, and later use of factual narratives that were supplied to law enforcement, prosecutors, evaluators, or other state actors.

60. Plaintiff alleges that the third-party witnesses did not personally observe Plaintiff make an imminent threat, threaten the children, threaten to burn down the residence, or commit an act of domestic violence during the April 17, 2020 police incident.

61. Plaintiff alleges that some prior factual narratives concerning Plaintiff were contradicted by contemporaneous records, communications, or recordings.

62. Plaintiff does not seek an adjudication of prior state-court witness credibility disputes.

63. Plaintiff alleges that the relevance of these facts is limited to motive, knowledge, pattern, causation, and the later use of allegedly false or misleading factual narratives in law-enforcement or state-action processes.

64. Plaintiff's actionable claims do not depend on overturning the FRO or any finding made at the FRO hearing, but on independent conduct by defendants that allegedly caused prosecution, records misuse, detention, security restrictions, or other constitutional injury.

B. Later allegations concerning custody exchanges

65. After the April 17, 2020 incident, Plaintiff began documenting custody exchanges to protect himself from further false allegations, including through recordings or video documentation he believed were lawful, permitted, or necessary to preserve objective evidence.

66. The custody exchanges occurred at or near police-station or municipal locations.

67. Plaintiff documented or preserved objective evidence of custody exchanges because prior allegations had already resulted in severe state action, including removal from the home, criminal charges, and restrictions on contact.

68. Plaintiff alleges that video recordings of later custody exchanges contradicted allegations that he stalked, harassed, threatened, intimidated, or improperly approached Groezinger during exchanges.

69. Plaintiff alleges that despite the existence of recordings, Groezinger continued to advance allegations concerning the exchanges that were materially inconsistent with the objective recordings.

70. Plaintiff alleges that those allegations became part of the factual basis for additional criminal charges, restrictions, and threats of enforcement.

71. Plaintiff alleges that Groezinger and Kleiner had access to, knew about, or were aware of recordings that contradicted the factual allegations being advanced.

72. Plaintiff alleges that those allegations were not merely litigation positions but factual accusations used to trigger or reinforce state action.

73. Plaintiff alleges that the injury from these allegations is independent of any request to overturn a state-court order because the injury arose from the creation and use of false factual predicates for state enforcement.

C. Groezinger's September 16, 2022 BCPO interview, recorded custody exchanges, and the superseding indictment

74. On September 16, 2022, Defendant Groezinger participated in a recorded interview with investigators from the Bergen County Prosecutor's Office concerning Plaintiff's conduct during child-custody exchanges.

75. The custody exchanges discussed during that interview were recorded by Plaintiff.

76. During the September 16, 2022 interview, as reflected in the BCPO interview recording and/or transcript, Groezinger told prosecutor's investigators that Plaintiff moved within two to three feet of her during custody exchanges, recorded her, forced her to take things from his hands in order to get the child back, refused to release the child to Groezinger's mother, required Groezinger to personally appear for exchanges, followed or approached her when she attempted to create distance, accused her of using an impostor, and used the custody-exchange process as a means of control.

77. Plaintiff alleges that those statements were materially false, misleading, exaggerated, or contradicted by the custody-exchange recordings.

78. Plaintiff alleges that the recordings show that he did not run up to Groezinger, did not place or shove a camera in her face, did not threaten or intimidate her, did not force her to take objects from his hand in order to receive the child, did not use the child as bait, did not follow or approach her in the manner alleged, did not improperly refuse to release the child in violation of the restraining order, and did not engage in conduct that would objectively constitute stalking or a restraining-order violation.

79. Groezinger knew the exchanges were being recorded when she made those allegations because one of her allegations was that Plaintiff was recording her and placing the camera in her face.

80. During the grand-jury presentation, as reflected in the grand-jury transcript, the State presented Groezinger's allegations through Detective Jeffrey Madonna, who testified that he had reviewed the file and repeated Groezinger's allegations concerning Plaintiff's alleged proximity, recording, refusal to release the child to Groezinger's mother, alleged demand for face-to-face interaction, alleged refusal to release the child until Groezinger exited the vehicle, alleged "impostor" accusation, and alleged conduct during custody exchanges.

81. The grand jury was told that Plaintiff recorded custody exchanges and heard Groezinger's accusations through Detective Madonna, but Plaintiff alleges that the

grand jury was not shown or played the custody-exchange recordings that would have allowed it to compare Groezinger's allegations against the objective video evidence.

82. Plaintiff alleges that the State presented Groezinger's allegations as factual predicates for the superseding indictment without presenting the objective recordings that would have allowed the grand jury to assess whether Plaintiff actually moved toward Groezinger, forced hand-to-hand exchanges, withheld the child, followed or approached her, recorded her in the manner alleged, accused her of using an impostor in the manner alleged, or engaged in conduct that objectively constituted stalking or a restraining-order violation.

83. The superseding indictment added charges of stalking and violating a final restraining order based substantially on alleged misconduct during custody exchanges.

84. The superseding indictment did not identify each exchange by specific date with sufficient particularity. When Plaintiff sought a bill of particulars, he was provided only a general time period of June, July, and August 2022.

85. Plaintiff has recordings of every custody exchange before, during, and after the June, July, and August 2022 time period relied upon for the superseding indictment.

86. After the superseding indictment, Plaintiff provided the custody-exchange recordings to the prosecutor and to the criminal court in support of his motion to dismiss the indictment. In opposition to that motion, the prosecutor acknowledged Plaintiff's reliance on the videos but asserted that the videos corroborated Groezinger's statement to Detective Madonna.

87. Despite receiving those recordings after the superseding indictment, the prosecutor opposed Plaintiff's motion to dismiss by continuing to rely on the same custody-exchange allegations and by asserting that the videos corroborated Groezinger's statement. Plaintiff alleges that the recordings did not corroborate Groezinger's allegations and instead contradicted the factual premise of the stalking and restraining-order-violation charges.

88. Plaintiff alleges that Groezinger did not merely make a private complaint. She knowingly supplied materially false or misleading factual allegations to prosecutor's investigators about events she knew were recorded. Those allegations were then repeated, adopted, or relied upon by state actors as operative facts in a criminal prosecution.

89. Plaintiff alleges that without Groezinger's materially false or misleading allegations concerning the recorded custody exchanges, the stalking and restraining-order-violation charges would not have been pursued or continued. Plaintiff further alleges that the later prosecutorial opposition to dismissal confirms that the prosecution continued to rely on Groezinger's custody-exchange narrative even after Plaintiff supplied the objective recordings.

90. Plaintiff's injuries from this conduct include additional criminal charges, increased criminal exposure, restrictions, reputational harm, legal expense, emotional distress, and deprivation of liberty.

91. Plaintiff does not seek review or reversal of any state-court judgment. Plaintiff seeks damages for the independent use of materially false factual allegations to cause or contribute to state action against him.

D. Groezinger's June 5, 2025 Oakland report and the shift from car-seat suspicion to recording/FRO enforcement

92. On June 5, 2025, before a custody exchange at or near the Oakland Municipal Court parking lot, Groezinger communicated with the Oakland Police Department.

93. Groezinger reported that Plaintiff or the vehicle transporting the child did not have a proper car seat or booster seat.

94. Groezinger also reported or asserted that being recorded during the exchange constituted a violation of the final restraining order.

95. After the child entered the vehicle, Groezinger left the location, and Oakland officers then approached Plaintiff and/or the vehicle.

96. Plaintiff alleges that the officers could not verify whether there was or was not a booster seat in the vehicle.

97. Plaintiff alleges that Groezinger could not reasonably have verified the absence of a booster seat from her vantage point. Plaintiff possesses photographs from the same or substantially similar vantage point showing that the booster seat area could not be seen clearly.

98. Plaintiff alleges that after officers could not verify the car-seat allegation, the justification for the detention shifted to a possible final-restraining-order violation based on recording by a third party.

99. The Oakland Police Department had previously addressed a substantially similar recording allegation under the same or materially similar restraining-order language. In a May 23, 2023 Oakland police report, Oakland documented that Assistant Prosecutor Silletti was consulted regarding a possible violation based on filming during custody exchanges and found that there was not probable cause to constitute a violation.

100. Plaintiff alleges that Oakland therefore had prior notice that the same or materially similar custody-exchange recording issue did not constitute probable cause for a restraining-order violation.

101. Plaintiff alleges that Groezinger's June 5, 2025 report was not a neutral or objectively reliable report of a clearly observed violation, but an unverified allegation that caused police detention and then shifted into a recording/FRO enforcement theory Oakland had already been told lacked probable cause under similar circumstances.

102. Plaintiff's injury from this conduct includes detention, intimidation, interference with protected recording activity, fear of arrest, and deprivation of constitutional rights.

E. Gurney, Waldwick, and irregular release of domestic-violence-related records

103. On or about December 19, 2019, while serving as a law-enforcement official and/or police chief, Defendant Bryan Gurney personally submitted, sought, or caused

to be sought records from the Waldwick Police Department concerning Plaintiff and Groezinger.

104. The request was not processed as an ordinary neutral public-records request. Plaintiff later obtained phone records showing that Gurney had two telephone communications with Waldwick Police Chief Mark Messner shortly before the OPRA request was submitted.

105. The OPRA request was submitted by or through Patti Gurney on Bryan Gurney's behalf, and the communications reflected familiarity between Gurney and Messner.

106. Gurney used the email address chiefgurney@gmail.com in connection with the request or related communications, and Messner's response included that address.

107. Messner responded "as requested" and transmitted records directly with files attached.

108. Plaintiff alleges that the initial version of the request produced to Plaintiff was not signed or authorized by the Borough Clerk. Plaintiff later received a version of the same request bearing a clerk signature, which Plaintiff alleges supports the inference that the records release was later made to appear as though it had proceeded through ordinary OPRA channels.

109. Plaintiff alleges that the records requested and released included Plaintiff's own domestic-violence-related report concerning Groezinger, and that Gurney's OPRA request sought not merely a public incident log but police reports from Groezinger, police reports from Plaintiff, and any other police report emanating from either party at the same address.

110. Plaintiff alleges that those records were not ordinary records available for informal, unredacted, direct, or relationship-based release without proper OPRA review, confidentiality review, redaction, denial where required, or legal approval.

111. Plaintiff alleges that Gurney used his law-enforcement status, relationships, access, influence, or authority to obtain records that an ordinary requester would not have received.

112. Plaintiff alleges that the released Waldwick records were later used in Gurney's daughter's custody case against Plaintiff in an effort to restrict or interfere with Plaintiff's parenting time with his daughter.

113. Plaintiff alleges that this later use of the Waldwick records confirmed that the disclosure caused continuing injury beyond the mere release of the records.

F. Ramsey juvenile records, Groezinger's OPRA request, Gurney's police-chief approval, and later disclosure to Dr. Tarle

114. On or about September 29, 2020, Groezinger submitted an OPRA request to the Borough of Ramsey seeking records concerning Plaintiff.

115. On or about October 5, 2020, records were released in response to Groezinger's request.

116. Plaintiff alleges that the released records included confidential juvenile or juvenile-related law-enforcement records concerning Plaintiff.

117. At the time of the request and release, Defendant Bryan Gurney was the Ramsey Police Chief.

118. Defendant Meredith Bendian was, at relevant times, the Ramsey Borough Clerk and/or municipal records custodian.

119. Plaintiff alleges that he was unaware that his confidential juvenile or juvenile-related records had been released to Groezinger until July 25, 2024, when Plaintiff and his family-law attorney retrieved materials from Dr. Marc Tarle's office and discovered records that Groezinger had provided to Dr. Tarle.

120. Plaintiff alleges that the materials retrieved from Dr. Tarle's office included Plaintiff's juvenile or juvenile-related law-enforcement records and Waldwick records previously released through the Gurney/Messner records chain.

121. Plaintiff has emails and court-record confirmation showing that Groezinger submitted Plaintiff's juvenile or juvenile-related records and other records to Dr. Tarle.

122. Kleiner, Groezinger's attorney, confirmed both in emails and on the record that Groezinger submitted those documents to Dr. Tarle. In a March 11, 2025 certification, Groezinger herself stated in substance that the issue with Dr. Tarle stemmed from documentation she claimed was lawfully provided to her through an OPRA request to the Borough of Ramsey, that she did not show the records to Kleiner, and that she "simply forwarded them to Dr. Tarle." Groezinger further stated in substance that the records from when Plaintiff was much younger could probably be disregarded because Plaintiff's alleged more recent "offenses" were sufficient to "paint a true picture" of Plaintiff. At the March 14, 2025 OTSC hearing, Kleiner further stated in substance that Dr. Tarle accidentally received documentation that Groezinger apparently accidentally received from Ramsey regarding an arrest Plaintiff may have had when he was a minor. Plaintiff further alleges that Dr. Tarle emailed Plaintiff requesting that Plaintiff appear for one final appointment so that Dr. Tarle could complete the evaluation. Plaintiff further alleges that, during a later recorded call, Dr. Tarle told Plaintiff in substance that he no longer needed to speak with Groezinger because Groezinger had supplied a "book" of information about Plaintiff. Shortly afterward, Plaintiff and his counsel obtained that "book" of information from Dr. Tarle's office, and it contained Plaintiff's confidential juvenile or juvenile-related records and other sensitive records. Plaintiff alleges that these facts caused continuing injury and reinforced the need to determine who released, transmitted, received, maintained, and used those records.

123. On or about August 21, 2024, Plaintiff spoke on a recorded call with Marlene Dougherty, the Ramsey Police Department's designated records clerk.

124. During that recorded call, Dougherty confirmed that when an OPRA request is submitted through the Borough or Borough website, the request is routed to the Borough Clerk, then to the Police Chief for approval, and then back to the Borough Clerk for release.

125. Dougherty further confirmed that if a records request is submitted directly to the Police Department, the request goes directly to the Police Chief for approval and release.

126. Plaintiff alleges that under either route described by Ramsey's designated police records clerk, the Ramsey Police Chief was required to approve or authorize release of police records before disclosure.

127. Plaintiff alleges that the juvenile or juvenile-related records would not have been released without Gurney's approval, authorization, sign-off, or failure to prevent disclosure in his official role as Ramsey Police Chief.

128. Plaintiff alleges that Groezinger's later transmission of those records to Dr. Tarle caused continuing injury because the records were used in a custody-related forensic evaluation and related family-court proceedings.

129. Plaintiff alleges that he did not know, and could not reasonably have known, the existence, scope, route, participants, or later use of the Ramsey juvenile-records disclosure until July 25, 2024 and related 2024 proceedings and disclosures.

G. Hawthorne body-camera footage, Newport SID information, later discovery, and delayed accrual

130. On or about December 14, 2022, Groezinger submitted an OPRA request to the Hawthorne Police Department seeking records and body-worn-camera footage concerning a disorderly-persons incident involving Plaintiff.

131. The Hawthorne incident did not occur during Plaintiff's parenting time and did not involve Plaintiff's children.

132. Hawthorne's disclosure log reflects that Groezinger was provided four pages of documents on or about December 14, 2022, but the disclosure did not include body-worn-camera footage.

133. On or about December 19, 2022, Gurney submitted a separate request seeking only the body-worn-camera footage that Groezinger had not received.

134. On or about December 19, 2022, Gurney was provided the body-worn-camera footage.

135. At the January 27, 2023 hearing before Judge Janeczko, Kleiner stated on the record that he had submitted or relied upon the Hawthorne documentation and body-worn-camera footage.

136. Plaintiff alleges that the sequence of events supports the inference that Groezinger could not obtain the body-worn-camera footage herself, that Gurney used his law-enforcement status, access, or influence to obtain the precise footage she did not receive, and that the footage was then provided to or used by Kleiner on Groezinger's behalf.

137. Plaintiff alleges that this was not ordinary litigation advocacy or neutral records access, but the use of law-enforcement records channels to obtain and use police materials against Plaintiff in custody-related proceedings.

138. Groezinger also used or relied upon information concerning Plaintiff's Newport, Rhode Island arrest, which was later dismissed, sealed, or expunged.

139. Groezinger claimed in court that she became aware of the Newport arrest through a public police blotter or public online source.

140. Plaintiff alleges, however, that Groezinger searched for or obtained information concerning the Newport matter using Plaintiff's Rhode Island SID number or another law-enforcement identifier not publicly available on the ordinary court docket or public online records.

141. Plaintiff confirmed with the Newport court clerk that the SID number was not visible on the public docket or ordinary online records and was information available only through law-enforcement-accessible sources or non-public channels.

142. Plaintiff alleges that Groezinger's possession or use of that non-public identifier supports the inference that she received law-enforcement-only information from Gurney or another law-enforcement source.

143. Plaintiff later obtained OPRA-related emails, phone records, request forms, disclosure logs, municipal records, recorded-call evidence, and court materials involving records requests concerning Plaintiff.

144. Those records and communications identified or referenced Gurney, Groezinger, Messner, Bendian, Waldwick, Ramsey, Hawthorne, or other actors in connection with records concerning Plaintiff.

145. Plaintiff alleges that these records and communications showed that records concerning Plaintiff were not obtained solely through ordinary neutral public access but through coordinated requests, law-enforcement channels, municipal records channels, police-chief approval, records-custodian action, or law-enforcement relationships. Plaintiff further alleges that Kleiner's March 14, 2025 on-record statements support this inference because Kleiner acknowledged that Groezinger searched online or checked for Plaintiff's arrests and also stated in substance that a person is not entitled to obtain records from a court while a matter is pending, which supports Plaintiff's allegation that Hawthorne disorderly-persons materials, police records, body-worn-camera footage, or discovery-type materials were released to Groezinger and Gurney through improper or non-public channels before Plaintiff himself had access to discovery in that matter.

146. Plaintiff alleges that on July 25, 2024, when Plaintiff and his family-law attorney retrieved materials from Dr. Tarle's office, Plaintiff first discovered that Groezinger had provided Dr. Tarle with Plaintiff's juvenile or juvenile-related records and Waldwick records.

147. Plaintiff alleges that on or about August 21, 2024, he learned through a recorded call with Ramsey Police Department's designated records clerk that Ramsey police-record requests submitted through the Borough's OPRA portal were routed to the Borough Clerk, then to the Police Chief for approval, and then back to the Borough Clerk for release.

148. Plaintiff alleges that the August 21, 2024 recorded call further confirmed that if a police-record request was submitted directly to the Ramsey Police Department, it would go directly to the Police Chief for approval and release.

149. Plaintiff alleges that the December 2022 Hawthorne disclosure logs later revealed that Groezinger requested records and body-worn-camera footage, received only documents, and that Gurney then requested and received the body-worn-camera footage that Groezinger did not receive.

150. Plaintiff alleges that these later-discovered communications and later-discovered uses support delayed accrual, equitable tolling, or factual development as to timeliness because Plaintiff could not reasonably know the full scope of the records-access scheme, approval chain, dissemination, and later constitutional injury until he obtained the communications and learned how the records were approved, released, disseminated, and used.

151. Plaintiff alleges that his claims are not based solely on a single historical records release, but on the acquisition, approval, disclosure, dissemination, later use, and continuing reliance on sensitive records in proceedings and evaluations affecting Plaintiff's parental rights, privacy rights, and liberty interests, including later discovery through transcripts, emails, disclosure logs, police reports, recorded calls, and materials obtained from Dr. Tarle's office.

H. Kleiner's extra-judicial exchange threat and later use of the same theory in the superseding indictment

152. Before the superseding indictment, the operative state-court exchange order provided in substance that Groezinger, the plaintiff in the FRO matter, was to transport E.P. to and from the Mahwah Police Department both ways.

153. Plaintiff alleges that the order did not authorize Groezinger to unilaterally substitute her mother or another third party in place of herself for the custody exchange.

154. Kleiner sent an email to Plaintiff's then-counsel stating that Groezinger would no longer personally conduct custody exchanges.

155. Plaintiff's counsel responded that Groezinger could not unilaterally change the court-ordered exchange procedure and that if the parties intended to permit third-party transportation or third-party exchanges, the order would need to be amended.

156. Kleiner nevertheless asserted, threatened, or communicated in substance that Plaintiff would be violating the order if he refused to release the child to Groezinger's mother and that Kleiner would pursue legal action or action in all legal forms if Plaintiff did not release the child to Groezinger's mother.

157. Plaintiff alleges that the order was later amended to allow third-party transportation, which supports Plaintiff's allegation that the original order did not authorize Groezinger's unilateral substitution of her mother at the time Kleiner threatened enforcement.

158. Plaintiff alleges that Groezinger and Kleiner knew or reasonably should have known that the court-ordered exchange procedure did not authorize Groezinger's unilateral substitution of her mother, yet Plaintiff's refusal to accept that substitution was later framed as criminal conduct. Plaintiff further alleges that this same mother-substitution and refusal-to-release theory appeared in Groezinger's BCPO interview, the grand-jury presentation, and the State's later opposition to Plaintiff's motion to dismiss the superseding indictment. Plaintiff alleges that this mother-substitution theory was not merely a private legal disagreement. After Plaintiff's counsel advised Kleiner that the operative order required Groezinger herself to conduct exchanges and did not authorize unilateral substitution of Groezinger's mother, the same disputed theory was later supplied to BCPO investigators, repeated in the grand-jury presentation, and relied upon as a factual predicate for the restraining-order-violation and stalking charges. Plaintiff alleges that Kleiner's pre-indictment threat is relevant because it shows notice that the theory was disputed and unsupported, yet the theory was later used as though Plaintiff's refusal to release the child to Groezinger's mother was criminal conduct.

I. Specific state-action allegations concerning private defendants

159. Plaintiff alleges that Groezinger, Gurney, and Kleiner were not acting merely as private complainants, family members, or ordinary litigation participants.

160. Groezinger supplied specific factual allegations to prosecutor's investigators concerning recorded custody exchanges, knew the exchanges were recorded, and those allegations were then repeated, adopted, or relied upon by state actors in pursuing the superseding indictment. Plaintiff further alleges that the same custody-exchange narrative was later repeated in the State's opposition to Plaintiff's motion to dismiss the indictment after Plaintiff supplied the custody-exchange recordings.

161. Groezinger also made the June 5, 2025 Oakland report that caused police officers to approach and detain Plaintiff based on an unverified car-seat allegation and a recording/FRO theory Oakland had previously documented as lacking probable cause under similar circumstances.

162. Gurney used or exploited law-enforcement status, police-chief authority, public-safety relationships, police-records approval channels, or law-enforcement-accessible information to obtain records that were not available to an ordinary requester and that were later used against Plaintiff in custody-related proceedings and evaluations. Plaintiff further alleges that he recently discovered that Bryan Gurney's sister, Kathlyn Gurney, is or was employed by the Borough of Oakland as confidential secretary to the Borough Administrator. Plaintiff alleges that this relationship is relevant to discovery concerning Gurney's municipal relationships, possible informal access, possible communications, or possible influence involving Oakland-related actors, records, or law-enforcement channels. Plaintiff does not presently allege that Kathlyn Gurney personally violated Plaintiff's rights.

163. Kleiner allegedly used or reinforced factual allegations and non-public police materials obtained through law-enforcement or municipal records channels outside ordinary neutral public access. Before the superseding indictment, Kleiner threatened legal consequences based on Groezinger's unilateral mother-substitution theory after Plaintiff's counsel disputed that the exchange order allowed such substitution. Plaintiff alleges that the same theory later appeared in Groezinger's BCPO interview, the grand-jury presentation, and the State's opposition to Plaintiff's motion to dismiss the superseding indictment. Plaintiff further alleges that Kleiner possessed, referenced, transmitted, or used non-public police materials, including Hawthorne body-worn-camera footage and Ramsey juvenile or juvenile-related records, in a manner that reinforced state action against Plaintiff.

164. Plaintiff alleges that the timing, sequence, repeated use of the same factual narratives, attorney communications, records requests, police reports, prosecutor filings, and later use of those narratives support a plausible inference that Kleiner participated in the creation, transmission, or reinforcement of factual predicates later used by state actors. Plaintiff alleges that the specific communications among Kleiner, Groezinger, Behaved Brain, law-enforcement actors, prosecutors, or John Does are presently within defendants' possession, but the known emails, recordings, police reports, court transcripts, records-disclosure evidence, and repeated factual narratives support a reasonable inference of coordinated extra-judicial conduct.

165. Plaintiff alleges that the private defendants' conduct became state action because it involved knowing participation in, substantial causation of, or joint use of state enforcement mechanisms, police-records channels, prosecutorial action, police detention, and custody-related state processes.

166. Plaintiff does not seek to impose liability merely because a private person complained, requested protection, retained counsel, or advocated in court. Plaintiff seeks relief for the knowing use of materially false factual allegations, non-public law-enforcement information, police-records channels, and state enforcement mechanisms to cause prosecution, detention, restrictions, evaluations, and constitutional injury.

J. Behaved Brain allegations

167. Plaintiff learned that his minor child had been receiving therapy or services through The Behaved Brain, LLC.

168. Plaintiff alleges that he was not informed of or included in the child's therapy despite joint legal custody and his parental rights.

169. Plaintiff sought access to information and records concerning his child's therapy and care.

170. On or about February 6, 2024 and February 7, 2024, Plaintiff went to Behaved Brain locations, including the Wyckoff and Ho-Ho-Kus locations, to seek information concerning his child's therapy and records.

171. Plaintiff recorded his interactions with Behaved Brain personnel.

172. Plaintiff alleges that the recordings show he was calm, polite, conversational, cooperative, and non-threatening during his interactions with Behaved Brain personnel. Plaintiff acknowledges that he discussed background concerning the custody dispute, criminal charges, and his concern that he had been excluded from his son's therapy, but alleges that he did so in a calm and non-threatening manner while attempting to obtain information concerning his son's care.

173. Despite those recordings, Behaved Brain personnel, agents, or representatives falsely or misleadingly characterized Plaintiff as intimidating, threatening, harassing, unsafe, or dangerous, even though the recordings do not show Plaintiff threatening anyone, threatening to sue anyone, yelling, refusing to leave, physically intimidating staff, or acting aggressively, and even though the Wyckoff police report later documented that "at no time did Mr. Peterson make specific threats toward them."

174. Plaintiff alleges that Katie Gateley, owner of Behaved Brain and wife of attorney Matthew Gateley, or another Behaved Brain representative, contacted and/or personally appeared at the Ho-Ho-Kus Police Department and the Wyckoff Police Department concerning Plaintiff's visits to Behaved Brain. Plaintiff alleges that Gateley reported or caused to be reported that Plaintiff had been harassing employees telephonically and in person, appeared at both the Wyckoff and Ho-Ho-Kus locations, had an intimidating nature, caused staff to feel unsafe, and caused Behaved Brain to consider or request extra police patrols or outside security.

175. Plaintiff alleges that the police reports and body-camera footage confirm that Behaved Brain escalated the matter to law enforcement. Plaintiff further alleges that the police reports also contain exculpatory or contradictory facts, including that Gateley declined to sign complaints, that the Wyckoff report stated Plaintiff made no specific threats toward staff, that Sgt. Gil later listened to Plaintiff's recordings and wrote that Plaintiff did not seem aggressive or argumentative, and that Sgt. Gil documented there were no pending charges from the Wellness Center.

176. Plaintiff alleges that Behaved Brain's conduct was not limited to passive compliance with subpoenas or ordinary confidentiality objections. Before any neutral evidentiary testing occurred, Behaved Brain allegedly escalated Plaintiff's recorded, non-threatening visits to law enforcement, supplied or caused to be supplied a disputed danger narrative to police, and sought police involvement, police documentation, extra patrols, security-detail assistance, or other government-security measures based on factual assertions contradicted by Plaintiff's recordings and later police review.

177. Plaintiff alleges that Behaved Brain did not merely await a court ruling or respond neutrally to subpoenas. Instead, Behaved Brain, through Katie Gateley, Matthew Gateley, counsel, employees, or agents, allegedly created, transmitted, or reinforced a safety narrative that Plaintiff was intimidating, threatening, harassing, unsafe, or dangerous; caused that narrative to be documented in police reports or

police-security requests; and then used or reinforced the same narrative in connection with Plaintiff's attempt to obtain information concerning his son's care.

178. Plaintiff alleges that on or about February 7, 2024, hours after subpoenas were served, Katie Gateley went to or communicated with the Ho-Ho-Kus Police Department and/or Wyckoff Police Department concerning Plaintiff's visits to Behaved Brain. Plaintiff possesses police body-camera footage and police records showing that Gateley supplied a safety narrative to law enforcement after Plaintiff attempted to obtain information concerning his son's therapy and after subpoenas were served.

179. Plaintiff alleges that Gateley's statements to law enforcement were materially false or misleading and were contradicted by Plaintiff's recordings. Gateley stated or suggested that Plaintiff sat and waited at the Wyckoff office for approximately ninety minutes, but Plaintiff's recording reflects that he waited patiently for approximately thirty-five minutes for a therapy session to end before speaking with the therapist. Gateley further stated or suggested that Plaintiff did not have identification or refused to show identification, but Plaintiff's recordings reflect that Plaintiff offered to show identification and a court order reflecting shared legal custody.

180. Plaintiff further alleges that Gateley or Behaved Brain personnel characterized Plaintiff as demanding records, refusing to identify himself, intimidating therapists, or creating a safety concern, but Plaintiff's recordings reflect that Plaintiff identified himself, offered identification, referenced the court order concerning legal custody, spoke calmly, did not threaten staff, did not refuse to leave, did not act aggressively, and accepted being directed to counsel.

181. Plaintiff alleges that during the February 7, 2024 police interaction, Gateley stated in substance that Plaintiff technically had not done anything illegal yet. Plaintiff alleges that this statement is material because it shows Behaved Brain knew that Plaintiff's recorded conduct had not crossed into criminal conduct, yet Behaved Brain nevertheless escalated the matter to law enforcement, requested security measures, and supplied or reinforced a danger narrative later repeated in court.

182. Plaintiff alleges that Behaved Brain affirmatively sought police involvement and police security based on the same disputed safety narrative. Plaintiff possesses body-camera footage and/or police records showing that Gateley filled out or submitted police-security-detail, extra-patrol, or police-security request forms in both Wyckoff and Ho-Ho-Kus because of Plaintiff, even though Plaintiff's recordings did not show threats, aggression, refusal to leave, or unlawful conduct. Plaintiff alleges that Behaved Brain requested government action, police documentation, extra patrols, police-security measures, or law-enforcement involvement based on factual assertions that were materially contradicted by Plaintiff's recordings. Plaintiff further alleges that these police-security requests were made for the purpose of creating or reinforcing an official danger narrative concerning Plaintiff after he sought information about his son's therapy and after subpoenas were served.

183. On or about February 7, 2024, Plaintiff was on a recorded telephone call with his attorney and Matthew Gateley, counsel for Behaved Brain.

184. During that recorded call, Matthew Gateley stated, threatened, or communicated in substance that if Plaintiff continued to press for records concerning his child, Behaved Brain would have staff members sign affidavits accusing Plaintiff of intimidating or harassing staff.

185. Plaintiff alleges that this was not a neutral confidentiality objection, ordinary subpoena response, or ordinary legal position, but a threat to create or obtain sworn accusations in response to Plaintiff's continued assertion of parental and records-access rights.

186. Plaintiff alleges that, regardless of whether staff affidavits were ultimately filed or formally used, the threatened affidavit narrative and staff-safety accusations were relayed, supplied, or reinforced through Behaved Brain's counsel, police reports, police-security requests, and the February 9, 2024 OTSC hearing.

187. Plaintiff alleges that the affidavits, police reports, and intimidation narrative were materially contradicted by Plaintiff's recordings, by the Wyckoff report's statement that Plaintiff made no specific threats, and by Sgt. Gil's later report stating that Plaintiff did not seem aggressive or argumentative after Sgt. Gil of the Ho-Ho-Kus Police Department listened to the recordings.

188. Plaintiff alleges that Behaved Brain knew or had reason to know that the characterizations of Plaintiff as intimidating, threatening, harassing, unsafe, or dangerous were false or materially misleading because its own personnel participated in the interactions, because the interactions were recorded, because Gateley declined to sign complaints, and because the Wyckoff report documented no specific threats. Plaintiff further alleges that Sgt. Gil's later review of the recordings independently confirmed that the aggressive or argumentative narrative was not supported by the recordings.

189. Plaintiff alleges that Behaved Brain, through Katie Gateley, Matthew Gateley, counsel, employees, or agents, communicated with Groezinger, Kleiner, law enforcement, or John Does concerning Plaintiff's attempt to obtain his son's therapy information and concerning the factual narrative that Plaintiff was intimidating, harassing, unsafe, dangerous, or stalking Groezinger.

190. Plaintiff alleges that this coordination is supported by the timing and sequence of events: Plaintiff's recorded non-threatening visits occurred on February 6 and February 7, 2024; subpoenas were served on February 7, 2024; Katie Gateley then went to or contacted police and supplied a safety narrative; Matthew Gateley then stated on a recorded call that Behaved Brain would have staff sign affidavits accusing Plaintiff of intimidation or harassment if Plaintiff continued pressing for records; and the same safety/stalking narrative was then repeated by Behaved Brain's counsel and Kleiner. Plaintiff alleges that the precise communications among Behaved Brain, Groezinger, Kleiner, law enforcement, and John Does are within defendants'

possession, but the known timing, repeated factual narrative, police reports, body-camera footage, recorded call, and transcript evidence support a plausible inference of coordinated extra-judicial conduct.

191. Plaintiff alleges that the February 9, 2024 hearing is not the basis for liability by itself. Plaintiff references the hearing only because it shows that the same disputed danger narrative allegedly created or reinforced outside court through police reports, police-security requests, threatened affidavits, and communications with private and state actors was repeated and used after those extra-judicial actions occurred. Plaintiff does not seek liability against Behaved Brain for ordinary subpoena compliance, ordinary confidentiality objections, or merely appearing through counsel.

192. Plaintiff alleges that Kleiner's February 9, 2024 statements are not asserted as ordinary courtroom advocacy giving rise to liability by themselves. Plaintiff references those statements because they repeated the same factual narrative allegedly created or reinforced outside court: that Plaintiff acted aggressively, intimidated Behaved Brain staff, threatened people, threatened to sue, and was stalking Groezinger by seeking information concerning his son's therapist. Plaintiff alleges that this narrative was contradicted by Plaintiff's recordings, the therapist-interaction transcripts, police reports documenting no specific threats, and later police review stating that Plaintiff did not seem aggressive or argumentative. Plaintiff further alleges that the transcripts of Plaintiff's actual interactions with the therapists do not show Plaintiff threatening to sue the therapists, threatening staff, refusing to leave, or acting aggressively.

193. Plaintiff alleges that the stalking narrative concerning Behaved Brain was materially false or misleading because Plaintiff's recordings show that he stated he was seeking information concerning his son and his son's treatment, not attempting to contact, monitor, approach, or communicate with Groezinger. Plaintiff alleges that the same false stalking narrative was used across extra-judicial police reports, security requests, threatened affidavits, and later litigation references, supporting the inference that the narrative was coordinated and not merely a good-faith legal position.

194. Plaintiff alleges that Behaved Brain's counsel and Kleiner repeated factual characterizations concerning Plaintiff before any sworn testimony, cross-examination, or neutral evidentiary testing of those accusations occurred. Plaintiff alleges that the relevant actionable conduct occurred before or outside that hearing, including the police reports, police-security requests, threatened affidavits, and communications that allegedly created or reinforced the disputed safety narrative.

195. Plaintiff does not seek relief based on the family court's ruling, the family court's weighing of evidence, or the correctness of any state-court decision. Plaintiff alleges that the injury arose from defendants' extra-judicial creation, transmission, and reinforcement of materially false factual accusations through police reports, police-security requests, threatened affidavits, non-public records, and repeated

danger/stalking narratives before those accusations were subjected to fair evidentiary testing.

196. Plaintiff alleges that Behaved Brain is not sued for complying with a subpoena, obeying a court order, asserting ordinary confidentiality objections, directing Plaintiff to counsel, or making a good-faith request for neutral records review. Behaved Brain is sued for extra-judicial conduct before or outside neutral court process, including materially false or misleading factual reports to police, police-security requests, extra-patrol requests, threatened staff affidavits, and coordinated safety accusations portraying Plaintiff as threatening, intimidating, harassing, unsafe, or dangerous, despite Plaintiff's recordings, the Wyckoff report, Gateley's body-camera statement that Plaintiff technically had not done anything illegal yet, and Sgt. Gil's later review contradicting that danger narrative.

197. Plaintiff alleges that Behaved Brain's conduct was undertaken in coordination with Groezinger, Kleiner, law-enforcement actors, or John Does for the purpose of restricting Plaintiff's access to information concerning his child's care, portraying Plaintiff as dangerous or stalking, and causing state-action consequences before fair evidentiary testing occurred. Plaintiff alleges that the injury is independent of the correctness of any family-court ruling because the injury arose from the false extra-judicial accusations, police escalation, police-security requests, threatened affidavits, and coordinated danger narrative itself.

K. Oakland June 5, 2025 custody exchange

198. Plaintiff appeared at the Oakland Police Department, Oakland Municipal Court, or related municipal parking lot for a custody exchange on June 5, 2025.

199. Defendant Harvey was the supervising officer on scene and directed, approved, or failed to stop the continued detention after the alleged car-seat violation could not be verified. Defendant Lopez participated in the encounter, questioning, investigation, continued detention, or threat of enforcement. Defendant Anderson participated in the encounter, questioning, investigation, continued detention, or threat of enforcement. Each officer remained present during the encounter, knew the initial car-seat allegation had not been verified, knew the justification had shifted to recording/FRO enforcement, and failed to intervene to stop the continued detention or threat of arrest.

200. Before the exchange, Groezinger communicated with Oakland police and reported both an alleged car-seat issue and an alleged restraining-order violation based on recording.

201. The police response was based on Groezinger's allegation that Plaintiff's child had previously been transported without a proper child safety restraint.

202. The alleged car-seat incident did not occur in the officers' presence.

203. Plaintiff alleges that no Oakland officer personally observed the alleged car-seat violation.

204. Plaintiff alleges that the accusation was based entirely on Groezinger's after-the-fact complaint.

205. After the child entered the vehicle, Groezinger left the location, and Oakland officers then approached Plaintiff and/or the vehicle.

206. Plaintiff alleges that Groezinger could not reasonably have verified the absence of a booster seat from her vantage point.

207. Plaintiff possesses photographs from the same or substantially similar vantage point showing that the booster-seat area could not be seen clearly.

208. Plaintiff alleges that the vehicle's rear seating area could not be verified from outside the vehicle in the manner claimed.

209. Plaintiff alleges that officers were unable to confirm whether a child restraint was or was not present.

210. Plaintiff alleges that the vehicle at issue was not Plaintiff's vehicle but belonged to or was being driven by a family friend or another person.

211. Plaintiff alleges that Plaintiff was not operating the vehicle at the time of the alleged violation.

212. Plaintiff alleges that officers sought consent to inspect or search the vehicle.

213. Plaintiff alleges that consent to search or inspect the vehicle was not given.

214. Plaintiff alleges that after consent was not given and officers could not independently verify the alleged car-seat violation, officers continued the encounter, prolonged Plaintiff's detention, or shifted the basis for enforcement.

215. Plaintiff alleges that after the officers were unable to confirm the alleged child-restraint violation, they shifted the basis of the encounter to the recording issue and the restraining order.

216. The Oakland Police Department had previously addressed a substantially similar recording allegation under the same or materially similar restraining-order language. In a May 23, 2023 Oakland police report, Oakland documented: "It should be noted that due to the verbiage in the amended FRO regarding filming during custody exchange, AP Silletti was consulted for legal advice regarding a possible violation to which she found there was not probable cause to constitute a violation."

217. Plaintiff alleges that Oakland therefore had prior notice that the same or materially similar custody-exchange recording issue did not constitute probable cause for a restraining-order violation.

218. Plaintiff alleges that after officers could not verify the car-seat allegation, the justification for the detention shifted to a possible final-restraining-order violation based on recording by a third party.

219. Plaintiff alleges that Groezinger's June 5, 2025 report was not a neutral or objectively reliable report of a clearly observed violation, but an unverified allegation that caused police detention and then shifted into a recording/FRO enforcement theory Oakland had already been told lacked probable cause under similar circumstances.

220. Plaintiff alleges that he was told he was not free to leave.

221. Plaintiff alleges that the encounter was prolonged beyond the time necessary to address any lawful purpose.

222. Plaintiff alleges that the detention lasted approximately twenty-five minutes, despite the officers' inability to verify the alleged car-seat violation and despite Oakland's prior documented notice that similar custody-exchange recording did not constitute probable cause for a restraining-order violation.

223. Plaintiff alleges that the officers lacked reasonable suspicion or probable cause to detain him or prolong his detention.

224. Plaintiff alleges that the officers relied on an unverified accusation from an adverse party in a contentious custody dispute without independent corroboration.

225. Plaintiff alleges that he had a First Amendment interest in documenting police activity occurring in a public police-station, municipal, or courthouse parking-lot area, subject to lawful restrictions.

226. Plaintiff alleges that the amended restraining-order language permitted Plaintiff to use a dash-mounted dash camera for exchange-related recording.

227. Plaintiff alleges that he was not personally using a handheld camera to record Groezinger or communicate with Groezinger.

228. To the extent a person accompanying Plaintiff recorded any portion of the encounter, Plaintiff alleges that the recording captured police activity or the public custody-exchange setting and was not directed communication, contact, harassment, intimidation, or approach toward Groezinger.

229. Plaintiff alleges that Defendant Harvey, Lopez, Anderson, or one or more of them threatened Plaintiff with arrest or enforcement action based on recording activity occurring during the public police encounter.

230. Plaintiff alleges that Oakland officers identified or referenced the amended-FRO recording language during the June 5, 2025 encounter. Plaintiff alleges, however, that the language identified was the same or materially identical language Oakland had already addressed in the May 23, 2023 police report, where Oakland documented that Assistant Prosecutor Silletti found no probable cause for a restraining-order violation under the same or materially similar circumstances involving recording during a custody exchange by someone other than Plaintiff.

231. Plaintiff alleges that the threat of arrest or enforcement chilled Plaintiff's own ability to document police conduct by lawful means, including through the dash-mounted dash camera permitted by the amended restraining order.

232. Plaintiff alleges that the officers' threat was not justified by the amended-FRO language because Oakland had prior documented notice that the same or materially similar custody-exchange recording issue did not constitute probable cause for a violation. Plaintiff alleges that the officers nevertheless treated public recording during a custody exchange as potential restraining-order misconduct despite Oakland's prior documented notice to the contrary.

233. Plaintiff alleges that the threat of arrest or enforcement interfered with and chilled protected recording or documentation activity.

234. Plaintiff alleges that the Oakland officers' conduct violated his First Amendment right to record police activity in public and his Fourth Amendment right to be free from unreasonable seizure.

235. Plaintiff alleges that the injury from this incident is independent of any challenge to a family-court order because the injury arises from the officers' conduct during a police encounter on June 5, 2025.

L. Ritondale and criminal complaint allegations

236. Defendant Ritondale responded to or participated in the April 17, 2020 Waldwick police response.

237. Plaintiff further alleges that Defendant Sergeant Christopher Sanchez was also present during the April 17, 2020 Waldwick police response that resulted in Plaintiff's removal from the home.

238. Plaintiff alleges that Sanchez's presence during the April 17, 2020 incident is relevant because Sanchez had prior personal knowledge of the original police response, the circumstances surrounding Plaintiff's removal from the home, the parties involved, and the factual background that later became part of the criminal, restraining-order, custody, and law-enforcement narratives concerning Plaintiff.

239. Plaintiff does not assert a standalone damages claim against Sanchez merely for being present at the April 17, 2020 incident unless discovery shows that Sanchez personally prepared, approved, signed, swore out, transmitted, or materially contributed to a false or misleading report, affidavit, criminal complaint, charging narrative, records action, or other state-action process. Plaintiff pleads Sanchez's April 17, 2020 presence at this stage as relevant to knowledge, context, pattern, motive, and the plausibility of Plaintiff's allegations concerning later Waldwick conduct, including the August 19, 2025 service-of-process interference.

240. Plaintiff alleges that Ritondale personally initiated criminal proceedings by swearing out, signing, approving, or submitting the probable-cause affidavit, criminal complaint, report, or charging narrative that led to criminal charges against Plaintiff.

241. Plaintiff alleges that those charges included terroristic threats and endangering the welfare of a child.

242. Plaintiff alleges that Ritondale later acknowledged in sworn testimony or court proceedings that Waldwick officers initiated the charges and stated, in substance, "we did the charges."

243. Plaintiff alleges that Ritondale attributed statements, threats, or conduct to Plaintiff that were not supported by the available recording.

244. Plaintiff alleges that Ritondale's affidavit, complaint, report, or charging narrative attributed statements to Plaintiff that do not appear in the recording, including statements that Plaintiff would "burn the residence down" or cause harm.

245. Plaintiff alleges that the actual recording reflected conditional, non-imminent, expressive, or emotionally charged speech materially different from the statements attributed to him.

246. Plaintiff alleges that the distinction between what Plaintiff actually said and what Ritondale attributed to Plaintiff was material to probable cause.

247. Plaintiff alleges that the recording did not show an actual, imminent, unconditional threat to kill Groezinger, harm the children, burn the residence down, or cause immediate physical harm.

248. Plaintiff alleges that Ritondale had access to, reviewed, relied upon, or reasonably should have reviewed the available recording before initiating or supporting criminal charges.

249. Plaintiff alleges that if Ritondale reviewed the recording, he knowingly or recklessly omitted context and materially altered the substance of Plaintiff's recorded statements.

250. Plaintiff alleges that if Ritondale did not review the recording, the failure to review readily available objective evidence was reckless under the circumstances because the recording was central to the allegation and probable-cause determination.

251. Plaintiff alleges that the misstatements and omissions were material because, had the charging authority been presented with the complete context reflected by the recording—including the conditional nature of the statements, the fact that the children were asleep and unaware, Groezinger's request that Plaintiff merely leave for the night, and her inquiry regarding the custody consequences of a restraining order— probable cause would not have existed.

252. Plaintiff alleges that Ritondale's charging narrative omitted material exculpatory facts, including that the children were asleep and unaware of the conversation, that Groezinger asked whether Plaintiff could leave for the night and return in the morning, and that Groezinger asked whether a restraining order would affect custody.

253. Plaintiff alleges that those omitted facts were material to probable cause because they undermined the claim that Groezinger was acting solely from immediate fear and undermined the claim that Plaintiff's statements constituted an actual imminent threat.

254. Plaintiff alleges that the criminal prosecution terminated in Plaintiff's favor when the charges were dismissed.

255. Plaintiff alleges that the prosecution lacked probable cause and caused a deprivation of liberty.

256. Plaintiff alleges that his malicious-prosecution claim accrued upon favorable termination of the criminal proceedings.

257. Plaintiff alleges that his claim is based on the initiation and support of charges through materially false or misleading factual assertions, not on a request to overturn any restraining order or family-court judgment.

M. Municipal policies, customs, or failures

258. Plaintiff alleges that Waldwick failed to maintain adequate policies, training, and supervision regarding the release of sensitive domestic-violence, victim-related, juvenile, or law-enforcement records.

259. Plaintiff alleges that Waldwick permitted sensitive records to be released through law-enforcement relationships or informal channels rather than neutral lawful records procedures.

260. Plaintiff alleges that Waldwick's records practices allowed police leadership to approve, facilitate, or permit the release of sensitive records to other law-enforcement-connected individuals without adequate review.

261. Plaintiff alleges that Ramsey failed to maintain adequate policies, training, supervision, and safeguards regarding OPRA processing, police-chief approval, juvenile-record confidentiality, redaction, legal review, and release of juvenile or juvenile-related law-enforcement records.

262. Plaintiff alleges that Ramsey's records practices allowed confidential juvenile or juvenile-related records to be released through municipal or police records channels without adequate safeguards, legal review, redaction, withholding, or denial.

263. Plaintiff alleges that Waldwick failed to train or supervise officers and records personnel regarding OPRA exemptions, domestic-violence confidentiality, juvenile-record confidentiality, victim-record confidentiality, and limits on disclosure.

264. Plaintiff alleges that Waldwick failed to maintain adequate safeguards to prevent police leadership or law-enforcement relationships from influencing records-release decisions.

265. Plaintiff alleges that Oakland failed to train or supervise officers regarding verification of custody-dispute accusations before detention.

266. Plaintiff alleges that Oakland failed to train or supervise officers regarding the limits of police authority during civil custody exchanges.

267. Plaintiff alleges that Oakland failed to train or supervise officers regarding the First Amendment right to record police activity in public places.

268. Plaintiff alleges that Oakland's practices permitted officers to rely on unverified allegations from one parent in a custody dispute to detain, threaten, or restrict the other parent.

269. Plaintiff alleges that Oakland's practices permitted officers to use the threat of arrest or enforcement to compel compliance where officers lacked probable cause, reasonable suspicion, or an objectively verified violation.

270. Plaintiff alleges that Oakland officers acted in concert during the June 5, 2025 encounter, including by participating in the detention, continuing the encounter despite lack of confirmation, shifting the justification for the encounter, and threatening enforcement based on public recording activity.

271. Plaintiff alleges that these municipal policies, customs, practices, or failures were moving forces behind the constitutional violations alleged above.

272. Plaintiff alleges that the municipal conduct was not limited to isolated negligence but reflected practices, customs, or failures to train that foreseeably caused constitutional injury.

N. Retaliation and interference with federal litigation/service of process

273. After Plaintiff filed this federal action, Plaintiff attempted to serve or caused service of federal litigation papers on certain defendants.

274. On or about August 7, 2025, a process server retained or used for service of federal litigation papers attempted to serve Defendant Groezinger at Groezinger's residence at approximately 5:38 p.m. The process server observed a black SUV in the driveway and was advised by occupants residing in the apartment below Groezinger's residence that Groezinger resided at that address, but no one answered the door.

275. Later that same evening, at approximately 6:03 p.m., the same process server attempted to serve Defendant Bryan Gurney at his residence. A male identifying himself as Bryan Gurney spoke to the process server through the Ring doorbell or intercom, asked what the documents concerned, and was advised that they were legal papers for him. Gurney stated that he was "out of the country" and declined to state when he would return or make himself available to accept service.

276. Plaintiff alleges that on August 19, 2025, at approximately 7:32 p.m., the same process server returned to Groezinger's residence. The process server again observed the same black SUV parked in the driveway. After the process server rang the Ring doorbell, an unidentified male whom Plaintiff believes resided with or was associated with Groezinger yelled or stated in substance that Groezinger did not live there and told the process server to leave or he would call the police. Plaintiff alleges that Groezinger did live at that residence. Later that same evening, at approximately 7:55 p.m., the same process server served Gurney, and Plaintiff alleges that during or immediately after that service, Gurney demanded the process server's driver's license, yelled at her to get off his property, and the process server heard what she described as Mr. Gurney spitting in her direction as she walked toward her vehicle.

277. Plaintiff alleges that later on August 19, 2025, at approximately 9:27 p.m., the process server received a telephone call from Defendant Officer Bernhard, Badge No. 61, of the Waldwick Police Department. Bernhard instructed the process server not to return to Groezinger's residence because she was considered to be trespassing. Plaintiff further alleges that at approximately 10:51 p.m., the process server spoke with Defendant Sergeant Christopher Sanchez, who had also been present during the April 17, 2020 Waldwick police response involving Plaintiff. Sanchez advised that the Waldwick Police Department had contacted the registered owner of the vehicle the process server was driving to determine whether she had permission to operate that vehicle. Plaintiff alleges that Sanchez described the matter as a "misunderstanding" and not an investigation, but nevertheless advised the process server that she should not return to Groezinger's residence. Plaintiff alleges that this conduct was not a neutral traffic, safety, or criminal investigation, but had the effect of questioning, discouraging, or interfering with lawful service of federal litigation papers by treating lawful service attempts as trespassing or suspicious conduct. Plaintiff alleges that lawful service of federal litigation papers is litigation activity and was not contact, communication, harassment, intimidation, or approach toward Groezinger. Plaintiff

further alleges that this conduct chilled or burdened Plaintiff's access to court and prosecution of this federal civil-rights action, and supports Plaintiff's allegation that law-enforcement mechanisms and motor-vehicle or police-information systems were used or threatened to be used against lawful litigation activity.

O. Judicial-security classification, JSMART-related threat designation, and lack of notice

278. Plaintiff alleges, upon information and belief, that he has been treated as a court-security concern, judicial-security concern, threat, threat-risk subject, or "problem litigant" in court-related systems, courthouse-security communications, JSMART-related records, judicial-security alerts, or similar databases or communications.

279. Plaintiff alleges, upon information and belief, that New Jersey court-security officials use or rely upon systems, databases, lists, alerts, JSMART-related information, or internal communications to identify litigants who are considered judicial-security risks, courthouse-security risks, or threats.

280. Plaintiff alleges, upon information and belief, that these classifications may be disseminated to judges, chambers staff, court administration, sheriff's officers, courthouse security personnel, law-enforcement personnel, or other court-related officials.

281. Plaintiff alleges that Defendant Robin Morante, as Chief of Court and Judicial Security for the State of New Jersey, oversees, administers, supervises, maintains, disseminates, implements, reviews, or has authority to correct such court-security classifications, JSMART-related entries, threat-risk designations, courthouse-security alerts, or judicial-security communications.

282. Plaintiff alleges that Morante's responsibilities include warning judges or courthouse-security personnel about perceived threats, problem litigants, or persons classified as security risks.

283. Plaintiff alleges that he has been subjected to heightened courthouse-security treatment that was not ordinary courthouse screening. During Plaintiff's criminal proceedings before Judge Wilcox, the criminal prosecutor was accompanied by a plain-clothes security detail at Plaintiff's hearings for more than one year. Plaintiff alleges that the existence of that plain-clothes security detail was confirmed on the record during the January 25, 2024 transcript before Judge Wilcox. Plaintiff further alleges that approximately two days before he was barred from appearing physically in Judge Antoniewicz's courtroom, approximately four sheriff's officers escorted Groezinger into and out of the courtroom. After that hearing, one sheriff's officer approached Plaintiff and stated in substance that when officers were called in, the situation had been described as though Plaintiff was a "monster," but that Plaintiff appeared to be a good father fighting for his children and should keep going. Plaintiff was not provided notice of any threat designation, security classification, factual basis, report, or procedure to contest the security treatment.

284. Plaintiff further alleges that, beginning on or about October 10, 2025, he was barred from appearing physically in Judge Antoniewicz's courtroom and forced to appear by Zoom, despite having submitted an ADA accommodation request seeking in-person access. Plaintiff alleges that there was no conduct by Plaintiff warranting exclusion from the courtroom, and that Plaintiff had appeared in person approximately two days earlier without incident.

285. Plaintiff alleges that the heightened treatment included being monitored, escorted, subjected to special courthouse-security procedures, barred from physical courtroom access, or otherwise treated differently from ordinary litigants without notice of the basis for that treatment, without disclosure of the information being used, and without any opportunity to contest or correct the alleged security classification.

286. Plaintiff alleges that the designation or classification was imposed without notice to Plaintiff.

287. Plaintiff alleges that he was not told that he had been classified as a judicial-security threat, courthouse-security risk, JSMART-related threat-risk subject, or problem litigant.

288. Plaintiff alleges that he was not told the factual basis for any such classification.

289. Plaintiff alleges that he was not provided the records, allegations, reports, communications, or criteria relied upon to classify him.

290. Plaintiff alleges that he was not given an opportunity to contest, correct, appeal, or seek review of any such classification.

291. Plaintiff alleges that persons designated in this manner are treated similarly to individuals placed on other government watchlists: they are burdened by a government classification, but are not told that they are on the list, why they are on the list, or how to get off the list.

292. Plaintiff alleges that such designation harms access to court because a litigant who has been secretly labeled as a threat enters court proceedings under a cloud of suspicion without any meaningful opportunity to challenge the information being disseminated about him.

293. Plaintiff alleges that secret court-security classifications are especially harmful to pro se litigants because they may cause judges, court staff, sheriff's officers, or courthouse personnel to view ordinary litigation activity, service of papers, objections, appeals, motions, or requests for relief as suspicious, threatening, or dangerous.

294. Plaintiff alleges that he has engaged in protected activity, including filing lawsuits, filing motions, seeking records, serving legal papers, appealing state-court orders, criticizing government conduct, and seeking legal recourse against government officials.

295. Plaintiff alleges that labeling pro se litigants as judicial-security threats merely because they seek legal recourse, challenge government officials, file complaints, file motions, or object to perceived misconduct violates the First Amendment and Fourteenth Amendment.

296. Plaintiff alleges that any ongoing designation continues to cause injury because it affects his access to court, the manner in which court personnel and security personnel perceive him, and the fairness or appearance of neutrality in proceedings involving him.

297. Plaintiff alleges that any ongoing designation also chills his willingness to file motions, serve legal papers, attend court, seek relief, record or document public official conduct where lawful, or assert his rights.

298. Plaintiff alleges that the injury is independent of the correctness of any state-court ruling because the injury arises from the secret classification, dissemination, and lack of procedural safeguards.

299. Plaintiff does not seek damages against judges or court officials for judicial rulings.

300. Plaintiff seeks prospective relief requiring notice of any ongoing designation, disclosure of the factual basis sufficient to permit meaningful review, an opportunity to contest or correct inaccurate information, and procedures sufficient to prevent secret, unsupported, retaliatory, or mistaken classification of Plaintiff as a court-security threat.

301. Plaintiff also seeks prospective relief prohibiting defendants from maintaining or disseminating false, unsupported, retaliatory, or materially misleading security classifications concerning Plaintiff without constitutionally adequate notice and opportunity to be heard.

302. Plaintiff alleges that the constitutional injuries described above arise from separate factual events, separate actors, and separate categories of conduct, including malicious prosecution, disclosure and use of confidential records, detention, interference with recording activity, false extra-judicial accusations, and ongoing judicial-security classifications.

CLAIMS FOR RELIEF

COUNT I

42 U.S.C. § 1983 / NJCRA — Due Process and Joint Action Based on Misuse and Disclosure of Sensitive Law-Enforcement, Juvenile, and Confidential Records Against Gurney, Messner, Bendian, Waldwick, Ramsey, and John Does; and against Groezinger and Kleiner to the extent they knowingly requested, used, possessed, disseminated, transmitted, or relied upon unlawfully disclosed, confidential, juvenile, sealed, expunged, or non-public law-enforcement records.

303. Plaintiff repeats and realleges the above paragraphs.

304. Plaintiff had constitutionally protected interests in due process, family integrity, privacy, and freedom from state action based on unlawfully obtained or improperly disseminated sensitive records.

305. Defendants Gurney, Messner, and Bendian, acting under color of law or jointly with state actors, obtained, released, facilitated, approved, processed, transmitted, or disseminated sensitive law-enforcement records concerning Plaintiff.

306. The records included domestic-violence-related records, police reports, juvenile or juvenile-related records, sealed or confidential materials, or other sensitive law-enforcement records.

307. Plaintiff alleges that the release and dissemination were not ordinary lawful OPRA processing but were facilitated through law-enforcement status, law-enforcement communications, police-chief authority, municipal records channels, records-custodian action, or informal channels.

308. Plaintiff alleges that Ramsey and Waldwick permitted or caused sensitive records to be released through municipal and police records systems without adequate safeguards, redaction, legal review, or compliance with confidentiality requirements.

309. Defendants Groezinger and Kleiner used, possessed, referenced, transmitted, disseminated, or relied upon records and non-public law-enforcement information to reinforce adverse factual narratives against Plaintiff and to trigger, support, or perpetuate state action. Plaintiff alleges that Groezinger admitted in a March 11, 2025 certification that she received records through an OPRA request to Ramsey and forwarded them to Dr. Tarle, and that Kleiner confirmed in emails and on the record that Groezinger submitted Plaintiff's juvenile or juvenile-related records and other records to Dr. Tarle. Plaintiff further alleges that Kleiner knew or reasonably should have known that juvenile or juvenile-related records, sealed records, expunged records, or non-public police materials were not ordinary public litigation materials because Kleiner acknowledged that the records involved an alleged arrest from when Plaintiff was a minor and acknowledged that records from pending matters are not ordinarily obtainable from court while the matter is pending. Plaintiff further alleges that Bendian later issued an OPRA response denying a request for juvenile records on the ground that juvenile records are exempt from disclosure, supporting Plaintiff's allegation that Bendian knew or should have known that such records were confidential.

310. Plaintiff alleges that Groezinger requested and obtained Ramsey juvenile or juvenile-related records, possessed those records, transmitted those records to Dr. Tarle, and used those records in custody-related proceedings or evaluations. Plaintiff further alleges that Groezinger admitted in her March 11, 2025 certification that she received records through an OPRA request to Ramsey and "simply forwarded them to Dr. Tarle," and that this admission supports Plaintiff's allegation that the injury arose from acquisition, possession, disclosure, and transmission of confidential records, not merely from protected courtroom advocacy.

311. Plaintiff alleges that Groezinger requested Hawthorne body-worn-camera footage but did not receive it, that Gurney then requested and received the same footage, and that Kleiner later referenced or submitted that footage in court on Groezinger's behalf.

312. Plaintiff alleges that the sequence of requests, releases, and later use supports the inference that private defendants knowingly used law-enforcement records channels and non-public information to cause or reinforce state action against Plaintiff.

313. The records were later used in proceedings, evaluations, custody disputes, or restrictions affecting Plaintiff's parental rights, liberty interests, privacy interests, and reputation.

314. Plaintiff did not discover the full scope of the acquisition, approval, dissemination, and later use of the records until later proceedings and disclosures.

315. Defendants' conduct caused Plaintiff constitutional injury.

316. Defendants are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act.

COUNT II

42 U.S.C. § 1983 / NJCRA — Malicious Prosecution / Initiation of State Action Without Probable Cause

Against Groezinger, Ritondale, and John Does; and against Kleiner to the extent his extra-judicial conduct knowingly caused or reinforced the restraining-order-violation theory.

317. Plaintiff repeats and realleges the above paragraphs.

318. Defendants initiated, caused, or substantially contributed to criminal proceedings or state enforcement action against Plaintiff.

319. The proceedings were based on materially false, misleading, exaggerated, or objectively unreliable allegations.

320. Groezinger supplied specific allegations to BCPO investigators during the September 16, 2022 recorded interview, as reflected in the BCPO interview recording and/or transcript, including allegations that Plaintiff moved within two to three feet of her, recorded her, forced her to take things from his hands in order to get the child back, refused to release the child to Groezinger's mother, required Groezinger to personally appear for exchanges, followed or approached her when she attempted to create distance, accused her of using an impostor, and used the custody-exchange process as a means of control.

321. Plaintiff alleges that those allegations were contradicted by the custody-exchange recordings and that Groezinger knew the exchanges were being recorded when she made the allegations. Plaintiff further alleges that after the recordings were supplied to the prosecutor and court, the State continued to rely on the same allegations and asserted that the recordings corroborated Groezinger's statement, even though Plaintiff alleges the recordings objectively contradicted her version.

322. The grand-jury transcript reflects that the State presented Groezinger's allegations to the grand jury through Detective Madonna, including allegations concerning Plaintiff's alleged physical proximity, recording, refusal to release the child to Groezinger's mother, alleged demand for face-to-face interaction, alleged

refusal to release the child until Groezinger exited the vehicle, alleged "impostor" accusation, and alleged conduct during custody exchanges.

323. The grand jury was told that Plaintiff recorded the exchanges, but the recordings were not shown or played to the grand jury.

324. Plaintiff alleges that Groezinger's allegations became the factual predicate for state action when law enforcement or prosecutors repeated, adopted, or relied upon them before the grand jury and then continued to rely upon them in opposition to Plaintiff's motion to dismiss the superseding indictment after Plaintiff supplied the custody-exchange recordings.

325. Plaintiff alleges that Kleiner's pre-indictment threat regarding Groezinger's unilateral refusal to personally conduct exchanges contributed to the later theory that Plaintiff violated the restraining order by refusing to release the child to Groezinger's mother. Plaintiff further alleges that Kleiner knew or reasonably should have known that Groezinger could not unilaterally change the exchange procedure, because Plaintiff's counsel advised Kleiner that the order required Groezinger to conduct the exchange and did not authorize her mother to replace her. Plaintiff further alleges that this same mother-substitution and refusal-to-release theory appeared in Groezinger's BCPO interview, the grand-jury presentation, and the State's later opposition to Plaintiff's motion to dismiss the superseding indictment. Plaintiff alleges that Kleiner's extra-judicial threat and the later use of the same theory in criminal proceedings support a plausible inference that Kleiner knowingly caused or reinforced a factual predicate for state action, rather than merely making a protected legal argument in court.

326. Ritondale initiated, supported, or contributed to criminal complaints, reports, affidavits, or charging documents without probable cause and despite the availability of objective evidence.

327. Ritondale personally swore out, signed, approved, or submitted a probable-cause affidavit, criminal complaint, report, or charging narrative that materially mischaracterized Plaintiff's recorded statements.

328. Plaintiff further alleges that the charging documents materially altered the language attributed to Plaintiff by converting statements expressing emotion or frustration into direct future threats, omitted exculpatory context reflected in the recording and body-microphone evidence, and relied upon factual assertions that were contradicted by available objective evidence.

329. The proceedings lacked probable cause.

330. The proceedings terminated in Plaintiff's favor.

331. Plaintiff's criminal proceedings terminated favorably when the charges were dismissed in their entirety after review by a new prosecutor. The dismissal was not based on compromise, plea, diversion, or technical avoidance of guilt, but reflected termination of the prosecution against Plaintiff.

332. Plaintiff suffered deprivation of liberty, reputational injury, emotional distress, legal expense, and restrictions arising from the prosecution.

333. Defendants acted knowingly, recklessly, maliciously, or with improper purpose.

334. Defendants are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act.

COUNT III

First Amendment Retaliation / Interference With Right to Record Police Activity

Against Harvey, Lopez, Anderson, and John Does

335. Plaintiff repeats and realleges the above paragraphs.

336. Plaintiff engaged in or sought to engage in protected documentation of police activity occurring in a public police-station, municipal, or courthouse parking-lot area, including through recording methods permitted by the amended restraining-order language.

337. The documentation concerned police activity and a custody exchange involving law enforcement.

338. Plaintiff alleges that he was not personally using a handheld camera to record Groezinger or communicate with Groezinger.

339. Plaintiff alleges that the recording or documentation did not constitute unlawful contact, communication, harassment, intimidation, or approach toward Groezinger.

340. Defendants threatened Plaintiff with arrest or enforcement action based on recording or documentation activity.

341. The threat would chill a person of ordinary firmness from continuing lawful documentation of police activity.

342. Plaintiff's protected documentation activity, or perceived documentation activity, was a substantial or motivating factor for the threat.

343. Defendants lacked a lawful basis to prohibit, threaten arrest over, or chill lawful documentation of police activity in a public place, including documentation by means permitted under the amended restraining-order language.

344. Defendants violated Plaintiff's First Amendment rights.

COUNT IV

Fourth Amendment — Unlawful Detention

Against Harvey, Lopez, Anderson, and John Does

345. Plaintiff repeats and realleges the above paragraphs.

346. Defendants detained Plaintiff or prolonged his detention during the June 5, 2025 Oakland incident.

347. Defendants lacked reasonable suspicion or probable cause.

348. Defendants relied on an unverified accusation from an adverse party in a custody dispute without independent corroboration.

349. No officer personally observed the alleged car-seat violation.

350. Defendants could not confirm whether a child restraint was or was not present.

351. Defendants prolonged the detention after failing to confirm the alleged violation.

352. Defendants sought to inspect or search a vehicle without adequate legal basis and continued the encounter after consent was denied.

353. Defendants shifted the basis of the encounter from the unverified car-seat allegation to the recording/FRO issue after the original allegation could not be verified.

354. Defendants violated Plaintiff's Fourth Amendment rights.

COUNT V

Monell Municipal Liability

Against Waldwick, Oakland, and Ramsey, including Waldwick municipal liability for alleged service-of-process interference by Waldwick officers

355. Plaintiff repeats and realleges the above paragraphs.

356. Waldwick maintained or permitted policies, customs, practices, or failures to train regarding the release of sensitive law-enforcement records.

357. Waldwick's policies, customs, practices, or failures allowed sensitive domestic-violence-related, juvenile, victim-related, or law-enforcement records to be released through law-enforcement relationships or informal channels.

358. Waldwick failed to maintain adequate procedures, training, supervision, and safeguards to prevent direct police-official communications, law-enforcement relationships, motor-vehicle or registration-information access, police-information systems, trespass warnings, or police directives from being used for improper, informal, retaliatory, or relationship-based purposes, including sensitive records-release decisions and interference with lawful service of federal litigation papers.

359. Ramsey maintained or permitted policies, customs, practices, or failures to train regarding OPRA processing, police-chief approval, juvenile-record confidentiality, redaction, legal review, and release of juvenile or juvenile-related law-enforcement records.

360. Ramsey's policies, customs, practices, or failures allowed Plaintiff's confidential juvenile or juvenile-related records to be released through municipal or police records channels without adequate safeguards.

361. Ramsey failed to maintain adequate procedures to ensure that juvenile or juvenile-related records were withheld, redacted, reviewed by counsel, or denied before disclosure to a private requester.

362. Ramsey's records-release practices, including the routing of OPRA requests between the Borough Clerk and Police Chief, were moving forces behind the disclosure of Plaintiff's confidential juvenile or juvenile-related records.

363. Ramsey's records system placed final release authority in municipal records channels while relying on police-chief approval for police records, but failed to include adequate safeguards to prevent juvenile or juvenile-related records from being released to private parties.

364. Oakland maintained or permitted policies, customs, practices, or failures to train regarding police involvement in custody exchanges, verification of accusations before detention, and the public's right to record police activity.

365. Oakland permitted officers to threaten arrest or enforcement over protected public recording activity without identifying a lawful basis. Oakland had actual notice before June 5, 2025 that the same or materially similar custody-exchange recording issue did not create probable cause for a restraining-order violation because the May 23, 2023 Oakland police report documented that an assistant prosecutor found no probable cause under the amended FRO language. Despite that prior notice, Oakland officers again used the recording/FRO theory to prolong Plaintiff's detention and threaten enforcement.

366. These policies, customs, practices, or failures were moving forces behind the constitutional violations alleged above, including the alleged release or use of sensitive records, the June 5, 2025 Oakland detention and recording-related threats, the Ramsey juvenile-record disclosure, and Waldwick's alleged use of law-enforcement or motor-vehicle information to interfere with lawful federal service of process.

367. The municipalities are liable under 42 U.S.C. § 1983.

COUNT VI

Abuse of Process / Retaliatory Misuse of Legal Process

Against Groezinger, Kleiner, and John Does

368. Plaintiff repeats and realleges the above paragraphs.

369. Defendants used or threatened to use legal process and state enforcement mechanisms for purposes other than those for which such processes were designed.

370. The processes allegedly misused included criminal accusations, restraining-order enforcement mechanisms, criminal-process threats, and law-enforcement referrals allegedly used to accomplish collateral purposes, including retaliation, intimidation, restriction of protected conduct, and reinforcement of false factual narratives.

371. As to Kleiner, Plaintiff alleges that the process misused included extra-judicial threats of restraining-order enforcement or criminal consequences based on Groezinger's unilateral mother-substitution theory, after Plaintiff's counsel had already disputed that the operative exchange order allowed Groezinger to substitute her mother for exchanges. Plaintiff alleges that the same theory was later repeated in Groezinger's BCPO interview, the grand-jury presentation, and the State's opposition to Plaintiff's motion to dismiss the superseding indictment.

372. Defendants allegedly used those mechanisms to retaliate against Plaintiff, restrict his access to records, suppress his participation in his child's care, chill protected recording activity, and portray him falsely as dangerous, intimidating, unstable, or lawless.

373. Groezinger allegedly used materially false or misleading allegations to trigger or reinforce law-enforcement and criminal processes.

374. Kleiner is not sued in this count for courtroom argument, legal filings, or ordinary advocacy. Kleiner is sued only to the extent he allegedly used extra-judicial threats of restraining-order enforcement or criminal consequences to support a factual theory he knew or reasonably should have known was disputed, contradicted by the operative exchange order, contradicted by Plaintiff's counsel's written objection, or later used as a factual predicate for criminal enforcement.

375. Plaintiff alleges that the misuse of process was intended to accomplish collateral objectives, including portraying Plaintiff as violating the restraining order, portraying Plaintiff as stalking or dangerous, chilling Plaintiff's protected conduct, and causing or reinforcing criminal or enforcement consequences not justified by the actual facts.

376. Plaintiff suffered damages as a result.

377. Defendants are liable for abuse of process and/or constitutional misuse of process.

COUNT VII

42 U.S.C. § 1983 / NJCRA — Joint Action and Due Process Deprivation Based on False Extra-Judicial Accusations, Police Escalation, and Security Requests Against Behaved Brain, Groezinger, Kleiner, and John Does

378. Plaintiff repeats and realleges the above paragraphs.

379. Plaintiff had protected interests in parental participation, due process, access to information concerning his child's care, and freedom from state action based on materially false or misleading factual accusations.

380. Behaved Brain, through its agents or representatives, allegedly supplied, threatened to supply, created, or helped create false extra-judicial accusations that Plaintiff was threatening, intimidating, harassing, unsafe, or dangerous.

381. Plaintiff alleges that those accusations were false or materially misleading because Plaintiff's recordings show calm, polite, cooperative, and non-threatening interactions; the Wyckoff police report documented that Plaintiff made no specific threats toward staff; a Ho-Ho-Kus supervising officer later listened to Plaintiff's recordings and wrote that Plaintiff did not seem aggressive or argumentative; and no pending charges were filed by the Wellness Center.

382. Plaintiff alleges that Behaved Brain affirmatively involved law enforcement, sought police reports, extra patrols, security-detail assistance, or police-security measures, and supplied or reinforced the disputed danger narrative through those law-enforcement channels.

383. Plaintiff alleges that on or about February 7, 2024, Matthew Gateley stated on a recorded call with Plaintiff and Plaintiff's attorney that Behaved Brain would have staff members sign affidavits accusing Plaintiff of intimidating or harassing staff if Plaintiff continued to press for records concerning his child.

384. Plaintiff alleges that Behaved Brain acted jointly or in coordination with Groezinger, Kleiner, law-enforcement actors, or John Does by creating, transmitting, or reinforcing materially false factual accusations through police reports, police-

security requests, threatened affidavits, and repeated safety/stalking narratives that foreseeably caused state involvement and restricted Plaintiff's parental participation before neutral evidentiary testing occurred.

385. Plaintiff alleges that the injury arose from false extra-judicial accusations, police escalation, police-security requests, threatened affidavits, and coordinated state-action consequences, not from Behaved Brain's ordinary confidentiality objections or from the correctness of any family-court ruling. Defendants are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act.

COUNT VIII

42 U.S.C. § 1983 — Prospective Declaratory and Injunctive Relief Regarding Judicial-Security Classification, JSMART-Related Threat Designation, Lack of Notice, and Lack of Opportunity to Be Heard

Against Robin Morante in Her Official Capacity Only

386. Plaintiff repeats and realleges the above paragraphs.

387. Plaintiff alleges that he has been treated as a court-security concern, judicial-security threat, threat-risk subject, JSMART-related threat-risk subject, courthouse-security concern, or problem litigant without notice or opportunity to contest the classification.

388. Plaintiff alleges that Defendant Robin Morante, as Chief of Court and Judicial Security for the State of New Jersey, has authority over, responsibility for, or involvement in the administration, dissemination, maintenance, implementation, review, correction, or supervision of such classifications, alerts, security communications, or courthouse-security procedures.

389. Plaintiff alleges that any ongoing classification or dissemination of that classification affects his access to court and the fairness or apparent neutrality of proceedings.

390. Plaintiff alleges that secret court-security classifications, JSMART-related designations, threat-risk alerts, or courthouse-security warnings impose a continuing stigma and practical burden on access to courts when they are maintained or disseminated without notice, factual basis, review, or an opportunity to correct inaccurate information.

391. Plaintiff alleges that designating pro se litigants as judicial-security threats merely for seeking legal recourse, filing lawsuits, filing motions, serving legal papers, appealing orders, criticizing government officials, or challenging official misconduct violates the First Amendment and Fourteenth Amendment.

392. Plaintiff alleges that he has a due-process right to notice and a meaningful opportunity to contest any ongoing governmental classification that labels him a judicial-security threat, courthouse-security risk, problem litigant, or similar threat-risk subject when that classification affects his access to court, courthouse treatment, or official perception of him.

393. Plaintiff seeks prospective relief only, including notice of any ongoing classification, disclosure of the factual basis sufficient to permit meaningful review, an opportunity to contest or correct inaccurate information, and procedures to prevent unsupported, retaliatory, or mistaken threat-risk classifications.

394. Plaintiff also seeks prospective relief prohibiting the ongoing maintenance or dissemination of false, unsupported, retaliatory, or materially misleading security classifications concerning Plaintiff without constitutionally adequate process.

395. Plaintiff does not seek damages against judges for judicial rulings.

396. Plaintiff does not seek reversal, modification, supervision, or review of any state-court order.

397. Plaintiff seeks prospective relief against Morante only in her official capacity to remedy ongoing or future constitutional violations arising from court-security classifications and lack of procedural safeguards.

COUNT IX

42 U.S.C. § 1983 / NJCRA — First Amendment Retaliation, Access-to-Courts Interference, and Interference With Lawful Federal Service of Process

Against Officer Bernhard, Sergeant Christopher Sanchez, and John Does

398. Plaintiff repeats and realleges the above paragraphs.

399. Plaintiff engaged in protected litigation activity by filing this federal civil-rights action and causing lawful service of federal litigation papers on defendants.

400. The retained process server was performing lawful service of process in connection with Plaintiff's federal civil-rights action and was not attempting to threaten, harass, intimidate, contact, or communicate with Groezinger for any purpose other than lawful service of federal litigation papers.

401. Defendant Officer Bernhard, acting under color of state law, contacted the retained process server after an attempted service at Groezinger's residence and instructed her not to return because she was considered to be trespassing.

402. Defendant Sergeant Sanchez, acting under color of state law, later spoke with the retained process server, advised that Waldwick police had obtained her cellular telephone number by contacting the registered owner of the vehicle she was driving, stated that the matter was a "misunderstanding" and not an investigation, but nevertheless advised that she should not return to Groezinger's residence. Plaintiff further alleges that Sanchez was not a neutral stranger to the underlying dispute because he had been present during the April 17, 2020 Waldwick police response involving Plaintiff.

403. Plaintiff alleges that the process server approached Groezinger's residence by the customary path to the front entrance, rang the doorbell, waited briefly, and left. Plaintiff further alleges that there were no signs, gates, barriers, or other restrictions preventing visitors or process servers from approaching the front entrance.

404. Plaintiff alleges that Defendants Bernhard and Sanchez used, ratified, continued, or participated in police authority, trespass warnings, police directives, motor-vehicle

or registration-information access, or police-information systems in a manner that would deter a person of ordinary firmness from continuing lawful service efforts in connection with Plaintiff's federal civil-rights action. Plaintiff further alleges that Sanchez's prior involvement in the April 17, 2020 police response supports the inference that the August 19, 2025 police involvement was not merely a random or neutral misunderstanding, but occurred against the backdrop of Waldwick's prior involvement with Plaintiff, Groezinger, and the same underlying dispute.

405. Plaintiff alleges that the adverse action was caused by, motivated by, or substantially connected to the protected litigation activity, namely the attempt to serve federal litigation papers on Groezinger in this civil-rights action.

406. Plaintiff alleges that Defendants' conduct burdened, chilled, delayed, or interfered with Plaintiff's access to court, prosecution of this federal civil-rights action, ability to complete lawful service, and ability to use ordinary federal litigation procedures without improper police interference.

407. Plaintiff alleges that Defendants lacked a lawful basis to treat the process server's ordinary service attempts as trespassing, suspicious conduct, or restraining-order-related misconduct.

408. Defendants Bernhard, Sanchez, and John Does are liable under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act.

DAMAGES

409. Plaintiff suffered loss of liberty, reputational harm, emotional distress, humiliation, anxiety, legal expenses, restrictions on parental rights, interference with protected speech, loss of privacy, damage to family relationships, and other damages.

410. Plaintiff suffered damages arising from the alleged unlawful acquisition, approval, release, disclosure, dissemination, and later use of sensitive law-enforcement records, domestic-violence-related records, juvenile or juvenile-related records, sealed records, confidential records, and other non-public information concerning Plaintiff.

411. Plaintiff suffered damages arising from the alleged release and dissemination of confidential juvenile or juvenile-related records through Ramsey municipal and police records channels, including alleged conduct by Gurney, Bendian, Ramsey, Groezinger, Kleiner, and John Does.

412. Plaintiff suffered damages arising from the alleged release and dissemination of sensitive Waldwick records through Waldwick municipal and police records channels, including alleged conduct by Gurney, Messner, Waldwick, Groezinger, Kleiner, and John Does.

413. Plaintiff suffered damages arising from the alleged use of false, misleading, unlawfully obtained, sealed, expunged, juvenile, confidential, or non-public records to portray Plaintiff as dangerous, unstable, lawless, intoxicated, threatening, stalking, or unfit in proceedings, evaluations, custody disputes, and related restrictions.

414. Plaintiff suffered damages arising from the alleged initiation, continuation, or reinforcement of criminal proceedings and state enforcement action without probable cause, including additional restrictions, reputational injury, legal expense, emotional distress, and deprivation of liberty.

415. Plaintiff suffered damages arising from the June 5, 2025 Oakland incident, including unlawful detention, interference with protected recording activity, chilling of First Amendment rights, emotional distress, humiliation, and loss of liberty.

416. Plaintiff suffered damages arising from the alleged false extra-judicial accusations, police reports, and threatened affidavits by Behaved Brain, Groezinger, Kleiner, and/or John Does, including interference with parental participation, records-access rights, due-process rights, and Plaintiff's ability to participate in his child's care, and from the use of contradicted factual narratives portraying Plaintiff as intimidating, threatening, unsafe, dangerous, or stalking Groezinger when recordings and police review showed otherwise.

417. Plaintiff suffered damages arising from the alleged abuse of legal process, retaliatory misuse of process, interference with lawful federal service of process, police interference with a retained process server, and use of false or misleading factual predicates to trigger, reinforce, or perpetuate state action.

418. Plaintiff suffered damages arising from Defendants Bernhard, Sanchez, and/or John Does allegedly treating lawful service of federal litigation papers as trespassing or suspicious conduct, contacting the retained process server, directing or advising the retained process server not to return to Groezinger's residence, using or relying on motor-vehicle or registration-information access to obtain the process server's telephone number, and interfering with Plaintiff's ability to complete lawful service and prosecute this federal civil-rights action.

419. Plaintiff alleges that Defendants' conduct was willful, knowing, reckless, malicious, retaliatory, or undertaken with deliberate indifference to Plaintiff's rights, entitling Plaintiff to punitive damages against individual defendants where legally available.

420. Plaintiff seeks compensatory damages, punitive damages where legally available, declaratory relief where appropriate, prospective injunctive relief where appropriate, costs, and any other relief the Court deems just and proper.

421. Plaintiff seeks compensatory damages and all other legally available relief against Ramsey and Bendian for the alleged unlawful release, disclosure, dissemination, and later use of confidential juvenile or juvenile-related records concerning Plaintiff.

422. Plaintiff seeks prospective declaratory and injunctive relief against Defendant Morante only in her official capacity and does not seek damages from Morante.

423. Plaintiff does not seek damages against judges for judicial rulings or adjudicative acts.

JURY DEMAND

424. Plaintiff demands a trial by jury on all issues so triable.
Respectfully submitted,
/s/ Christopher Peterson
Christopher Peterson
Plaintiff Pro Se
Address on file with the Court
christopherpeterson847@gmail.com
Dated: July 9, 2026

## END OF PROPOSED SECOND AMENDED COMPLAINT TEXT

EXHIBIT C

COMPARISON CHART SUMMARIZING MAJOR
AMENDMENTS

Plaintiff submits this comparison chart in support of Plaintiff's
Motion for Leave to File Second Amended Complaint.

This exhibit summarizes the major amendments, newly added
allegations, narrowed claims, added defendants, removed or
narrowed theories, and changes intended to address issues raised
in prior motion-to-dismiss briefing and the Court's dismissal
order.

This chart is submitted to assist the Court because the Proposed
Second Amended Complaint substantially reorganizes and
rewrites the prior Amended Complaint.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH
OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY,
MEREDITH BENDIAN, DONALD HARVEY, MATTHEW LOPEZ, HANK
ANDERSON, DYLAN RITONDALE, OFFICER BERNHARD, SERGEANT
CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE BEHAVED BRAIN,
LLC, ROBIN MORANTE, and JOHN DOES 1-20,
Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

## EXHIBIT C

## COMPARISON CHART SUMMARIZING MAJOR AMENDMENTS

This comparison chart is submitted for the Court's convenience in connection with
Plaintiff's Motion for Leave to File Second Amended Complaint. It compares the
prior Amended Complaint with the Proposed Second Amended Complaint and
identifies the principal changes in parties, structure, factual allegations, claims, and
relief requested.

This chart is not intended to replace the marked/redline version submitted as
Exhibit B. Exhibit B is submitted to show the textual differences required by Local
Civil Rule 15.1. This chart is intended only to make the major amendments easier
to follow because the Proposed Second Amended Complaint substantially
reorganizes, narrows, clarifies, and supplements the prior pleading.

The comparison below is based on the operative text of the prior Amended
Complaint and the Proposed Second Amended Complaint. Any redline markings
or annotations appearing on a copy of the prior Amended Complaint are
disregarded for purposes of this chart.

## I. OVERALL CHANGES

| Subject | Prior Amended Complaint | Proposed Second Amended Complaint | Purpose / Effect |
|---|---|---|---|
| Pleading structure | The prior Amended Complaint was 67 pages and contained factual allegations followed by eleven counts, including broad declaratory and injunctive counts directed at state-court and statewide family-court policies. | The Proposed Second Amended Complaint is 92 pages, uses numbered factual sections A through O, and separates the claims into nine counts that identify the defendants against whom each count is asserted. | To make the pleading easier to follow and to separate facts, defendants, claims, and relief in a more organized way. |
| Scope of federal action | The prior pleading included broader requests for declarations concerning family-court procedures, supervised visitation, custody-related restrictions, recording custody exchanges, weapons restrictions connected to restraining orders, and alleged ex parte court-security communications. | The Proposed Second Amended Complaint expressly states that Plaintiff is not asking the federal court to review, reverse, modify, enforce, invalidate, or supervise any state-court custody order, restraining order, parenting-time order, criminal-court order, evidentiary ruling, venue ruling, or family-court ruling. | To narrow the case to alleged independent conduct by defendants and avoid any appearance that Plaintiff is seeking appellate review of state-court decisions. |
| Relief requested | The prior pleading sought broad declaratory and injunctive relief against judicial and administrative defendants and also sought damages against multiple defendants. | The Proposed Second Amended Complaint seeks damages for alleged independent constitutional injuries and limits the court-security claim against Robin Morante to prospective declaratory and injunctive relief in her official capacity only. | To narrow requested relief and separate damages claims from prospective-relief claims. |
| Private-defendant allegations | The prior pleading alleged conspiracy and misuse of process in broad terms against private defendants and mixed court advocacy, private conduct, and police-related conduct together. | The Proposed Second Amended Complaint states that Plaintiff is not suing private defendants merely for complaining, retaining counsel, advocating in court, asserting confidentiality, opposing subpoenas, or participating in ordinary litigation. It focuses on alleged extra-judicial conduct, joint action, misuse of non-public records, materially false allegations, and police/state enforcement mechanisms. | To make clear that liability is based on alleged non-privileged or joint-action conduct, not ordinary litigation conduct. |
| Post-filing events | The prior pleading could not include events that occurred after it was filed. | The Proposed Second Amended Complaint adds allegations concerning alleged interference with lawful federal service of process after this federal action was filed, including allegations involving Officer Bernhard, Sergeant Christopher Sanchez, and John Does. | To include related supplemental allegations under Rule 15(d) concerning conduct allegedly connected to the prosecution of this federal action. |
| Rule 15.1 presentation | The prior Amended Complaint was the pleading being amended. | The motion packet now includes the clean Proposed Second Amended Complaint as Exhibit A, the marked/redline version as Exhibit B, and this chart as Exhibit C. | To provide both the required redline and a practical explanation of the major changes. |

## II. PARTY AND DEFENDANT CHANGES

| Party / Defendant | Prior Amended Complaint | Proposed Second Amended Complaint | Purpose / Effect |
|---|---|---|---|
| Plaintiff | Christopher Peterson. | Unchanged. | No substantive change. |
| Kaitlyn Groezinger | Named as a defendant and alleged to have made false allegations and participated in misuse of process and malicious prosecution. | Retained as a defendant, but the proposed pleading narrows the theory to specific alleged conduct: materially false or misleading allegations, the September 16, 2022 BCPO interview, alleged records use/transmission, the Ramsey/Tarle records issue, the June 5, 2025 Oakland report, and joint action with state actors or John Does. | Clarifies the factual bases for the claims and avoids treating ordinary private complaints or court participation alone as the basis for liability. |
| Bryan Gurney | Named as a defendant and alleged to have used law-enforcement connections in relation to prosecution and records issues. | Retained as a defendant with more specific allegations concerning law-enforcement status, alleged records access, police-chief approval, Ramsey/Waldwick record channels, and alleged use or transmission of non-public records. | Adds factual detail concerning the alleged source and role of law-enforcement or municipal records channels. |
| Mark Messner / Borough of Waldwick | Messner and Waldwick were named, including allegations connected to April 17, 2020, records, and later police conduct. | Retained with clarified allegations concerning Waldwick records practices, alleged irregular release of domestic-violence-related records, Ritondale's charging allegations, and alleged service-of-process interference through Waldwick officers. | Separates individual conduct, municipal policy/custom allegations, and service-of-process allegations. |
| Borough of Oakland / Harvey / Lopez / Anderson | Named in connection with the June 5, 2025 Oakland custody-exchange encounter, recording issues, and detention. | Retained with more detailed allegations concerning the June 5, 2025 encounter, the alleged shift from car-seat suspicion to recording/FRO enforcement, the duration and nature of detention, and prior notice that similar recording did not establish probable cause. | Clarifies the First Amendment and Fourth Amendment theories and the related Monell theory. |
| Borough of Ramsey | Not separately named in the prior caption. | Added as a defendant. | Added because the Proposed Second Amended Complaint includes specific allegations concerning Ramsey records. |

| | | | OPRA processing, police-chief approval, juvenile or juvenile-related records, and municipal policies or practices. |
|---|---|---|---|
| Meredith Bendian | Not separately named in the prior caption. | Added in her individual capacity and official capacity as Borough Clerk and/or records custodian for Ramsey. | Added because the Proposed Second Amended Complaint alleges conduct involving records-custodian processing, alleged disclosure, later denial of juvenile-records access, and Ramsey records practices. |
| Officer Bernhard / Sergeant Christopher Sanchez | Not named in the prior pleading. | Added based on alleged post-filing interference with service of federal litigation papers. | Added to plead supplemental allegations that arose after the federal action was filed. |
| Lawrence Kleiner | Named as a defendant and alleged to have participated in misuse of process and other conduct. | Retained, but the Proposed Second Amended Complaint expressly narrows the allegations to extra-judicial conduct, alleged exchange threats, alleged use of records, and alleged conduct that caused or reinforced state action. | Avoids basing claims on ordinary legal representation or protected litigation advocacy alone. |
| The Behaved Brain, LLC | Named as a defendant based on events involving Plaintiff's efforts to obtain information concerning his child's treatment. | Retained, but narrowed to alleged extra-judicial police reports, security requests, threatened affidavits, and disputed danger narratives. The proposed pleading states that Plaintiff is not suing Behaved Brain merely for complying with subpoenas, asserting confidentiality, obeying court orders, or refusing records under a court order. | Clarifies the conduct being challenged and separates it from ordinary compliance with court orders or confidentiality obligations. |
| Robin Morante | Named in connection with court-security/JSMART-related issues and alleged ex parte communications. | Retained in official capacity only for prospective declaratory and injunctive relief concerning alleged ongoing judicial-security classification, threat designation, alerts, lack of notice, and lack of opportunity to be heard. | Narrows the claim to prospective relief for alleged ongoing constitutional injury. |
| Michael Blee, David Tang, Gary Wilcox, Michael Antoniewicz, Frances McGrogan, and Lee Schaer | Named in the prior Amended Complaint. | Not included in the proposed caption as defendants. | The Proposed Second Amended Complaint narrows the case and no longer pursues the same claims against these judicial, administrative, or prosecutorial defendants. |
| John Does | Prior pleading named John Does 1-10. | Proposed pleading names John Does 1-20. | Allows identification of unknown actors allegedly involved in records access, records dissemination, police-information use, court-security classification, service-of-process interference, or other conduct described in the pleading. |

## III. FACTUAL AMENDMENTS BY PROPOSED SECOND AMENDED COMPLAINT SECTION

| Subject / Proposed SAC Location | Prior Amended Complaint | Proposed Second Amended Complaint | Purpose / Effect |
|---|---|---|---|
| Introduction and scope, paragraphs 1-13 | The prior pleading included broad factual and legal allegations tied to family-court and criminal-court events. | The proposed pleading begins by limiting the action to independent conduct and expressly states what Plaintiff is not asking the federal court to do. | Clarifies that the proposed pleading does not seek review or reversal of state-court decisions. |
| Parties, paragraphs 14-37 | The prior pleading identified parties and relevant persons, including several state judicial, administrative, and prosecutorial defendants. | The proposed pleading updates the caption and party allegations, adds Ramsey, Bendian, Bernhard, and Sanchez, narrows Morante to official-capacity prospective relief, and removes several state judicial, administrative, and prosecutorial defendants from the proposed caption. | Clarifies who is sued, in what capacity, and for what category of alleged conduct. |
| Jurisdiction and venue, paragraphs 38-40 | The prior pleading alleged federal jurisdiction and venue. | The proposed pleading states federal-question jurisdiction, supplemental jurisdiction, and venue in this District based on the alleged conduct and defendants located in New Jersey. | No major substantive expansion, clarified presentation. |
| April 17, 2020 allegations, paragraphs 41-64 | The prior pleading alleged false statements concerning the April 17, 2020 incident and disputed the "burn the residence down" charging language. | The proposed pleading provides a more detailed, separated factual section concerning the April 17, 2020 allegations, police response, recorded statements, DCPP outcome, alleged mischaracterization, and resulting state action. | Adds detail and separates the April 2020 allegations from later custody-exchange and prosecution allegations. |

| Later custody-exchange allegations, paragraphs 65-73 | The prior pleading included allegations concerning custody-exchange recordings and later use of those recordings in criminal charges. | The proposed pleading separates later custody-exchange allegations into their own section and alleges that Plaintiff documented exchanges to protect himself against further allegations. | Clarifies the relationship between recording activity, custody exchanges, and later enforcement theories. |
|---|---|---|---|
| September 16, 2022 BCPO interview and superseding indictment, paragraphs 74-91 | The prior pleading alleged that Groezinger complained about custody-exchange recording and that the superseding indictment added stalking and contempt charges based on recording. | The proposed pleading adds a dedicated section concerning Groezinger's September 16, 2022 BCPO interview, the recorded custody exchanges, alleged inconsistencies, the superseding indictment, and Plaintiff's allegation that the recordings contradicted the factual narrative used to support added charges. | Adds specific factual detail to the malicious-prosecution theory and separates the 2022 prosecution allegations from the April 2020 incident. |
| June 5, 2025 Oakland report, paragraphs 92-102 | The prior pleading alleged that Oakland officers stopped or detained Plaintiff during a custody exchange and threatened action concerning recording. | The proposed pleading adds a section alleging that Groezinger's June 5, 2025 report began as a car-seat accusation and shifted into a recording/FRO enforcement theory. | Clarifies causation between the report, the car-seat issue, and the later recording/FRO enforcement theory. |
| Gurney, Waldwick, and domestic-violence-related records, paragraphs 103-113 | The prior pleading alleged that Gurney and Waldwick were connected to records and prosecution issues. | The proposed pleading adds more specific allegations concerning Gurney, Waldwick, and alleged irregular release or use of domestic-violence-related records. | Adds factual detail concerning records access, records release, and alleged use of law-enforcement status or municipal channels. |
| Ramsey juvenile records and Tarle, paragraphs 114-129 | The prior pleading did not separately plead Ramsey, Bendian, or a detailed Ramsey/Tarle records chain as separate defendants and facts. | The proposed pleading adds Ramsey, Bendian, Groezinger's OPRA request, alleged police-chief approval, juvenile or juvenile-related records, transmission to Dr. Tarle, and Plaintiff's later discovery of those materials. | Adds a new, more specific records-disclosure theory and identifies the municipal and records-custodian actors allegedly involved. |
| Hawthorne body-camera footage and Newport SID information, paragraphs 130-151 | The prior pleading alleged use of law-enforcement information in broader terms. | The proposed pleading adds a dedicated section concerning Hawthorne body-camera footage, Newport SID information, later discovery, and delayed accrual allegations. | Clarifies the records-based injury and why later discovery matters to timeliness and causation. |
| Kleiner exchange threat, paragraphs 152-158 | The prior pleading alleged misuse of process and conspiracy involving Kleiner in broader terms. | The proposed pleading adds a focused section concerning Kleiner's alleged extra-judicial exchange threat and later use of the same theory in the superseding indictment or enforcement narrative. | Narrowing amendment to distinguish extra-judicial alleged conduct from ordinary legal advocacy. |
| Private-defendant state-action allegations, paragraphs 159-166 | The prior pleading alleged conspiracy and joint conduct in broader terms. | The proposed pleading adds specific state-action allegations concerning Groezinger, Gurney, Kleiner, Behaved Brain, and John Does. | Clarifies the basis for treating certain private conduct as joint action or conduct causing state action. |
| Behaved Brain allegations, paragraphs 167-197 | The prior pleading included allegations about Behaved Brain, subpoenas, records, and police involvement. | The proposed pleading adds detailed allegations concerning the therapy-provider events, police reports, security requests, threatened affidavits, disputed safety accusations, and the limits of the claim. | Clarifies that the claim is not based on mere compliance with a subpoena, confidentiality objections, or following a court order. |
| Oakland custody exchange, paragraphs 198-235 | The prior pleading included the Oakland June 5, 2025 encounter under recording and detention counts. | The proposed pleading provides a detailed factual section concerning the parking-lot encounter, officer conduct, alleged detention, alleged threats regarding recording, prior notice, internal-affairs statements, and lack of summons or charges. | Supports separate First Amendment, Fourth Amendment, and Monell counts with more specific facts. |
| Ritondale allegations, paragraphs 236-257 | The prior pleading alleged that Ritondale's probable-cause affidavit misstated the April 17, 2020 recording and charging basis. | The proposed pleading gives Ritondale his own factual section and ties the allegations to the malicious-prosecution count. | Separates the charging-officer allegations from other Waldwick and municipal allegations. |
| Municipal policies, paragraphs 258-272 | The prior pleading named municipalities and alleged constitutional violations but did not separately plead as detailed a Monell section. | The proposed pleading adds a specific municipal-policy/custom/failure section for Waldwick, Oakland, and Ramsey. | Strengthens the municipal-liability presentation by identifying alleged policies, practices, failures, training issues, or customs. |
| Service-of-process interference, paragraphs 273-277 | Not included because the alleged events occurred after the earlier pleading. | The proposed pleading adds allegations concerning service attempts, Jyll Jakes's certification, Officer Bernhard, Sergeant Sanchez, alleged trespass warnings, and alleged use of vehicle-registration or police-information channels. | Adds related supplemental allegations concerning litigation activity in this federal case. |
| Judicial-security/JSMART classification, paragraphs 278-302 | The prior pleading alleged court-security/JSMART-related issues, alleged ex parte communications, and denial of access to an unbiased court in broader terms. | The proposed pleading narrows this subject to alleged ongoing court-security classification, JSMART-related threat designation, courthouse restrictions, lack of notice, lack of opportunity to contest, and prospective relief against Morante in official capacity only. | Narrows the claim and separates it from damages claims against judges or review of judicial rulings. |

## IV. CLAIM-BY-CLAIM COMPARISON

| Prior / Proposed Claim | Prior Amended Complaint | Proposed Second Amended Complaint | Purpose / Effect |
|---|---|---|---|
| Prior First Count - Declaratory Relief under 28 U.S.C. § 2201 | Sought declarations concerning state family-court policies and supervised or restricted visitation. | No direct equivalent broad declaratory count. The proposed pleading instead includes scope limitations in paragraphs 1-13 and a narrowed prospective-relief claim in Count VIII concerning alleged ongoing court-security classification only. | Removed or narrowed to avoid seeking review or supervision of state-court custody or family-court rulings. |
| Prior Second Count - § 1983 claim against judicial/administrative defendants | Alleged failures by state judicial or administrative defendants concerning fair and timely family-court hearings and policies. | No direct equivalent claim against Blee, Tang, Antoniewicz, Wilcox, or McGrogan. Those defendants are not included in the proposed caption. | Narrows the case away from judicial or administrative policy claims and toward alleged independent conduct by remaining defendants. |
| Prior Third Count - malicious abuse of process | Alleged misuse of Family Court proceedings by Groezinger, Gurney, Messner, Kleiner, Schaer, and Behaved Brain. | Reworked principally into Count VI, "Abuse of Process / Retaliatory Misuse of Legal Process," against Groezinger, Kleiner, and John Does, with related factual allegations placed in specific factual sections. | Narrows the abuse-of-process theory and identifies specific defendants rather than presenting a broad conspiracy claim. |
| Prior Fourth Count - § 1983 malicious prosecution | Alleged malicious prosecution concerning terroristic-threats and endangering charges against Groezinger, Gurney, and Schaer. | Reworked into Count II, "§ 1983 / NJCRA - Malicious Prosecution / Initiation of State Action Without Probable Cause," against Groezinger, Ritondale, John Does, and Kleiner to the limited extent his extra-judicial conduct caused or reinforced the restraining-order-violation theory. | Clarifies defendants, factual predicates, favorable termination, lack of probable cause, and causation. |
| Prior Fifth Count - declaratory/injunctive relief concerning recording custody exchanges | Sought broad declaratory and injunctive relief that Plaintiff had a constitutional right to audio/video record custody exchanges at a public police parking lot. | No broad statewide declaratory recording claim. The proposed pleading instead pleads Count III against Oakland officers for First Amendment retaliation/interference with the right to record police activity, and related factual allegations concerning the June 5, 2025 encounter. | Narrows the recording issue to the specific alleged police encounter and alleged retaliation/interference. |
| Prior Sixth Count - recording-rights claim against police defendants | Alleged that police defendants violated Plaintiff's rights by preventing audio/video recording of custody exchanges in a public police parking lot. | Reworked into Count III against Harvey, Lopez, Anderson, and John Does, supported by the expanded Oakland factual section. | Retains the core recording/interference theory but clarifies the defendants and facts. |
| Prior Seventh Count - unreasonable detention/search | Alleged detention without probable cause or reasonable suspicion and illegal search connected to the June 5, 2025 Oakland encounter. | Reworked into Count IV, "Fourth Amendment - Unlawful Detention," against Harvey, Lopez, Anderson, and John Does. The proposed pleading focuses on detention/prolonged detention rather than a broad search theory. | Clarifies the Fourth Amendment theory and narrows the claim to the alleged detention. |
| Prior Eighth Count - malicious prosecution/malicious use of process under New Jersey law | Alleged malicious prosecution and malicious use of process concerning April 17, 2020, custody-exchange recordings, and the superseding indictment. | Split and refined into Count II for malicious prosecution and Count VI for abuse of process, with supporting facts in the April 2020, BCPO, Ritondale, and Kleiner sections. | Separates criminal-prosecution allegations from abuse-of-process allegations. |
| Prior Ninth Count - constitutional challenge to New Jersey weapon restrictions connected to TRO/FRO status | Challenged broad weapons restrictions as violating due process and other constitutional rights. | No equivalent count in the Proposed Second Amended Complaint. | Removed from the proposed pleading. |
| Prior Tenth Count - equal protection/access to unbiased court/ex parte communications concerning court security | Alleged denial of equal protection and access to an unbiased court through negative ex parte communications and court-security/JSMART-related information. | Reworked into Count VIII against Morante in official capacity only, seeking prospective declaratory and injunctive relief concerning alleged ongoing court-security classification, JSMART-related designation, lack of notice, and lack of opportunity to be heard. | Narrowed to prospective relief concerning alleged ongoing classification rather than damages against judges or review of judicial rulings. |
| Prior Eleventh Count - NJCRA | Asserted a broad NJCRA claim against several defendants based on prosecution and family-integrity rights. | NJCRA theories are integrated into specific proposed counts where pleaded, including Count I, Count II, Count VII, and Count IX. | Avoids a broad catch-all NJCRA count and ties the NJCRA allegations to specific conduct and defendants. |
| New Count I | No identical count in the prior pleading. | Adds § 1983 / NJCRA due process and joint-action claim based on alleged misuse and disclosure of sensitive law-enforcement, juvenile, and confidential records against Gurney, Messner, Bendian, Waldwick, Ramsey, John Does, and against Groezinger/Kleiner to the extent they knowingly requested, used, possessed, disseminated, transmitted, or relied upon such records. | Adds a distinct records-misuse theory supported by Ramsey, Waldwick, Hawthorne/Newport, and Tarle allegations. |
| New Count V | Municipalities were named previously, but the prior pleading did not separately | Adds Monell municipal liability against Waldwick, Oakland, and Ramsey, including alleged Waldwick municipal liability for service-of-process interference. | Clarifies municipal-liability theories and alleged policies/customs/failures. |

| | present the same detailed Monell count. | | |
|---|---|---|---|
| New Count VII | No identical narrowed count in the prior pleading. | Adds § 1983 / NJCRA joint action and due process deprivation based on alleged false extra-judicial accusations, police escalation, and security requests against Behaved Brain, Groezinger, Kleiner, and John Does. | Separates Behaved Brain and private-defendant joint-action allegations from ordinary litigation or subpoena-related conduct. |
| New Count IX | Not included in the prior pleading because the events occurred after the federal action was filed. | Adds § 1983 / NJCRA First Amendment retaliation, access-to-courts interference, and interference with lawful federal service of process against Officer Bernhard, Sergeant Sanchez, and John Does. | Adds supplemental allegations arising after the federal action was filed and tied to litigation activity in this case. |

## V. AMENDMENTS DIRECTED TO CLARITY, NARROWING, AND RULE 15 PURPOSES

| Amendment Objective | How the Proposed Second Amended Complaint Addresses It |
|---|---|
| Clarifies that Plaintiff is not seeking federal appellate review of state-court orders | The Proposed Second Amended Complaint adds repeated limitations making clear that Plaintiff is not asking this Court to alter custody, parenting-time, FRO, criminal, evidentiary, venue, or family-court rulings. |
| Removes or does not reassert broad claims against certain judicial, administrative, and prosecutorial defendants | The proposed caption does not include Blee, Tang, Wilcox, Antoniewicz, McGrogan, or Schaer as defendants. |
| Narrows private-defendant theories | The proposed pleading states that private defendants are not sued merely for complaining, retaining counsel, appearing in court, advocating, asserting confidentiality, or participating in ordinary litigation. |
| Adds specific facts concerning records and records channels | The proposed pleading adds allegations concerning Ramsey records, Bendian, Gurney's alleged approval role, Waldwick records, Hawthorne body-camera footage, Newport SID information, Tarle materials, and delayed discovery. |
| Adds specific facts concerning the June 5, 2025 Oakland encounter | The proposed pleading separates the car-seat allegation, recording/FRO theory, detention allegations, officer conduct, prior notice, and lack of charges into a detailed factual section. |
| Adds Monell allegations | The proposed pleading includes a separate municipal-policy/custom/failure section and a Monell count against Waldwick, Oakland, and Ramsey. |
| Narrows the court-security/JSMART issue | The proposed pleading limits the court-security claim to prospective declaratory and injunctive relief against Morante in official capacity concerning alleged ongoing classification and lack of process. |
| Adds supplemental allegations arising after filing | The proposed pleading adds the Bernhard/Sanchez/service-of-process allegations and relies on the Jyll Jakes certification as Exhibit D. |
| Uses a more organized claim format | Each proposed count identifies the legal theory and the defendants against whom the count is asserted, reducing ambiguity from the prior pleading. |

## VI. SUMMARY

The Proposed Second Amended Complaint is not simply a longer version of the prior pleading. It restructures the case, narrows the scope of relief, removes several prior defendants, adds defendants tied to newly pleaded records and service-of-process allegations, and separates the factual allegations into discrete sections tied to specific counts.

The principal changes are: (1) the removal or narrowing of broad state-court review theories; (2) the addition of specific records-disclosure allegations involving Ramsey, Bendian, Gurney, Waldwick, Hawthorne/Newport materials, and Dr. Tarle; (3) the reworking of malicious-prosecution and abuse-of-process allegations into more specific counts; (4) the narrowing of Oakland recording and detention allegations into First and Fourth Amendment counts; (5) the addition of Monell allegations against Waldwick, Oakland, and Ramsey; (6) the narrowing of the Morante/court-security claim to prospective official-capacity relief; and (7) the

addition of supplemental service-of-process allegations concerning Bernhard and Sanchez.

Plaintiff submits this chart so that the Court and Defendants can see, in practical terms, how the Proposed Second Amended Complaint differs from the prior Amended Complaint, while Exhibit B remains the marked pleading showing the textual differences required by Local Civil Rule 15.1.

## EXHIBIT D

## CERTIFICATION OF PROCESS SERVER JYLL JAKES

Plaintiff submits the signed Certification of Process Server Jyll Jakes in support of Plaintiff's Motion for Leave to File Second Amended Complaint.

This exhibit relates to Plaintiff's proposed supplemental allegations concerning alleged interference with lawful service of federal litigation papers after this federal action was filed.

UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON, Plaintiff,

v.

KAITLYN GROEZINGER, et al.,
Defendants.

Civil Action No. 2:25-cv-11801

CERTIFICATION OF PROCESS
SERVER

(In Support of Amended Complaint)

Hon. André M. Espinosa, U.S.M.J.

Date: July 8, 2026

I, **Jyll Jakes**, residing at 85 Harrison Ave, Red Bank, New Jersey 07701, declare under penalty of perjury pursuant to **28 U.S.C. § 1746** that the following is true and correct based upon my personal knowledge:

1. **Employment and Authority:** I am a professional process server. I make this declaration based solely upon my personal observations and communications while attempting to serve defendants in the above-captioned matter. On July 31, 2025, Attorney **Kenneth Rosellini** retained me to effect service of process upon eleven defendants named in a federal civil action filed on behalf of Plaintiff **Christopher Peterson**.

2. **Service Status:** On August 7, 2025, I successfully served the majority of the named defendants. The only defendants who remained unserved were **Bryan Gurney** and **Kaitlyn Groezinger**.

3. **Attempted Service on Bryan Gurney (August 7 & 19, 2025):**

   o **First Attempt:** At approximately 6:03 P.M. on August 7, 2026, I attempted to serve Mr. Gurney at 14 Elm Place, Ramsey, New Jersey 07446. I observed a vehicle parked in the driveway bearing New Jersey plate **V843L**. I approached the front entrance using the normal walkway and rang the Ring video doorbell.

   o A male identifying himself as Bryan Gurney spoke to me through the intercom of the Ring doorbell. Mr. Gurney stated that he was "out of the country." He asked what the documents concerned, and I replied that they were legal papers for him. Mr. Gurney declined to state when he would return or when he would make himself available to accept service.

   o **Second Attempt:** At approximately 7:55 P.M. August 19, 2025, I returned to Mr. Gurney's residence. Mr. Gurney answered the door, and I personally delivered the summons and complaint to him.

   o After reviewing the summons, Mr. Gurney demanded that I produce my driver's license. I declined, as I am not legally required to do so. As I turned to leave, Mr.

Gurney yelled, "**Get the fuck off my property.**" As I walked toward my vehicle, I heard Mr. Gurney **spitting in my direction.**

4. **Attempted Service on Kaitlyn Groezinger (August 7 & 19, 2025):**

- o **First Attempt:** At approximately 5:38 P.M. on August 7, 2025, I attempted to serve Ms. Groezinger at 30 Cleveland Avenue, Waldwick, New Jersey. I observed a black SUV parked in the driveway bearing New Jersey plate **N51-MPH**. I rang the Ring video doorbell several times but received no response. I then spoke with occupants residing in the apartment below Ms. Groezinger's residence, who confirmed to me that Ms. Groezinger lived in the apartment.

- o **Second Attempt:** On August 19, 2025, at approximately 7:32 P.M., I returned to the same address. I again observed the same black SUV bearing the same New Jersey license plate parked in the driveway. After I rang the Ring video doorbell, an unidentified male shouted from a screened second-floor window that Kaitlyn Groezinger "no longer lived there."

- o **Threats and Police Interference:** Prior to this attempt, I had confirmed the vehicle color, make and model information with Attorney Rosellini. I advised the unidentified male that I would report his statement in my affidavit to the court. The individual then shouted that he was calling the police and would report me for trespassing. I immediately contacted Mr. Rosellini's office and was instructed to leave and proceed to Mr. Gurney's residence.

- o **Waldwick Police Department Contact:** At approximately 9:27 P.M., while driving home, I received a telephone call from (201) 652-5700. The caller identified himself as **Officer Peter Bernhard**, Badge No. 61, of the Waldwick Police Department. Officer Bernhard instructed me not to return to Ms. Groezinger's residence because I was "considered to be trespassing." I explained that I had been retained to effect service of process. Officer Bernhard asked me to identify the legal authority supporting my position. Because I was operating a motor vehicle at the time, I advised him that I would contact the department after I arrived home.

- o **Follow-Up Call:** At approximately 10:51 P.M., I called the Waldwick Police Department and requested Officer Bernhard. Dispatcher for Waldwick Police Department advised he was unavailable, and my call was transferred to **Sergeant Christopher Sanchez**. I asked Sergeant Sanchez how the department had obtained my cellular telephone number. Sergeant Sanchez advised that the department had contacted the registered owner of the vehicle I was driving to determine whether I had permission to operate that vehicle. When I asked why that inquiry had been made, Sergeant Sanchez replied that the matter was "a misunderstanding" and not an investigation.

- o **My Response:** I advised Sergeant Sanchez that I had been attempting to lawfully serve process upon Ms. Groezinger and that I had made two good-faith attempts to personally serve her. I further advised that Groezinger's Attorney **Lawrence Kleiner** had already been personally served as an individual defendant on August 7, 2025 in the same federal action. During both attempts to serve Ms. Groezinger, I approached the residence by the customary path to the front entrance. I observed **no "No Trespassing" signs, gates, barriers, or other restrictions** preventing visitors from approaching the front door. My actions were limited to approaching the residence, ringing the doorbell, waiting briefly, taking time stamped photographs and leaving.

- o **Final Directive:** Sergeant Sanchez advised me that I should not return to Ms. Groezinger's residence. I responded that any decision regarding additional service attempts would be made by the attorney who retained me. I stated Ms. Groezinger could voluntarily accept service through counsel or by another lawful method. I further advised that if I were instructed to make another attempt, I would notify the Waldwick Police Department beforehand as a professional courtesy. Sergeant Sanchez asked whether I was personally involved in the lawsuit; I advised him that I was not a party and had been retained solely as a process server.

5. **Conclusion:** The sequence of events described above—including two unsuccessful attempts to serve Ms. Groezinger, the threat to call the police, the subsequent telephone call from the Waldwick Police Department instructing me not to return, and the department's acquisition of my personal cellular telephone number—occurred while I was performing my duties as a retained process server in connection with this federal action. These facts demonstrate a coordinated effort to evade service and obstruct federal process through intimidation and false claims of trespass.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of July, 2026.

Jyll Jakes
85 Harrison Avenue
Red Bank, New Jersey 07701
GottaservesomebodyNJ@protonmail.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH
OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY,
MEREDITH BENDIAN, in her individual capacity and official capacity as
Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD
HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE,
OFFICER BERNHARD, Badge No. 61, first name presently unknown,
SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE
BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief
of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20,
Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO
FILE SECOND AMENDED COMPLAINT

THIS MATTER having come before the Court on Plaintiff Christopher Peterson's
Motion for Leave to File Second Amended Complaint; and the Court having
considered Plaintiff's Notice of Motion, Certification in Support, Memorandum of
Law, proposed Second Amended Complaint, marked/redline version, comparison
chart, Certification of Process Server Jyll Jakes, and the record in this matter; and
for good cause shown;

IT IS on this _____ day of _____, 2026,

ORDERED that Plaintiff's Motion for Leave to File Second Amended Complaint
is GRANTED; and it is further

ORDERED that Plaintiff is granted leave to file the Proposed Second Amended
Complaint and Jury Demand; and it is further

ORDERED that the Proposed Second Amended Complaint and Jury Demand shall
become the operative pleading in this action upon filing; and it is further

ORDERED that Plaintiff shall file the Second Amended Complaint and Jury Demand within seven days of entry of this Order, unless the Court directs otherwise; and it is further

ORDERED that Defendants shall respond to the Second Amended Complaint in accordance with the Federal Rules of Civil Procedure and any further Order of the Court.

Hon. André M. Espinosa, U.S.M.J.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER PETERSON,
Plaintiff,

v.

KAITLYN GROEZINGER, BRYAN GURNEY, MARK MESSNER, BOROUGH
OF WALDWICK, BOROUGH OF OAKLAND, BOROUGH OF RAMSEY,
MEREDITH BENDIAN, in her individual capacity and official capacity as
Borough Clerk and/or records custodian for the Borough of Ramsey, DONALD
HARVEY, MATTHEW LOPEZ, HANK ANDERSON, DYLAN RITONDALE,
OFFICER BERNHARD, Badge No. 61, first name presently unknown,
SERGEANT CHRISTOPHER SANCHEZ, LAWRENCE KLEINER, THE
BEHAVED BRAIN, LLC, ROBIN MORANTE, in her official capacity as Chief
of Court and Judicial Security for the State of New Jersey, and JOHN DOES 1-20,
Defendants.

Civil Action No. 2:25-cv-11801-MEF-AME

CERTIFICATION OF SERVICE

I, Christopher Peterson, certify as follows:

1. I am the Plaintiff in this matter and am appearing pro se.
2. On May 8, 2026, the Court entered a Text Order at Docket Entry 101 directing that if Plaintiff wished to file an amended pleading, Plaintiff must first seek leave to do so from the United States Magistrate Judge.
3. On June 22, 2026, the Court granted Plaintiff's request for an extension of time and ordered that any motion to amend must be filed on or before July 9, 2026. The Court further ordered Plaintiff to serve a copy of that motion and all supporting documents on all defense counsel by email or overnight mail, using the addresses available on the electronic docket for this case, on the same day the motion is filed with the Court.
4. On July 9, 2026, in accordance with the Court's May 8, 2026 Text Order and June 22, 2026 Order, I filed Plaintiff's Motion for Leave to File Second Amended Complaint with the Court.

5. On the same day that the motion was filed with the Court, I served a copy of the motion and all supporting documents on all defense counsel by email, using the email addresses available on the electronic docket for this case.

6. The motion papers served on defense counsel included the Notice of Motion, Plaintiff's Certification in Support of Motion for Leave to File Second Amended Complaint, Plaintiff's Memorandum of Law in Support of Motion for Leave to File Second Amended Complaint, Exhibit A, Exhibit B, Exhibit C, Exhibit D, and the proposed form of Order.

7. This Certification of Service is submitted to confirm Plaintiff's compliance with the Court's May 8, 2026 Text Order and the Court's June 22, 2026 Order requiring same-day service of the motion and all supporting documents on all defense counsel.

8. I certify that the foregoing statements are true and correct to the best of my knowledge.

Respectfully submitted,

/s/ Christopher Peterson
Christopher Peterson
Plaintiff Pro Se
Address on file with the Court
christopherpeterson847@gmail.com

Dated: July 9, 2026